**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

| | |
|---|---|
| _____ | ) |
| HOWARD UNIVERSITY | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 06-cv-2076 (DKC) |
| | ) |
| BELINDA LIGHTFOOT WATKINS, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**DEFENDANT'S MOTION TO DISMISS THE COMPLAINT FOR**
**FAILURE TO STATE A CLAIM OR FOR SUMMARY JUDGMENT**
**AND MEMORANDUM IN SUPPORT THEREOF**

Twenty-five years ago, the Supreme Court ruled that employers could not seek indemnity or contribution from others to recover even a portion of their liability under anti-discrimination laws regardless of how culpable those individuals may be. Howard University has filed this lawsuit in direct contravention of settled law in an improper effort to force its former employee, Belinda Watkins, to pay HU's costs in settling a discrimination suit. In 1981, the Supreme Court unanimously held that employers were not entitled to seek either contribution or indemnity under federal anti-discrimination laws. Because that is the essence of HU's claim, its complaint fails to state a claim for which relief can be granted.

This suit appears to be retaliation for Watkins' own strong claims of age discrimination, now embodied in her lawsuit against HU filed in D.C. Superior Court. After settling the Goodwin case, HU responded to Ms. Watkins' internal age discrimination complaint by asking her to resign after 30 years, and making other threats. When Ms. Watkins declined to resign, HU in quick succession (a) dismissed her internal complaint of discrimination, (b) fired her, and

(c) not satisfied with ending Belinda Watkins' 30-year career, filed this lawsuit seeking $253,000 from her, which it claims is the *entire* cost of the settlement it voluntarily reached with another university employee. Whether retaliatory or not, though, HU's suit cannot proceed.

Even if the Supreme Court had not precluded this case, HU's suit would still have to be dismissed for other defects including (1) the fact that the elements of an equitable claim for indemnity are not met because HU is independently liable, and the liability in the Goodwin case would not have been "joint and several," (2) indemnity is an equitable remedy and other equitable considerations preclude HU's claim; and (3) various procedural problems including *forum non conveniens and* indispensable parties not amenable to suit in Maryland.

For all these reasons, the complaint in this case should be dismissed.

## BACKGROUND[1]

This case exists because Belinda Watkins filed her own discrimination complaint against Howard University. Howard University has been sued frequently for employment discrimination yet, to our knowledge, has not sued its individual employees for indemnification until now. What apparently caused HU to target Ms. Watkins is that she has a strong discrimination claim against the University, and was pursuing it before she got fired and before HU sued her. Ms. Watkins' allegations are described more fully in her Complaint filed in D.C. Superior Court, Case no. 7247-06 (Watkins Decl., Attachment 4, Exh. I).

During the time that Watkins was complaining about age discrimination and reprisal, Daniel Goodwin's case against HU was pending. HU settled Goodwin's case, and is now pursuing Watkins to pay the entire cost of that settlement. The allegations in Goodwin's case are

---

[1] Most of these facts are provided solely to give background and context to the current dispute. For purposes of this motion, no materials outside the pleadings need be considered, but to the extent that such materials are considered, this motion is also brought pursuant to Fed.R.Civ.P. 56, as stated in Fed.R.Civ.P. 12(b).

relevant to this motion, and his Second Amended Complaint is attached. (Attachment 1,

Complaint in Case No. 03-cv-2447 (RCL), in D.D.C.)  Unlike federal law, the D.C. Human

Rights Act permits suits against individuals, at least in some instances,[2] and Goodwin filed suit

against both HU and Watkins.  HU's lawyer did not represent Watkins, nor did HU reimburse

her for the costs of her own defense.  Instead, Watkins had to hire an attorney out of her own

meager savings to defend herself.  Her attorney filed a motion to dismiss the claims against

Watkins in Goodwin's suit, showing that all of the counts were untimely, insufficient or

otherwise defective (Attachment 2).  HU settled the case before Watkins' motion to dismiss was

ruled upon by the Court. (Attachment 3, Goodwin Docket Sheet).

In the Goodwin case, HU never asserted a cross-claim against Watkins for indemnity or

reimbursement.  (This is significant, as a cross-claim among defendants appears in almost every

reported case to be a precursor to a later suit for contribution or indemnity.)  Watkins was never

deposed in the Goodwin case.  HU and Goodwin discussed settlement privately, without

Watkins' participation.[3]  The University never indicated, via cross-claim or otherwise, that it

intended to force Watkins to pay 100% of the settlement amount that it privately negotiated with

Goodwin, and the University never tendered the case to Watkins for defense and never asked

Watkins to review or approve the settlement.

---

[2] *Wallace v. Skadden Arps*, 715 A.2d 873 (1998).

[3] The docket reflects at least two court-ordered mediation sessions. Watkins and her attorney
were present for the first mediation and sat in the hallway, excluded from any substantive
discussions between HU and Goodwin.  Accordingly, because it was costing Watkins money she
could ill afford to sit outside a mediation room and have her attorney sit idle, she requested to be
excused from the second and any subsequent mediation sessions.  Watkins also did not
participate in any other settlement discussions between HU and Goodwin that happened outside
of the mediation sessions.

In Goodwin's case, he alleged that Watkins initially denied him a reasonable

accommodation for his disability, but he also alleged that he brought his request to HU's Human

Resources office and to HU's Office of General Counsel.  Goodwin's Complaint states:

> 45. The Human Resources Department discussed Goodwin's complaint with the
> University's General Counsel's Office and the Human Resources Department referred
> Goodwin to the University's EEO investigator.

> 46. Watkins was instructed to rescind the threat of termination and to give Goodwin a
> modified work schedule to accommodate his health situation, almost one year after
> Goodwin first requested the accommodation.

> * * *

> 55.  . . . After contacting Human Resources about the leave issue, Goodwin was told that
> Watkins' transfer of Goodwin's leave hours was improper and that the University should
> have given Goodwin Family and Medical leave for his serious medical condition. Only
> after contacting Human Resources was Goodwin offered paperwork to apply for Family
> and Medical Leave. Goodwin completed the paperwork. On the form for Family and
> Medical Leave, Goodwin identified his disability as HIV.

Attachment 1.  This shows that HU did, in fact, agree to accommodate Goodwin by changing his

start time from 8:30 a.m. until noon, and also gave him forms to request FMLA leave.  More

importantly, it shows that HU's Human Resources officials and its Office of General Counsel

employees were aware of Goodwin's status as having requested an accommodation and FMLA

leave.  These same officials were directly involved in HU's decision to not renew Goodwin's

contract.  The decision to not renew Goodwin's contract required the express approval of

Raymond Archer (Interim VP for Student Affairs), A. Toy Caldwell-Colbert (Provost), and

Carole Borggren (Budget Director) (Attachment 4, ¶¶ 3-6, and Exh. D thereto, Personnel form

showing approvals).  Significantly, this particular personnel form also had the box checked

indicating that the University's President had to approve the action, and the signature of

H.Patrick Swygert, President, also appears on this form indicating his express approval (though

faint in this copy). Id.  In addition, because Goodwin had already complained about reasonable

accommodation and FMLA leave, Watkins had sought and received advice from HU's Human Resources officials and from the Office of General Counsel in how to deal with Goodwin's spotty attendance and performance. Thus, the University's HR and OGC offices were directly involved in the decision to not renew Goodwin's contract and approved that decision, including, but not limited to, Leroy Jenkins (Assistant General Counsel) and Ann Barnes (Human Resources). Attachment 4, Watkins Decl., ¶¶ 3-6 and related Exhibits thereto.

To the extent that any individuals at HU were potentially liable as individuals under the DCHRA for Goodwin's legal claims, each of the above-named people would be liable for their role in the group decision to not renew Goodwin's contract. Each of them knew that Goodwin had spoken with HR and OGC about his request for accommodation and for FMLA leave, and each of them approved and participated in his non-renewal. According to Goodwin, he disclosed his HIV positive status to the HR office, but he does not claim that he disclosed this status to Watkins. Attachment 1 (Goodwin's Complaint; compare ¶ 35 with ¶ 55). More importantly, Watkins did not have the authority to not renew Goodwin's contract. The signature of the other officials, including the President of the University, demonstrate that this decision was made at the highest levels of the University, and that both HR and OGC were well aware of Goodwin's protected activity when the decision was made. Indeed, that was the very reason that Watkins had sought advice from HR and OGC—so that she could address her concerns with Goodwin's attendance and performance in compliance with HU policies. In one of her emails to HR and OGC, Watkins wrote, "I wanted to be certain that I was proceeding correctly and, at the same time, safeguarding University liability, with these two personnel actions." Attachment 4, Watkins Decl. at ¶ 5 and Exh. C thereto.

Watkins had a role in the decision to not renew Goodwin's contract, but so did many others with far greater knowledge of EEO claims and disabilities law. Watkins has no expertise in HU's personnel rules, or in EEO law, the ADA or the Family and Medical Leave Act. She reasonably relied on the advice and expertise of the Human Resources and General Counsel's offices in documenting problems with Goodwin's attendance and performance. The decision to not renew Goodwin's contract was made not by Watkins acting alone but with the advice and support of multiple higher-level officials with equal or superior knowledge of Goodwin's protected activities. HU is unfairly singling her out by seeking to hold her liable for the entire amount of the settlement that it agreed to pay Goodwin.

## ARGUMENT

### I.    THE COMPLAINT FAILS TO STATE A CLAIM

The Complaint in this case offers four counts, but in essence, they all boil down to the same legal theory, namely, that an employee is liable as an insurer to her employer if, in the performance of her job, she takes actions that subjects her employer to potential liability under anti-discrimination laws. This theory had gained wide acceptance in the lower federal courts many years ago but was rejected by the Supreme Court in 1981. HU's packaging of its claim by calling it another name is nothing but an attempted end-run around the Supreme Court. Such claims are not viable under current law, and HU's suit fails to present a claim for which relief can be granted.

### A.    The Fraud Claim Fails To Plead The Legal Elements Of The Fraud With Particularity In Violation Of Rule 9

As an initial matter, HU's fraud and misrepresentation claims are deficient. It is well established that a complaint alleging fraud must state "with particularity" the facts giving rise to the alleged fraud or misrepresentation, Fed.R.Civ.P. 9(b); *Harrison v. Westinghouse Savannah*

*River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999) (a party alleging fraud must plead elements of fraud with particularity which includes the time place, and contents of the false representations). HU's counts for fraud and misrepresentation utterly fail to meet that standard and should be dismissed.

### B.    Employees Are Not Insurers Against Losses Suffered By Their Employers

The crux of HU's complaint is its claim for indemnity. Indemnity is just another word for insurance, and in this case, HU seeks to force Belinda Watkins to act as its insurer for a discrimination suit that it settled with another employee.  This type of claim is not permitted, as we show below.  But even if it were permitted, the elements of an indemnification claim do not exist in this case because HU was independently liable to Goodwin, making its suit defective twice over.

The issue in this case is simple because it was resolved by the Supreme Court's unanimous opinion in *Northwest Airlines, Inc. v. Transp. Workers Union of America*, 451 U.S. 77 (1981).  At issue in the *Northwest Airlines* case was whether an employer's "claims for contribution and indemnification" from third parties whose conduct contributed to the violations of Title VII and the Equal Pay Act should have been dismissed "for failure to state a claim upon which relief could be granted." *Id.*, 451 U.S. at 82.  The Court noted that many lower courts had permitted employers to recover some or all of their Title VII liability from culpable third parties:

> The weight of authority in the lower federal courts supports the District Court's conclusion that a right to contribution is available to employers found liable for backpay under Title VII.

*Northwest Airlines*, 451 U.S. at 84 n.11 (citing eleven cases).  The Court clearly discussed and considered the policy arguments in favor of permitting suits for contribution and indemnity. *Id.*, at 86-87.  And the Court also assumed that all of the other elements of a contribution claim— missing in HU's claims against Watkins—were present, but still rejected such claims:

> In this case, we assume that all of the elements of a typical contribution claim are established. This means that we assume that the plaintiffs . . . could have recovered from either the union or the employer, under both the Equal Pay Act and Title VII, and that it is unfair to require petitioner to pay the entire judgment. Furthermore, . . . we assume that the policy considerations favor the recognition of the right. And, as argued by petitioner, we assume that the respondent unions in this case, as well as other unions in other industries, bear significant responsibility for discriminatory practices that these statutes were designed to prohibit. . . . None of these assumptions, however, provides a sufficient basis for recognizing the right [of contribution or indemnity] petitioner is asserting in this proceeding.

*Northwest Airlines*, 451 U.S. at 88-89 (footnotes omitted). The Court noted that the anti-discrimination statutes were aimed at regulating the conduct of employers and, despite a comprehensive framework for enforcement and remedies, did not include an employer's right of indemnification or contribution. The Court noted that even "a favorable reaction to the equitable considerations supporting petitioner's contribution claim is not a sufficient reason for enlarging on the remedial provisions contained in these carefully considered statutes." *Northwest Airlines*, 451 U.S. at 98. The holding of the Court was clear: "we hold that there is no implied right to contribution under those statutes." *Id.*, at 95.

District of Columbia courts generally follow the Supreme Court's interpretation of Title VII, meaning that the holding of *Northwest Airlines* applies with equal force to claims brought under the D.C. anti-discrimination law.[4] *Psychiatric Inst. v. D.C. Comm'n on Human Rights*, 871 A.2d 1146, 1152 (D.C. 2005) ("We generally follow Title VII analysis in discrimination cases brought under the DCHRA,"(citations omitted)). The District of Columbia Human Rights Act (DCHRA), D.C. Code §§ 2-1401.01 *et seq*., is a comprehensive anti-discrimination law that prohibits discrimination in employment as well as in education, housing, and places of public accommodation. Like Title VII, the DCHRA has an administrative

enforcement scheme.  Unlike Title VII, DCHRA permits suits against individuals in some circumstances[5], but that is not a meaningful distinction in this instance because the Supreme Court's analysis in *Northwest Airlines* assumed that the unions from whom the employer sought indemnity were also amenable to suit under Title VII.  That is, the fact that D.C. law may have permitted Goodwin to sue Watkins (and other HU officials) individually does not in any distinguish this suit from *Northwest Airlines*.

The Supreme Court's decision 25 years ago that employers could not shift liability to other parties for discrimination is consistent with its more recent decisions.  For example, the Supreme Court's paired decisions in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), created an affirmative defense for employers for the express purpose of furthering Title VII's goals of putting the responsibility on employers to prevent or promptly correct discriminatory behavior.  *Faragher*, 524 U.S. at 806 ("It would therefore implement clear statutory policy and complement the Government's Title VII enforcement efforts to recognize the employer's affirmative obligation to prevent violations and give credit here to employers who make reasonable efforts to discharge their duty.").[6]  These cases dealt with suits alleging sexually hostile environments, claims that necessarily rely on improper conduct by managers or other employees.

---

[4] District of Columbia law applies because all conduct occurred in the District of Columbia, and Maryland has no contacts with the issues in this case save for being the residence of Ms. Watkins.

[5] *Wallace v. Skadden Arps*, 715 A.2d 873 (1998).

[6] In making this motion, the primary argument is failure to state a claim under Rule 12(b)(6), meaning that we have not relied on documents outside the pleadings.  However, the facts in this case show that the University's HR and OGC officials were consulted and gave advice regarding the accommodation and discharge of Daniel Goodwin.  Attachment 1, Goodwin Complaint at ¶¶ 44-46; Attachment 4, Watkins' Decl., ¶¶ 3 – 6.  Thus, HU was not blameless and was, in fact, in the best position to ensure that Goodwin's termination was not discriminatory.  This is the

Accordingly, even accepting the factual allegations in the complaint as true, HU's suit fails to state a claim upon which relief can be granted because an employer cannot shift liability under anti-discrimination laws to its individual employees.[7]

### C.    The Elements Of Indemnity Are Not Present

Even if a claim for contribution or indemnity were permitted for DCHRA liability—and it is not—HU still cannot state a claim. First, HU did not plead a claim for contribution. This is significant, because contribution is the normal method by which liability is apportioned among potentially liable parties. *Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101, 1103 (4th Cir. 1989) ("Indemnification, of course, involves shifting the entire loss from one wrongdoer to another; contribution requires each wrongdoer to pay his proportionate -- or *pro rata* -- share of the adverse judgment."). Rather than seek to recover a portion of its settlement payment, Howard instead seeks to recover all of it from the now-unemployed Ms. Watkins. This is a patently unjust result, making it a result which is not available in equity.

---

opposite of the general justification for shifting liability, e.g., to put the liability on the party better suited to avoid the harm.

[7] The discussion of indemnity focuse primarily on his discrimination claims because his claim for Intentional Infliction of Emotional Distress (IIED) was so clearly deficient under D.C. law. See Attachments 1 and 2 (Goodwin 2nd Amended Complaint and Watkins' Motion To Dismiss Goodwin's Complaint). Because this is a suit for indemnity growing out of the Goodwin matter, this Court can take notice of the pleadings in the Goodwin matter. For the same reasons articulated in Watkins' Motion To Dismiss, it is evident that Goodwin's complaint of unjustified criticism of his performance and improper termination may only be redressed through the DCHRA because such employer-employee conflicts are not sufficiently extreme and outrageous to give rise to a common-law claim for IIED:

> This conduct, even construed as true, was of the type attributable to "employer-employee conflicts [that] do not, as a matter of law, rise to the level of outrageous conduct."
> *Howard Univ. v. Best*, 484 A.2d 958, 986 (D.C. 1984). Kerrigan's intentional infliction of emotional distress claim, therefore, also failed as a matter of law.

*Kerrigan v. Britches of Georgetowne*, 705 A.2d 624, 628 (D.C. 1997). Goodwin's claim, to the extent that it was viable at all, was that he suffered criticism and termination for being disabled or in reprisal for seeking an accommodation or FMLA leave. That is not sufficiently outrageous conduct for IIED, but does state a claim under DCHRA. As to those statutory claims, HU cannot seek indemnity from its employees.

Implied indemnity is an equitable doctrine designed to prevent unjust enrichment. *Quadrangle Development Corp. v. Otis Elevator Co.*, 748 A.2d 432, 435 (2000). Given the enormous disparity in financial resources, coupled with HU's own, independent liability, the only unjust enrichment would be if HU escaped all liability for its conduct and shifted 100% of its financial responsibility to Ms. Watkins.

The heart of HU's lawsuit is that Belinda Watkins is legally obligated to act as HU's insurer because the University got sued for discrimination by one of her subordinates. Even assuming the truth of the factual allegations in HU's complaint (but not its legal conclusions), HU cannot establish that Watkins has a legal obligation to indemnify HU for its settlement payment. Without an express contractual duty to indemnify, a legal right to indemnity only exists in situations in which a duty to indemnify may be implied out of a relationship between the parties to prevent an unjust result. *East Penn Mfg. Co. v. Pineda*, 578 A.2d 1113, 1126 (D.C. 1990). Yet it would be far more unjust in these circumstances for Howard to bear no financial responsibility and the now-unemployed Ms. Watkins to bear the total cost. A court sitting in equity cannot permit that result.

Moreover, equitable implied indemnity is not available where the party seeking to be indemnified is independently liable for the harm. *District of Columbia v. Washington Hosp. Ctr.*, 722 A.2d 332, 340-341 (D.C. 1998) (a "joint tortfeasor whose active negligence concurs in causing an injury may be entitled to contribution, but indemnity is not available."); *Howard Univ. v. Good Food Services, Inc.*, 608 A.2d 116, 125 (1992) (indemnification not available where putative indemnitee may be directly liable for injuries, not secondarily liable).

In this case, Howard University was not an innocent bystander whose *sole* responsibility comes through *respondeat superior* for Watkins' conduct. Instead, HU was liable for its own

conduct because (a) other University officials had to review and approve the non-renewal

decision; and (b) its in-house experts on accommodation and EEO law reviewed, advised and

concurred in the decisions regarding Goodwin's employment.  Attachment 4, Watkins Decl. ¶¶ 3

-6; Attachment 1, Goodwin Complaint, ¶¶ 44-46, 55.  Therefore, to the extent that Goodwin had

viable claims against HU, those claims did not arise solely because of Watkins' conduct, but also

arose from the actions of HU employees Porter (identified in Goodwin's complaint, Attachment

1, at ¶¶16-21), and the various University employees who advised or, or approved of, the

decisions made regarding Goodwin's employment.  These include but are not limited to HR

official Barnes, OGC official Jenkins, Provost Cash and President Swygert. Attachment 4,

Watkins Decl., ¶¶ 3-6.  Goodwin's claim against HU was for its own liability, and did not rest

solely on Watkins' conduct. Accordingly, HU's independent liability precludes it from shifting

100% of the liability to another. *Hubbard v. Chidel*, 790 A.2d 558, 568-69 (2002); *Washington

Hosp. Ctr.*, 722 A.2d at 340-341; *Howard Univ.*, 608 A.2d at 125; *Quadrangle Development

Corp.*, 748 A.2d at 436.

        Another separate failing in the indemnity claim is that HU did not tender its defense to

Watkins, nor give her a chance to review and approve the settlement terms.  Due process requires

at least this much to establish an equitable claim for indemnity.  *Atlantic Richfield Co. v.

Interstate Oil Transp. Co.*, 784 F.2d 106, 111, 113 (1986) *citing Jennings v. United States*, 374

F.2d 983, 986 (4th Cir. 1967) ("The indemnitee's unilateral acts, albeit reasonable and

undertaken in good faith, cannot bind the indemnitor; notice and an opportunity to defend are the

indispensable due process satisfying elements."); *Howard Univ. v. Good Food Services, Inc.*, 608

A.2d 116, 125 n.5 (D.C. 1992).  While Watkins knew of Goodwin's suit and the existence of

settlement discussions, she was excluded from participation. More importantly, Watkins was

never notified of the amount of the settlement payment, nor was she given a chance to approve or disapprove of the settlement. This failure also undermines HU's claim for indemnity. *Tankrederiet Gefion A/S v. Hyman-Michaels Co.*, 406 F.2d 1039 (6th Cir. 1969) (failure to disclose terms of settlement or tender defense); *Whisenant v. Brewster-Bartle Offshore Co.*, 446 F.2d 394 (5th Cir. 1971) (failure to tender defense or seek approval of settlement).

This is not a case where Watkins knew or should have known that HU was going to seek indemnity. Contrary to most reported cases, HU did not file a cross-claim against Watkins, nor did it tender its defense to her. Because of *Northwest Airlines* and its longstanding precedent, there was no reason for Watkins to anticipate that HU would make an indemnity claim against her after settling with Goodwin. To the contrary, her motion to dismiss was quite strong and she had reason to believe that she would be dismissed from the case had the court ruled on her motion, and that she would have no further liability. Additionally, Watkins knew that she had received advice and approval from the University's Human Resources and legal offices regarding the issues of accommodation and termination, thereby rendering HU the more responsible party.

Finally, we do not fully address the issue of contribution because HU has not pled a cause of action for contribution, but it is worth noting two points. First, HU could not be in this Court under diversity jurisdiction seeking contribution because there are at least five parties, and probably more, whose conduct is sufficiently implicated to give rise to a potential claim of contribution,[8] *Hubbard*, 790 A.2d at 570. Under D.C. law, the allocation is *pro rata*,[9] meaning

---

[8] These five parties include, at a minimum, HU itself, along with Barnes, Jenkins, Archer and Cash. Watkins Decl. at ¶¶ 3-6. HU employee Porter was mentioned repeatedly in Goodwin's complaint, and the decision to not renew Goodwin's contract had the express approval of Caldwell-Colbert, Borggren and Swygert. Id. If all of these responsible individuals were

that the maximum potential recovery HU could have against Watkins would be one-fifth of the

settlement amount of $253,000 or $50,600.  Although Watkins' potential liability would be

lower if more employees were added to the mix, even this amount of $50,600 is below the

threshold for diversity jurisdiction. 28 U.S.C. § 1332. HU could take no comfort from the fact

that Goodwin chose to name only Watkins in his suit, because the plaintiff's choice of tortfeasors

is not relevant in a contribution action, and because Goodwin did not know at the time he filed

his pro se complaint which other University employees were involved in the decision to not

renew his contract.[10]  Accordingly, this Court would not have subject matter jurisdiction for a

contribution action even if HU had chosen to plead one.

Second, HU could not maintain an action for contribution here because such claims exist

only where the liability among contributors is joint and several, but liability under the DCHRA

for an employer and an employee is not joint, but separate.  Generally, where two or more

tortfeasors are jointly liable, the plaintiff may sue any single tortfeasor to recover his entire

damages, and then let that tortfeasor sue the others to apportion the joint liability between or

among the tortfeasors.  If the liability is separately calculated for each defendant, as it is under

the DCHRA, then no contribution is available.

Liability under the DCHRA is not joint but separate.  In *Estate of Underwood v. National

Credit Union Admin*, 665 A.2d 621 (1995), the plaintiff employee ended a romantic involvement

with West, an individual defendant who was chair of the credit union's board.  Plaintiff alleged

---

included, a *pro rata* division would divide the settlement into at least ten portions of about
$25,000 each.

[9] *Hubbard v. Chidel*, 790 A.2d at 569.

[10] *Martello v. Hawley*, 112 U.S. App. D.C. 129 (D.C. Cir. 1962) (""The right to seek contribution
belongs to the tortfeasor who has been forced to pay, and the existence of the right cannot
logically depend upon a selection of defendants made by the plaintiff.")

that West discredited her and orchestrated her termination by the defendant credit union. The jury reached separate verdicts of $10,000 against the individual West and $425,000 against their mutual employer, the credit union. *Id*. at 626-27. The credit union appealed, arguing that it was liable solely under *respondeat superior* for the actions of West because no other employee's conduct was at issue, and therefore could not be liable in a different amount than West. That is, the employer claimed that liability between itself and its employee was joint and several. The D.C. Court of Appeals rejected the credit union's argument and upheld the separate awards. *Id*. at 648-49. Accordingly, even if Goodwin's case had gone to trial, the liability assessed against Watkins and the University would not have been joint and several, but would have been separately determined. Accordingly, the liability of HU and Watkins could not be allocated through an action for contribution.

###### D.    HU Cannot Escape The Prohibition Of *Northwest Airlines* By Calling Its Claim By Another Name

HU may try to argue that its complaint in this case, styled as something other than a suit for contribution, can evade the Supreme Court's prohibition in *Northwest Airlines*. But the essence of the claim is not changed by entitling it as something else. In almost every employment discrimination case, there is presumably a duty on the part of the alleged wrongdoing-employees to not violate the law or to comply with various published employer policies. But that is not enough to permit an "end-run" around the Supreme Court's holding.

Calling its claim "indemnity," "fraud" or "misrepresentation" does not change the claim. The Fourth Circuit rejected just such an attempt to evade *Northwest Airlines*:

> PPG recognizes that the suit filed against it by the plaintiff-employees is premised entirely on Title VII and the Equal Pay Act, and, citing *Northwest Airlines*, it concedes that normally in such a case there is no right to contribution in its favor should it lose the case. But it asserts that it has surmounted this difficulty by filing its cross-complaint stating a separate and distinct claim under the non-discrimination language of the collective bargaining agreement, jurisdiction for which it would find in Section 301 of the

LMRA. . . . Thus, the argument concludes, the employer in this case has successfully evaded the denial of a right of contribution in this Title VII and Equal Pay suit under *Northwest Airlines*. There are, however, a number of serious flaws in this carefully crafted theory.

*Scott v. PPG Indus.*, 920 F.2d 927, 1990 U.S. App. LEXIS 21666 (4th Cir. 1990) (unpublished)

(Attachment 5). This Court should not be led down the path that the Court of Appeals rejected in

*Scott*. The claim is the same even known "by any other name." HU seeks to shift its liability for

accusations of discrimination to its employee. This it cannot do.

II.    **THE PROPER FORUM FOR THESE ISSUES IS THE DISTRICT OF COLUMBIA, WHERE ALL PARTIES AND WITNESSES ARE WITHIN THE COURT'S JURISDICTION, AND ALL ACTIONS TOOK PLACE**

All actions and conduct at issue in this case took place within the District of Columbia.

Even if any of HU's claims were viable—and they are not—this case would have to be tried in

the District of Columbia. As shown above, a resolution on the merits of this case requires the

participation of numerous HU employees not only as witnesses, but as named parties (including

possibly as third-party defendants). Some of those people are residents of D.C. or Virginia, and

are therefore not subject to this Court's personal jurisdiction. In addition, nearly all evidence,

including documents and witnesses, are located in the District of Columbia, and this case, should

it survive, would be governed by the laws of the District of Columbia. For all these reasons, the

case should not proceed in Maryland.

The court has the authority to transfer a case to a different district under 28 U.S.C.

§ 1404(a) if the convenience of the parties and witnesses and the interest of justice would be

better served. Venue exists in the District of Columbia. Section 1404(a) gives the court

authority to transfer cases according to an "individualized, case-by-case consideration of

convenience and fairness." *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)

(quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).

To determine the most "convenient" forum requires a balancing of the private and public interest factors set forth in *Gulf Oil Corp v. Gilbert*, 330 U.S. 501, 511 (1947). These considerations include the convenience to the parties, the practical difficulties involved in the adjudication of a dispute in a certain locality, evidentiary problems, availability of witnesses, difficulty of coordinating multiple lawsuits, the burden of jury duty to the community, public interest in the litigation, and other administrative obstacles. *See Gulf Oil*, 330 U.S. at 511.

The private factors in this case weigh heavily in favor of transferring this case to the District of Columbia. In cases of discrimination in particular, the claim arises where the alleged discriminatory acts occurred. *See Liban v. Churchey Group II*, 305 F. Supp. 2d 136, 141-42 (D.D.C. 2004) ("But this deference [to plaintiff's choice of forum] is weakened when the plaintiff is not a resident of the chosen forum. This deference is further mitigated if a plaintiff's choice of forum has 'no meaningful ties to the controversy and no particular interest in the parties or subject matter.' " (citations omitted)). The plaintiff and the other indispensable parties worked for Howard University exclusively in the District of Columbia. Every meeting of Howard University employees concerning Goodwin's employment occurred in the District of Columbia, as did every decision and even the performance of his job. Goodwin filed a charge of discrimination against Howard University and Ms. Watkins in the District of Columbia. Based upon these circumstances, the Court must conclude that the activity leading to the plaintiff's claim clearly arose in the District of Columbia.

Finally, there is a compelling public interest in resolving local controversies in the locality in which the events take place. *Id*. at 509-510. In this case, the events did not take place in Maryland and, therefore, there is no public interest in having this case litigated in Maryland. Therefore, the Court should dismiss the plaintiff's complaint because of *forum non conveniens*.

Similarly, if this case should proceed, the other potentially responsible tortfeasors are necessary or indispensable parties that must be joined. However, not all of these necessary parties are subject to suit in Maryland, but all are subject to suit in the District of Columbia. This is further support for dismissing the instant case.

## CONCLUSION

For all the reasons stated herein, the complaint in this case fails to state a claim upon which relief can be granted, and it should be dismissed.

                                    /s/
                        _____
                        Stephen Z. Chertkof  (Bar No. 12709)
                        HELLER, HURON, CHERTKOF,
                        LERNER, SIMON & SALZMAN
                        1730 M Street, N.W.,  Suite 412
                        Washington, D.C. 20036
                        (202) 293-8090
                        Fax:  (202) 293-7110

**CERTIFICATE OF SERVICE**

Plaintiff hereby certifies that on October 2, 2006, a copy of the foregoing was served via electronic filing upon:

Timothy F McCormack
Jennifer Erin Keyser
Ballard Spahr Andrews and Ingersoll LLP
300 E Lombard St 18th Fl
Baltimore, MD 21202-3268

                                        /s/
                                  Stephen Z. Chertkof

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

| | |
|---|---|
| HOWARD UNIVERSITY | ) |
|            Plaintiff, | ) |
| | ) |
|     v. | ) Civil Action No.: 06-cv-2076 (DKC) |
| | ) |
| BELINDA LIGHTFOOT WATKINS, | ) |
| | ) |
|       Defendant. | ) |

**ORDER**

IT IS HEREBY ORDERED that Defendant's motion to dismiss or for summary judgment is GRANTED, and IT IS FURTHER ORDERED that Plaintiff's Complaint shall be dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

Copies to:

Stephen Z. Chertkof
HELLER, HURON, CHERTKOF,
LERNER, SIMON & SALZMAN
1730 M Street, N.W., Suite 412
Washington, D.C. 20036

Timothy F McCormack
Jennifer Erin Keyser
Ballard Spahr Andrews and Ingersoll LLP
300 E Lombard St 18th Fl
Baltimore, MD 21202-3268

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DANIEL GOODWIN                        )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )          Civil No. 1:03-cv-02447-RCL
                                      )
HOWARD UNIVERSITY                     )
                                      )
      &                               )
                                      )
BELINDA L. WATKINS                    )
                                      )
          Defendants.                 )
                                      )

**SECOND AMENDED COMPLAINT FOR DECLARATORY
JUDGMENT, INJUNCTIVE RELIEF, AND DAMAGES**

NATURE OF ACTION

1.   Plaintiff Daniel Goodwin ("Goodwin") brings this action against his former employer Defendant Howard University ("the University"), and his former supervisor, Belinda L. Watkins, under the Americans with Disabilities Act of 1991 ("ADA"), 42 U.S.C. § 12111 *et seq.,* the D.C. Human Rights Act ("DCHRA"), D.C. CODE § 2-1401.01 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and the Health and Human Services Regulations thereto, 45 C.F.R. Part 84, and the federal Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*  Plaintiff also brings this action for intentional infliction of emotional distress.

PARTIES

2.   Plaintiff Daniel Goodwin was a resident of Maryland during the relevant times described herein.  Plaintiff was employed by the University from 1998 until June 2002, and on information and belief, Plaintiff worked more than 1,250 hours during any relevant calendar year.

DC: 1246090-1

3.   Defendant Howard University is a private university doing business in Washington, D.C.  The University is subject to the Americans with Disabilities Act, the DCHRA, the D.C. Family and Medical Leave Act, and the federal Family and Medical Leave Act.  The University is a recipient of federal financial assistance and therefore is subject to Section 504 of the Rehabilitation Act.

4.   On information and belief, at all relevant times, Defendant Howard University has employed 50 or more employees.

5.   On information and belief, Defendant Belinda L. Watkins, Plaintiff's former supervisor and "employer," as defined by the Family Medical Leave Act, during the relevant times described herein, was and is a resident of Maryland.

<u>JURISDICTION AND VENUE</u>

6.   This Court has jurisdiction over Plaintiff's ADA claims pursuant to 28 U.S.C. §§ 1331 and 1343.

7.   This Court has jurisdiction over Plaintiff's Rehabilitation Act claims pursuant to 28 U.S.C. §§ 1331 and 1343.

8.   This Court has jurisdiction over Plaintiff's claim under the federal Family and Medical Leave Act pursuant to 28 U.S.C. § 1331.

9.   This Court has jurisdiction over Plaintiff's D.C. law claims under the DCHRA, the D.C. Family and Medical Leave Act, and common law claims pursuant to supplemental jurisdiction, 28 U.S.C. § 1367(a).

10.   Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the University is a resident of the District of Columbia, and because Plaintiff's employment, which gives rise to Plaintiff's claims, was located in the District of Columbia.

11. Plaintiff has exhausted all administrative prerequisites to filing suit.  Plaintiff timely filed a charge with the EEOC on September 11, 2002, complaining of the unlawful acts described herein.  This charge was timely cross-filed at the same time with the D.C. Office of Human Rights.  Plaintiff received his Right to Sue notice on August 5, 2003 and filed his claim with the Court within ninety days of receipt of that notice, on November 3, 2003.

FACTS

12. Plaintiff Goodwin, at all times discussed herein, was a qualified individual with a disability.  He is and was at all relevant times infected with the Human Immunodeficiency Virus ("HIV").  He is and was substantially limited in the major life activities, including but not limited to sitting, working, procreation, and basic bodily functions such as bowel continence.

13. Goodwin was hired by the University in early August 1998 as Acting Assistant Dean of Students.

14. From 1998 until 2001, Goodwin received performance reviews of "meets expectations" or higher from Watkins, who was Acting Dean of Students.

15. On September 29, 1998, Goodwin suffered a stroke that resulted in a coma and hospitalization.  During his hospitalization at Howard University Hospital, Goodwin learned that he was infected with HIV, a serious health condition within the meaning of the Family Medical Leave Act.

16. During his hospitalization, Paulette Porter, an administrative assistant who reported to Watkins in the office in which Goodwin worked, stopped by frequently to check on Goodwin.  Upon information and belief, Porter, during one of her visits, learned of Goodwin's disability.

17. Goodwin returned to work in February 1999.

3

18. Immediately upon Goodwin's return to work, Porter's treatment of him changed.  For instance, after his use of office phones, Porter would wipe the phone down with a cleaning antiseptic.  She would not do so when others used the phones.

19. In March 1999, Porter stated to Goodwin, "It's no secret what's going on with you. We know what is wrong with you."  Upon information and belief, in the spring of 2000, Porter also made statements to a student at the University that led that student to believe that Goodwin had AIDS.

20. The relationship between Goodwin and Porter, progressively worsened until, ultimately, Porter began to refuse to complete work assigned by Goodwin, thus publicly embarrassing him in front of students and other staff members.  Porter also made inappropriate derogatory comments about Goodwin, including accusing Goodwin of having sexual relations with male students and comments about his medical condition.

21. For instance, in the spring of 2000, Porter told a student that Goodwin had returned to "his old ways" and that "it wasn't wise to have any dealings with him," implying to the student that Goodwin was acting improperly.

22. Soon after his return to work in February 1999, Goodwin began to experience side effects from the drugs he was taking in order to treat his disability.

23. Due to the side effect of these drugs, which caused irritable bowel symptoms including uncontrollable diarrhea, Goodwin frequently was physically unable to arrive at work at the regularly scheduled time.

24. Goodwin compensated for any late arrivals by staying past the regularly scheduled office closing time.

25. Goodwin's late arrivals seemed not to constitute a problem until March 21, 2001, when Goodwin received a letter from Watkins that criticized Goodwin for his late arrivals.

26. On March 22, 2001, Goodwin submitted a response letter to Watkins and an attached doctor's note specifically requesting an adjustment of his work schedule.  The note stated, "This is to certify that Mr. Goodwin has a chronic medical condition that may require workplace accommodation for a reasonable adjustment to his work schedule.  If there are any questions and if specific details are required please notify me."  Goodwin's physician also sent a similar letter to Watkins on March 23, 2001.

27. Goodwin met with Watkins to explain the need for the accommodation based on Watkins' demands that Goodwin arrive at 8:30 a.m.; Goodwin requested that Watkins contact his physician if she wanted further information to supplement Goodwin's request for accommodation.

28. In response to Goodwin's March 2001 request for accommodation, Watkins expressed displeasure at the doctor's note, claimed she did not "understand" the note, yet refused to contact Goodwin's doctor.  Goodwin attempted to explain the request to her, but Watkins indicated that she did not have time to speak with him.  Watkins refused to provide the requested accommodation.

29. Subsequently, Goodwin made frequent requests for an accommodation, each time referencing his doctor's note.  Each time Watkins brushed his request aside, stating she did not "understand" it.  Watkins never contacted Goodwin's physician.

30. In a June 21, 2001 email, Watkins again reprimanded Goodwin for arriving late.  Goodwin went to her office and again discussed his need for an accommodation.  He requested that Watkins contact his doctor.  Watkins replied that she "did not understand" what

the letter meant and that she had given him enough time to "get himself together" before returning to work in February 1999. Goodwin again asked her to contact his doctor. Watkins refused to answer.

31. Watkins continued to reprimand Goodwin based on his late arrivals in October and November of 2001.

32. Goodwin attempted to arrive at work on time, in spite of the effects of his drug regimen. These attempts were sometimes unsuccessful due to Goodwin's incontinence.

33. Determined to satisfy demands that he be at work at the regularly scheduled time, but unable to do so because of the effects of his morning drug regimen, Goodwin began to sleep overnight in his office.

34. The scheduling accommodation that Goodwin sought was beneficial to the duties of his position. In the previous months, Goodwin had stayed late each night in order to compensate for any delay in arriving in the morning. Students found this schedule very helpful, as it mirrored their own schedules better. Goodwin, therefore, was better able to perform his job with the modified schedule.

35. Upon information and belief, Watkins became aware that Goodwin had HIV around the time Goodwin requested a reasonable accommodation.

36. Watkins expressed and had negative feelings towards those with a HIV disability. For example, in 1994 or 1995, Watkins called Goodwin to tell him that a former classmate of his had died of AIDS and that the death was because of his "risqué lifestyle."

37. Watkins, like Porter, began to harass Goodwin by questioning Goodwin's relationships with male students and, upon information and belief, frequently made comments to

6

male students discouraging them from visiting Goodwin and implying that Goodwin's relationships with male students were sexual in nature.

38. For example, upon information and belief, in April 2001, Porter, in a conversation with a student, accused Goodwin of having sexual relations with male students. When this student complained to Goodwin of this statement in writing, Goodwin brought the matter to the Human Resources department and to the EEO office of the University. Upon information and belief, no action was ever taken against Porter for this statement.

39. Around this same time, Watkins began a campaign of harassment against Goodwin, including questioning students about their interactions with him, falsely accusing him of "title fraud" when students referred to him as "dean," and refusing him leave for the 2001 Christmas holidays.

40. On January 25, 2002, Goodwin received an unprecedented "interim evaluation" from Watkins. This evaluation focused on Goodwin's frequent late arrivals and alleged performance problems. Watkins, however, never identified or explained the alleged performance problems.

41. In his meeting with Watkins, Goodwin specifically responded that he had problems with the fact that Watkins continued to write him up for being late and that she had ignored his request for a reasonable accommodation.

42. Watkins responded, again, that she did not "understand" the doctor's note and brushed his request aside. Again, Goodwin responded and asked her to contact his doctor to get the necessary information. Watkins refused to do so.

43. In February 2002, Watkins sent Goodwin an email and memo reiterating their discussion in the meeting.

44. In February 2002, Goodwin complained to the Human Resources Department of the University about the denial of reasonable accommodation and the negative performance review.

45. The Human Resources Department discussed Goodwin's complaint with the University's General Counsel's Office and the Human Resources Department referred Goodwin to the University's EEO investigator.

46. Watkins was instructed to rescind the threat of termination and to give Goodwin a modified work schedule to accommodate his health situation, almost one year after Goodwin first requested the accommodation.

47. Watkins, in response, sent Goodwin nine "objectives" to complete by March 25, 2002, at which time she promised to meet with Goodwin to discuss his progress.  These objectives only covered tasks that Goodwin needed to complete, tasks that were part of his normal job responsibilities.  The memo offered Goodwin only a thirty-minute accommodation. Goodwin requested an additional accommodation.  Upon a directive by agents of the University, Goodwin was finally offered a sufficiently modified work schedule.

48. Shortly after his complaint, however, Watkins' bad treatment of Goodwin worsened dramatically.  She began to strip Goodwin of even the most minor authority, including his ability to send mail out of the office.  Watkins also began to deny Goodwin access to staff meetings.

49. Watkins refused to meet with Goodwin, although she had promised a meeting with Goodwin to discuss the completion of the assignments.

50. On May 6, 2002, Watkins questioned a campus services employee about his relationship with Goodwin in a manner that surprised and created discomfort for the employee.

Upon information and belief, Watkins seemed to be implying that this male employee's relationship with Goodwin was a sexual one.

51.    On May 16, 2002, Goodwin received what he perceived to be a harassing email from Porter.  He reported Porter's e-mail three separate times to Watkins between May 16 and May 20, 2002.

52. In a May 17, 2002 email about Porter's e-mail, Goodwin wrote, "An immediate response to this rather uncomfortable message would be most appreciated in light of the hostile work environment that I am currently experiencing under your leadership."

53. In response, in a May 17, 2002 email, Watkins accused Goodwin of being unprofessional.

54. Watkins also began removing job responsibilities from Goodwin.  For example, even though his duties included student orientation, on May 16, 2002, Watkins sent an email to others in the office, without informing Goodwin, telling them to no longer discuss orientation issues with Goodwin and to direct all inquiries to her instead.

55. In or around March 2002, Goodwin learned that Watkins, without giving proper notice to Goodwin, transferred Goodwin's hours of annual leave to cover his sick leave deficit, which was due to his lengthy illness at the beginning of his tenure at the University. After contacting Human Resources about the leave issue, Goodwin was told that Watkins' transfer of Goodwin's leave hours was improper and that the University should have given Goodwin Family and Medical leave for his serious medical condition.  Only after contacting Human Resources was Goodwin offered paperwork to apply for Family and Medical Leave. Goodwin completed the paperwork.  On the form for Family and Medical Leave, Goodwin identified his disability as HIV.

56. Later that spring, Howard University students voted Goodwin "Administrator of the Year."  On the night he received the award, Goodwin overheard Watkins and Porter discussing his receipt of the award.  In this conversation, they continued to refer to him by derogatory names.

57. Goodwin periodically reported his completion of assignments to Watkins and completed all nine objectives in the time assigned.

58. On May 22, 2002, Goodwin sent an email to Watkins in which he described the  "degradation" he had had to suffer, and still suffered, from Watkins' mistreatment.

59. On June 20, 2002, Watkins informed him that his contract for the following year's employment would not be renewed because of alleged performance problems.  When he inquired what the alleged problems were, since he had completed all the objectives assigned to him, Watkins refused to respond.

## COUNT I

### (Retaliation)

60. Plaintiff realleges and incorporates by reference Paragraphs 1 through 59, as if set forth fully herein.

61. Plaintiff complained to Defendants regarding discrimination.  Defendants subsequently subjected him to adverse employment actions, including the termination of his employment, in retaliation for his complaints.

62. Plaintiff asserts this claim of retaliation against Defendant Howard University under the ADA, 42 U.S.C. § 12112, the Rehabilitation Act, 29 U.S.C. § 794 and the Health and Human Services Regulations thereto, at 45 CFR Part 84 and the DCHRA, D.C. CODE § 2-1402.01 and 2-1402.61.

63. Plaintiff asserts this claim of retaliation against Defendant Belinda Watkins under the DCHRA, D.C. Code §§ 1402.01 and 2-1402.61.

## COUNT II

### (Disability Discrimination)

64. Plaintiff realleges and incorporates by reference Paragraphs 1 through 63, as if set forth fully herein.

65. During the relevant times, Plaintiff was a qualified individual with an actual or perceived disability.

66. Defendants discriminated against Plaintiff in the terms and conditions of Plaintiff's employment because of his disability.

67. For example, Defendants failed to provide a reasonable accommodation to Plaintiff and Plaintiff suffered adverse consequences as a result of Defendants' failure to provide a reasonable accommodation.

68. Defendants also discriminated against Plaintiff because of his disability in other terms and conditions of his employment, including but not limited to harassment, Plaintiff's performance evaluations, Plaintiff's responsibilities, and Defendants' failure to renew Plaintiff's contract.

69. Plaintiff asserts this claim against Defendant Howard University under the ADA, the Rehabilitation Act, and the DCHRA.

70. Plaintiff asserts this claim against Defendant Belinda Watkins under the DCHRA.

## COUNT III

### (Violation of Family and Medical Leave Act)

71. Plaintiff realleges and incorporates by reference Paragraphs 1 through 70, as if set forth fully herein.

72. During the relevant times, Plaintiff suffered from a serious medical condition and informed Defendants of his requests for periods of leave.

73. Defendants unlawfully and willfully denied Plaintiff leave and discriminated against Plaintiff for seeking leave, in violation of the federal Family and Medical Leave Act, 29 U.S.C. §§ 2612(a)(1), (a)(2).

## COUNT IV

### (Intentional Infliction of Emotional Distress)

74. Plaintiff realleges and incorporates by reference Paragraphs 1 through 73, as if set forth fully herein.

75. Defendant Howard University, by and through its employees Watkins and Porter, and Defendant Belinda Watkins, individually, sought to inflict, and did inflict, severe emotional distress upon Plaintiff.  To that end, Defendants engaged in a behavior that was severely harassing, abusive and intimidating.  They deliberately sought to demoralize, harass, torment and ostracize Plaintiff, and to publicly and privately humiliate him.

76. Defendants' conduct was extreme and outrageous.  Defendants had power, authority and leverage over Plaintiff by virtue of its control and influence over (a) Plaintiff's continued employment and livelihood and (2) his ability to remain an active part of the Howard University campus, which is very important to him as an alumnus.  This behavior was further exacerbated by virtue of Plaintiff's emotional vulnerability due to his disability and resultant impending demise and his extreme financial dependency on his employment with the University.

77. As a direct result of Defendants' conduct Plaintiff has suffered, and continues to suffer, severe emotional distress. Plaintiff's emotional distress has been severe, debilitating, long lasting and intensive. Plaintiff has suffered actual monetary damages as a result of defendants' unlawful conduct. For example, Plaintiff has lost his job, his place of resident, and has filed for bankruptcy, all as a result of the extreme and outrageous acts committed by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant relief as follows:

A. Enter a declaratory judgment finding that the actions of Defendants violated the ADA, Rehabilitation Act, the DCHRA, and the federal Family and Medical Leave Act;

B. Award Plaintiff all of the back pay, front pay in the event Plaintiff is not reinstated, and the value of all of the benefits and other privileges of his employment that he lost as a result of Defendants' unlawful conduct;

C. Award compensatory damages in an amount that would fully compensate Plaintiff for the economic loss, humiliation, embarrassment, emotional distress, and mental anguish caused by Defendants' violation of the federally and locally protected rights alleged in this Complaint, including but not limited to liquidated damages under the Family and Medical Leave Act;

D. Award punitive damages in an amount that would punish Defendants for the willful, wanton, and reckless misconduct alleged in this Complaint and that would effectively deter Defendants from future discriminatory and retaliatory behavior;

E. Award Plaintiff injunctive relief, including but not limited to reinstatement, or front pay in lieu thereof;

F. Award Plaintiff his reasonable attorneys' fees and costs; and

G. Order all other relief deemed just and equitable by the Court.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues.

This, the 1st Day of March, 2004.

Respectfully submitted,
**COVINGTON & BURLING**

/s Chad Tang
Jeffrey G. Huvelle (D.C. Bar 227769)
Chad Tang (D.C. Bar 464496)
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 662-6000
(202) 662-6291 - Fax

**WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS
AND URBAN AFFAIRS**
Susan E. Huhta (D.C. Bar 14547)
11 Dupont Circle, N.W.
Suite 400
Washington, D.C. 20036
(202) 319-1000
(202) 319-1010 - Fax

**COUNSEL FOR PLAINTIFF
DANIEL GOODWIN**

## THE UNITED STATES OF THE DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DANIEL GOODWIN,                          *

          Plaintiff,                    *

     v.                                 *    Civil Action No.:  1:03-cv-2447-RCL

HOWARD UNIVERSITY                        *

and                                      *

BELINDA L. WATKINS,                      *

          Defendants.                   *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### STIPULATION OF DISMISSAL WITH PREJUDICE

      Plaintiff Daniel Goodwin and Defendants Howard University and Belinda L.

Watkins, by their respective counsel, pursuant to Rule 41 of the Federal Rules of Civil

Procedure, hereby stipulate and agree that the above-captioned matter is dismissed, with

prejudice, each party to bear its own attorney's fees and costs, except as otherwise agreed

between Plaintiff Daniel Goodwin and Defendant Howard University.

Jeffrey G. Huvelle
DC Bar No. 227769
Chad Tang
DC Bar No. 464496

Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 662-6000
Facsimile:  (202) 662-6291

Susan E. Huta
DC Bar No. 14547

Washington Lawyers' Committee for Civil
Rights and Urban Affairs
11 DuPont Circle, N.W., Suite 400
Washington, DC 20036
(202) 319-1000
Facsimile: (202) 319-1010

Attorneys for Plaintiff Daniel Goodwin

Timothy F. McCormack
Bar No. 385025
Jennifer E. Keyser

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
300 E. Lombard Street
18th Floor
Baltimore, Maryland 21202
(410) 528-5600
Facsimile: (410) 528-5650

Attorneys for Defendant Howard University

Karen A. Kahn
DC Bar No. 455297
Timothy W. Romberger
DC Bar No. 458225

Kahn Romberger PLLC
1025 Connecticut Avenue, N.W., Suite 1000
Washington, D.C. 20036
(202) 828-1243
Facsimile: (202) 882-8756

Attorneys for Defendant Belinda L. Watkins

CLOSED, JURY, TYPE-H

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:03-cv-02447-RCL

GOODWIN v. HOWARD UNIVERSITY et al
Assigned to: Judge Royce C. Lamberth
Cause: 42:2003 Job Discrimination

Date Filed: 11/26/2003
Jury Demand: Defendant
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**DANIEL GOODWIN**

represented by    **Chad Y. Tang**
COVINGTON & BURLING
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
(202) 662-6000
Fax: (202) 778-5697
Email: ctang@cov.com
*ATTORNEY TO BE NOTICED*

**Jeffrey G. Huvelle**
COVINGTON & BURLING
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2494
(202) 662-5169
Fax: (202) 778-5169
Email: jhuvelle@cov.com
*ATTORNEY TO BE NOTICED*

**Susan E. Huhta**
WASHINGTON LAWYERS'
COMMITTEE
FOR CIVIL RIGHTS AND URBAN
AFFAIRS
11 Dupont Circle, NW
Suite 400
Washington, DC 20036
(202) 319-1000
Fax: (202) 319-1010
Email: sue_huhta@washlaw.org
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**HOWARD UNIVERSITY**

represented by    **Leroy T. Jenkins, Jr.**
HOWARD UNIVERSITY

2400 Sixth Street, NW
Suite 321
Washington, DC 20059
(202) 806-2650
Fax: (202) 806-6357
Email: ljenkins@howard.edu
*ATTORNEY TO BE NOTICED*

**Timothy F. McCormack**
BALLARD SPAHR ANDREWS &
INGERSOLL. LLP
300 East Lombard Street
18th Floor
Baltimore, Md 21202-3268
(410) 528-5600
Fax: (410) 361-8901
Email: mccormackt@ballardspahr.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**BELINDA L. WATKINS**                  represented by   **Timothy W. Romberger**
KHAN ROMBERGER PLLC
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036-5405
(202) 828-1243
Fax: (202) 882-8756
Email: Timromberger1@comcast.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen A. Khan**
KHAN ROMBERGER PLLC
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036-5405
(202) 828-1243
Fax: (202) 882-8756
Email: kkhan@starpower.net
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/26/2003 | 1 | MOTION to use Post Office Box by DANIEL GOODWIN. (td, ) (Entered: 11/28/2003) |
| 11/26/2003 | 2 | COMPLAINT against HOWARD UNIVERSITY, BELINDA L. WATKINS (Filing fee $ 150.) , filed by DANIEL GOODWIN.(td, ) (Entered: 11/28/2003) |

| | | |
|---|---|---|
| 11/26/2003 | | Summons (2) Issued as to HOWARD UNIVERSITY, BELINDA L. WATKINS. (td, ) (Entered: 11/28/2003) |
| 11/26/2003 | 3 | MOTION for Leave to Proceed in forma pauperis by DANIEL GOODWIN. (rje, ) (Entered: 12/18/2003) |
| 12/05/2003 | | FIAT ORDER granting 3 Motion for Leave to Proceed in forma pauperis . Signed by Judge Colleen Kollar-Kotelly on 12/5/03. (rje, ) (Entered: 12/18/2003) |
| 01/12/2004 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. HOWARD UNIVERSITY served on 1/2/2004, answer due 1/22/2004 (rje, ) (Entered: 01/13/2004) |
| 01/13/2004 | 4 | First MOTION for Extension of Time to File Answer re 2 Complaint by HOWARD UNIVERSITY. (Jenkins, Leroy) (Entered: 01/13/2004) |
| 01/15/2004 | 6 | NOTICE of Appearance by Susan E. Huhta, Chad Y. Tang on behalf of DANIEL GOODWIN (rje, ) (Entered: 01/16/2004) |
| 01/21/2004 | | MINUTE ENTRY ORDER granting 4 Defendants' Motion for Extension of Time to Answer the Complaint. Defendants' response is due by February 23, 2004. Signed by Judge Royce C. Lamberth on 1/16/04.(ah) (Entered: 01/21/2004) |
| 01/28/2004 | 7 | NOTICE of Appearance by Jeffrey G. Huvelle on behalf of DANIEL GOODWIN (rje, ) (Entered: 01/30/2004) |
| 01/28/2004 | 8 | First AMENDED COMPLAINT against HOWARD UNIVERSITY, BELINDA L. WATKINS , filed by DANIEL GOODWIN.(rje, ) (Entered: 01/30/2004) |
| 02/04/2004 | 9 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. BELINDA L. WATKINS served on 1/21/2004, answer due 2/10/2004 (rje, ) (Entered: 02/05/2004) |
| 02/17/2004 | 10 | NOTICE of Appearance by Karen A. Khan on behalf of BELINDA L. WATKINS (Khan, Karen) (Entered: 02/17/2004) |
| 02/17/2004 | 11 | MOTION to Dismiss *First Amended Complaint* by BELINDA L. WATKINS. (Attachments: # 1 # 2 # 3)(Khan, Karen) (Entered: 02/17/2004) |
| 02/26/2004 | 12 | First MOTION for Leave to File *Howard University's Answer to Plaintiff's Amended Complaint* by HOWARD UNIVERSITY. (Jenkins, Leroy) (Entered: 02/26/2004) |
| 02/26/2004 | 13 | *Howard University's* ANSWER to Complaint *of Daniel Goodwin* by HOWARD UNIVERSITY.(Jenkins, Leroy) (Entered: 02/26/2004) |
| 03/01/2004 | 14 | MOTION for Leave to File *Second Amended Complaint* by DANIEL GOODWIN. (Attachments: # 1 Exhibit exhibit 1 - second amended complaint)(Tang, Chad) (Entered: 03/01/2004) |
| 03/01/2004 | 15 | Memorandum in opposition to motion re 11 filed by DANIEL GOODWIN. (Attachments: # 1 Exhibit 1# 2 Exhibit 2)(Tang, Chad) (Entered: 03/01/2004) |
| 03/04/2004 | 16 | REPLY in support of motion re 11 *to Dismiss* filed by BELINDA L. WATKINS. (Khan, Karen) (Entered: 03/04/2004) |

| 03/04/2004 | 17 | Memorandum in opposition to motion re 14 *For Leave to File Second Amended Complaint* filed by BELINDA L. WATKINS. (Attachments: # 1 # 2)(Khan, Karen) (Entered: 03/04/2004) |
| 03/11/2004 | 18 | MOTION for Extension of Time to File Response/Reply as to 17 Memorandum in Opposition *to Motion for Leave to File Second Amended Complaint* by DANIEL GOODWIN. (Tang, Chad) (Entered: 03/11/2004) |
| 03/12/2004 | | MINUTE ORDER granting 12 Defendant's Motion for Leave to File Answer to the Amended Complaint. Signed by Judge Royce C. Lamberth on 3/12/04.(ah) (Entered: 03/12/2004) |
| 03/15/2004 | 19 | REPLY in support of motion re 14 filed by DANIEL GOODWIN. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6)(Tang, Chad) (Entered: 03/15/2004) |
| 03/19/2004 | 20 | MOTION to Dismiss *Plaintiff's Second Amended Complaint* by BELINDA L. WATKINS. (Attachments: # 1 # 2 # 3 # 4)(Khan, Karen) (Entered: 03/19/2004) |
| 03/30/2004 | 21 | Memorandum in opposition to motion re 20 filed by DANIEL GOODWIN. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5)(Tang, Chad) (Entered: 03/30/2004) |
| 04/02/2004 | 22 | Consent MOTION to Withdraw 20 MOTION to Dismiss *Plaintiff's Second Amended Complaint as Premature* by BELINDA L. WATKINS. (Attachments: # 1)(Khan, Karen) (Entered: 04/02/2004) |
| 04/02/2004 | | MINUTE ENTRY: ORDER granting 22 Defendant Watkins' Consent Motion to Withdraw Motion to Dismiss Second Amended Complaint. Signed by Judge Royce C. Lamberth on 4/2/04.(ah) (Entered: 04/02/2004) |
| 04/06/2004 | | MINUTE ENTRY: ORDER denying 11 Defendant Watkins' Motion to Dismiss First Amended Complaint, as moot, granting 14 Plaintiff's Motion for Leave to File Second Amended Complaint, granting 18 Plaintiff's Motion for Extension of Time to File Reply to Opposition to amending the complaint. Signed by Judge Royce C. Lamberth on 4/6/04.(ah) (Entered: 04/06/2004) |
| 04/06/2004 | 23 | SECOND AMENDED COMPLAINT against HOWARD UNIVERSITY, BELINDA L. WATKINS , filed by DANIEL GOODWIN.(rje, ) (Entered: 04/06/2004) |
| 04/14/2004 | 24 | MOTION to Dismiss *Plaintiff's Second Amended Complaint* by BELINDA L. WATKINS. (Attachments: # 1 # 2 # 3 # 4)(Khan, Karen) (Entered: 04/14/2004) |
| 04/19/2004 | 25 | ANSWER to Complaint by HOWARD UNIVERSITY.(Jenkins, Leroy) (Entered: 04/19/2004) |
| 04/26/2004 | 26 | Memorandum in opposition to motion re 24 filed by DANIEL GOODWIN. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7# 8 Exhibit 8# 9 Exhibit 9)(Tang, Chad) (Entered: 04/26/2004) |
| 04/30/2004 | 27 | NOTICE of Appearance by Timothy F. McCormack on behalf of HOWARD UNIVERSITY (McCormack, Timothy) (Entered: 04/30/2004) |

| 05/03/2004 | 28 | REPLY to opposition to motion re 24 filed by BELINDA L. WATKINS. (Khan, Karen) (Entered: 05/03/2004) |
| 05/24/2004 | | MINUTE ENTRY: ORDER granting 1 Plaintiff's Motion to Use Post Office Box address. Signed by Judge Colleen Kollar-Kotelly on 11/14/03.(ah) (Entered: 05/24/2004) |
| 06/30/2004 | 29 | MOTION for Mediation by DANIEL GOODWIN. (Tang, Chad) (Entered: 06/30/2004) |
| 07/21/2004 | 30 | ORDER granting 29 Motion for Mediation . Signed by Judge Royce C. Lamberth on 7/21/04. (lcrcl1) (Entered: 07/21/2004) |
| 07/21/2004 | | CASE REFERRED to Magistrate Judge Deborah A. Robinson for Mediation. (jsc) Modified on 7/29/2004 (jsc, ). (Entered: 07/29/2004) |
| 07/30/2004 | | Set Hearing: Settlement Conference set for Tuesday, 9/21/2004 @ 09:30 AM in Courtroom 25 before Judge Deborah A. Robinson. (EW) (Entered: 07/30/2004) |
| 08/09/2004 | 31 | Consent MOTION to Continue *Mediation to September 30, 2004* by BELINDA L. WATKINS. (Attachments: # 1)(Khan, Karen) (Entered: 08/09/2004) |
| 08/10/2004 | | MINUTE ORDER granting Consent Motion to Reschedule Mediation for September 30, 2004 31; Settlement conference previously scheduled for 9/21/04 continued to 9/30/04 at 9:30 a.m. Signed by Mag. Judge Deborah A. Robinson on 8/10/04.(jcl) (Entered: 08/10/2004) |
| 09/29/2004 | | Set/Reset Hearing: Settlement Conference re-set for Thursday, 10/7/2004 @ 03:00 PM in Courtroom 25 before Judge Deborah A. Robinson; Settlement Conference scheduled for Thursday, 9/30/04 Cancelled. (EW) (Entered: 09/29/2004) |
| 09/30/2004 | | Set/Reset Hearing: Settlement Conference re-set for Thursday,10/14/2004 @ 03:00 PM in Courtroom 25 before Judge Deborah A. Robinson. (EW) (Entered: 09/30/2004) |
| 10/15/2004 | | Minute Entry for proceedings held before Judge Deborah A. Robinson : Settlement Conference held on 10/15/2004; Telephone Conference set for 10/21/2004 03:30 PM before Judge Deborah A. Robinson. (EW) (Entered: 10/15/2004) |
| 10/15/2004 | 32 | MEMORANDUM from Belinda Watkins (Supplemental) in Support of Motion to Dismiss. (Attachments: # 1)(Khan, Karen) (Entered: 10/15/2004) |
| 10/21/2004 | | Minute Entry for proceedings held before Judge Deborah A. Robinson : Telephone Settlement Conference held on 10/21/2004; Further Settlement Conference scheduled for 11/3/04 @ 2 p.m.(KCG) (Entered: 10/21/2004) |
| 10/25/2004 | 33 | MOTION to Partially Dissolve, Alter or Amend Order of Referral to Voluntary Mediation re Case Referred to Magistrate Judge by BELINDA L. WATKINS. (Attachments: # 1)(Khan, Karen) (Entered: 10/25/2004) |
| 10/26/2004 | 34 | Memorandum in opposition to motion re 24 filed by DANIEL GOODWIN. (Attachments: # 1 Exhibit 1# 2 Exhibit 2)(Tang, Chad) (Entered: 10/26/2004) |

| | | |
|---|---|---|
| 11/03/2004 | 35 | MOTION to excuse Belinda Watkins from attending mediation on November 3, 2004 @ 2:00 p.m. by BELINDA L. WATKINS. (Attachments: # 1 Text of Proposed Order)(jf, ) (Entered: 11/03/2004) |
| 11/03/2004 | | Minte order granting 35 Consent Motion to Excuse Belinda Watkins from Attending Mediation on November 3, 2004. Signed by Judge Deborah A. Robinson on 11/3/04.(kcg) (Entered: 11/03/2004) |
| 11/03/2004 | | Minute Entry for proceedings held before Judge Deborah A. Robinson : Settlement Conference held on 11/3/2004; Telephone Conference set for Wednesday, 11/10/2004 @ 02:00 PM before Judge Deborah A. Robinson. (EW) (Entered: 11/03/2004) |
| 11/10/2004 | | Minute Entry for proceedings held before Judge Deborah A. Robinson : Telephone Conference held on 11/10/2004. Telephone Conference set for 11/18/2004 12:00 before Judge Deborah A. Robinson. (EW) (Entered: 11/10/2004) |
| 11/18/2004 | | Set/Reset Hearing: Telephone Conference set for Monday 11/22/2004 @ 03:30 PMbefore Judge Deborah A. Robinson. (EW) (Entered: 11/18/2004) |
| 11/23/2004 | | Minute Entry for proceedings held before Judge Deborah A. Robinson : Settlement Conference conducted on 11/22/04; next settlement conference scheduled for 1:30 p.m. on Wednesday, 12/1/04 in Courtroom 25 before Judge Deborah A. Robinson. (kcg) (Entered: 11/23/2004) |
| 12/01/2004 | | Minute Entry for proceedings held before Judge Deborah A. Robinson : Settlement Conference held on 12/1/2004. Telephone Conference set for 12/3/2004 12:00 before Judge Deborah A. Robinson. (EW) (Entered: 12/01/2004) |
| 12/03/2004 | | Minute Entry for proceedings held before Judge Deborah A. Robinson : Telephone Conference held on 12/3/2004. Telephone Conference set for Thursday, 12/9/2004 @ 03:00 PM before Judge Deborah A. Robinson. (EW) (Entered: 12/03/2004) |
| 12/09/2004 | | Minute Entry: Telephone conference conducted; Telephone Conference set for 1/6/2005 at 11:00 AM before Judge Deborah A. Robinson. (kcg) (Entered: 12/09/2004) |
| 01/06/2005 | | Minute Entry for proceedings held before Judge Deborah A. Robinson : Telephone Conference held on 1/6/2005. Telephone Conference set for Thursday, 1/13/2005 @ 10:00 AM before Judge Deborah A. Robinson. (EW) (Entered: 01/06/2005) |
| 01/13/2005 | | Minute Entry for proceedings held before Judge Deborah A. Robinson : Telephone Conference held on 1/13/2005. Telephone Conference set for 1/14/2005 03:30 PM before Judge Deborah A. Robinson. (EW) (Entered: 01/13/2005) |
| 01/14/2005 | | Minute Entry for proceedings held before Judge Deborah A. Robinson : Telephone Conference held on 1/14/2005. (EW) (Entered: 01/14/2005) |
| 01/14/2005 | | NOTICE of Hearing: Status Conference set for 1/25/2005 09:30 AM in Courtroom 21 before Judge Royce C. Lamberth. (mon, ) (Entered: 01/14/2005) |

| 01/25/2005 | | Minute Entry for proceedings held before Judge Royce C. Lamberth : Present for Plaintiff: Jeffrey Huvelle & Chad Tang; for defendants: Timothy McCormack, Jennifer Keyser and Timothy Romberger;Status Conference held on 1/25/2005. Next Status Conference set for 3/3/2005 09:30 AM in Courtroom 21 before Judge Royce C. Lamberth. (Court Reporter Theresa Sorensen.) (mon, ) (Entered: 01/25/2005) |
| --- | --- | --- |
| 01/25/2005 | | MINUTE ENTRY ORDER denying 33 Defendant Watkin's Motion regarding mediation referral, as moot. Signed by Judge Royce C. Lamberth on 1/25/05.(ah) (Entered: 01/25/2005) |
| 03/03/2005 | | Minute Entry for proceedings held before Judge Royce C. Lamberth : Present for plaintiff: Chad Tang & Susan Huhta; for defendanats: Timothy McCormack & Timothy RombergerStatus Conference held on 3/3/2005. (Court Reporter Rebecca King.) (mon, ) (Entered: 03/15/2005) |
| 10/19/2005 | 36 | STIPULATION of Dismissal *With Prejudice* by DANIEL GOODWIN, HOWARD UNIVERSITY, BELINDA L. WATKINS. (McCormack, Timothy) (Entered: 10/19/2005) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 09/07/2006 11:39:18 | | |
| **PACER Login:** | hh0141 | **Client Code:** | watkins |
| **Description:** | Docket Report | **Search Criteria:** | 1:03-cv-02447-RCL |
| **Billable Pages:** | 4 | **Cost:** | 0.32 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

| | |
|---|---|
| HOWARD UNIVERSITY<br>　　　　　　Plaintiff,<br><br>　　v.<br><br>BELINDA LIGHTFOOT WATKINS,<br><br>　　　　　　Defendant. | )<br>)<br>)<br>)<br>) Civil Action No.: 06-cv-2076 (DKC)<br>)<br>)<br>)<br>)<br>) |

## <u>DECLARATION OF BELINDA LIGHTFOOT WATKINS</u>

1.　　　　I am over the age of 18 and competent to testify to the matters herein.

2.　　　　I was employed by Howard University from 1976 until July 20, 2006.  I was

Acting Dean for Student Life and Activities for approximately five years, ending on June 30,

2004.  In that role, I supervised Daniel Goodwin.

3.　　　　In 2001 and 2002, Mr. Goodwin's attendance was unpredictable and we were

having concerns about his performance.  By early 2002, I believed that formal action was

warranted.  I sought and received advice from my supervisor, Raymond Archer, III and various

people in the University's Human Resources department and in the Office of General Counsel.  I

had numerous communications with Ann Barnes in HR and Leroy Jenkins, Jr. in OGC regarding

what we should do about Mr. Goodwin's attendance and performance issues.  Ms. Barnes and

Mr. Jenkins were my primary contacts, although other people also participated in some of these

communications.  On their advice and with their approval, I put Mr. Goodwin on a performance

improvement plan.  Attached to this declaration as Exhibits A and B are emails to Ms. Barnes

and Mr. Jenkins (with attachments) showing my initial draft and two revisions.  Exhibit B shows that Ann Barnes explicitly approved the final version on February 15, 2002 ("Good to go.").

4.      One of the issues concerned Mr. Goodwin's start time.  My first two versions asked Mr. Goodwin to keep ordinary hours of 9:00 a.m. to 5:30 p.m.  However, in response to Mr. Goodwin's request for an accommodation, I was directed to shift his work day to start at noon and end at 8:30 p.m.

5.      Mr. Goodwin's performance did not improve sufficiently. Accordingly, I sought advice from HR and OGC about how to terminate his employment.  I did not have the authority to terminate Mr. Goodwin.  Ultimately, the advice I received was to let his contract expire on June 30, 2002 without reappointment.  This was a group decision involving, at a minimum, Mr. Archer, Mr. Jenkins, Ms. Barnes and Clyde Cash, Jr., the Associate Vice Provost for Human Resources.  Exhibit C to this Declaration is an email chain reflecting one of my communications with Mr. Jenkins of OGC and Mr. Cash (Vice Provost, HR).  By this time, HR and OGC were aware of Mr. Goodwin's HIV status, his request for accommodate of his work schedule, and his request for FMLA leave.  It was my understanding that HR and/or OGC were the University experts on disabilities law and FMLA leave, and I relied on their advice.  In my June 25, 2002 email, I summarized clearly the reason that I was seeking the advice of HR and OGC:  "I wanted to be certain that I was proceeding correctly and, at the same time, safeguarding University liability, with these two personnel actions."

6.      The decision not to renew Mr. Goodwin's contract is documented on a "Personnel Recommendation Form," Exhibit D.  In addition to myself, this decision required the written approval of Raymond Archer (Interim Vice Provost for Student Affairs), Carole Borggren (Budget Director), A. Toy Caldwell-Colbert (Provost), and in this particular case, the personal

approval of the University's President, H.Patrick Swygert (see box at top right of Exhibit D form because the signature was too faint to photocopy from the "octuplicate" page).

7.       In 2004, I had my own complaint of discrimination based on age. Franklin Chambers became the Vice Provost for Student Affairs. He was under 40 years old and made a seriers of selections and appointments of people under 40, passing over better qualified people who were over 50. This included me. I had been doing well as the Acting Dean for Student Life and Activities for five years, yet Mr. Chambers selected a much younger and less qualified candidate instead. Indeed, the experience requirements for the job had to be reduced in order to permit the selection of this younger candidate. The facts relating to my complaint of discrimination are summarized in the Complaint filed in the District of Columbia Superior Court, Case no. 7247-06 (Exhibit I).

8.       I made a formal complaint of age discrimination to the University's EEO office on December 6, 2004.

9.       Daniel Goodwin filed a lawsuit against the University and me in late 2003. The University refused to have their lawyer represent me, or to reimburse me for having to hire my own lawyer. I was never deposed in that case. I attended the first court-ordered mediation session but my attorney and I spent most of the time in the hall, excluded from the substantive discussions between Mr. Goodwin and Howard University. I had to pay my attorney for the unproductive time she spent at the mediation. Because of that, we asked to be excused from the next mediation, and that request was granted.

10.       Ultimately, Howard University settled with Daniel Goodwin. I do not have a copy of that settlement agreement and I do not believe that I ever saw it or signed it. Until I was sued by HU, I had no idea of what the settlement terms were. My attorney did sign a stipulation

of dismissal. I understand that the court records show that the case was dismissed on October 19, 2005. At no time before Mr. Goodwin's case was dismissed was I told that Howard University intended to hold me financially responsible for the amount of money that it agreed to pay to Mr. Goodwin to settle the case.

11.     The first time that I can remember Howard University threatening to have some type of claim against me relating to the Goodwin suit was in connection with settlement discussions of my discrimination claim. There was a mediation session for my complaint on January 10, 2006, followed by a letter from HU's lawyer on April 5, 2006 (Exhibit E). It was in this context that HU's lawyer stated that HU may have claims against me.

12.     In the Spring of 2006, HU's lawyer sent at least three letters offering to settle my case against the University only if I resigned and gave up my 30-year career. I did not agree to this.

13.     On July 17, 2006, Howard University finally completed its review of my discrimination complaint, supposedly finding no discrimination. Exhibit F. Three days later, on July 20, 2006, Howard University fired me.

14.     On or about August 17, 2006, I received a summons showing that Howard University was suing me for the entire $253,000 it claims to have paid Mr. Goodwin to settle his case.

15.     I did not have counsel and wrote to HU's lawyer to ask if he would consent to an extension of time to respond to their complaint. HU's lawyer emailed me back, saying "Your request is denied." Exhibit H.

16.     I have caused a complaint to be filed in the District of Columbia Superior Court for discrimination and retaliation against Howard University and various individuals.  Exhibit I.


I hereby affirm under penalty of perjury that the foregoing is true and correct based on my personal knowledge.


_____
Belinda Lightfoot Watkins            Date

16.    I have caused a complaint to be filed in the District of Columbia Superior Court for discrimination and retaliation against Howard University and various individuals.  Exhibit I.

I hereby affirm under penalty of perjury that the foregoing is true and correct based on my personal knowledge.

Belinda Lightfoot Watkins                    Date    9/30/06

**Watkins, Belinda**

| | |
|---|---|
| **From:** | Watkins, Belinda |
| **Sent:** | Wednesday, February 13, 2002 1:54 PM |
| **To:** | Barnes, Ann W. |
| **Cc:** | Jenkins Jr., Leroy |
| **Subject:** | Daniel Goodwin Termination |

**Importance:**    High

Enclosed is a draft of the letter I would like to send to Mr. Goodwin, given my discussion with Mr. Jenkins on yesterday.  I

dgoodwin term
momo revised.doc...

am forwarding it to you for your review and/or comments, please.

Decl. Exh. A

Draft Letter to Dan Goodwin

February 13, 2002

After consulting with the Human Resources Department and the Office of the General Counsel at the University, I am forwarding notice to you to rescind the previous termination notice, which was effective March 4, 2002. While a review of your performance record supports the termination of you in the position of Acting Assistant Dean for Student Life and Activities, resultant our meeting on February 12th, regarding this matter, I am offering you an opportunity to improve your work performance for duties and responsibilities assigned to that position. The period for improvement will begin February 15 and end March 25th. On March 25th we will meet to discuss your performance, as it relates to the specific items outlined herein. At that time, if these items have been completed in a satisfactory manner, you will be expected to maintain the same level of performance throughout the duration of your continued temporary appointment as Acting Assistant Dean for Student Life and Activities.

The following items represent specific responsibilities, tasks, and projects you will be expected to execute, implement, and/or adhere for the period aforementioned.

1. Update and execute and upload information on Orientation web site for Spring 2002, by not later than 2/19/02

2. Provide me with update draft for Orientation web site with information for Fall 2002, by not later than 3/11/02.

3. Provide update draft for Orientation brochure for Fall 2002, by not later than 3/11/02.

4.

A. Report to duty, on a daily basis, by not later than 9:00 AM.

B. Maintain daily office hours between 9AM and 5 PM.

C. Contact me, via my cell phone; if and when you are unable to report at the designated time, providing at projected arrival time.

5. Provide written notification to ineligible Campus Pals, with a copy to Ms. Cara Tyson, and me by not later than 2/8/02.

6. Refrain from referencing yourself as "dean" in your conversations with students, University personnel, as well as those clients or contacts outside of the University.

7. Settle any and all open encumbrances, in your name, or that you caused to be encumbered, to include settlement reports, with the necessary receipts, receiving reports, and the like, to the General Accounting Office, of the University, by not later than 3/4/02.

8. Continue to serve as advisor to the Campus Pals Organization, which includes attending March executive board and general body meetings, as well as overseeing officer elections, and reporting written results to me within 48 hours of the occurrence or process.

9. As per your annual performance objectives for FY02:

A. Convene meeting with the University wide Orientation Advisory Committee to critique Spring 2002 Orientation Program, particularly programs and materials sponsored by the Office of the Dean for Student Life and Activities, with a written report, to me, of the proceedings/minutes of that meeting including any feedback, from the membership, of suggested improvements to our program.

B. At that same meeting of the Advisory Committee, discuss, explore and note, to me, feedback for the Fall 2002 Orientation Program to include new deadlines for our receipt of pertinent information from the schools and colleges, as well as, information from other support services offices, for web site revisions, as well as the Fall Orientation Booklet.

C. Develop and implement at least one academic survival workshop, with freshman students as the focus participants, by not later than 3/4/02.

10. Develop draft list and time line (deadline due dates) for all Orientation related activities to be reviewed, by me, which encompasses Orientation related duties of the Assistant Dean for Student Life and Activities from February 15th through May 1st; to include brochure mailings to domestic and international students, booklet printing, novelty/souvenir items and ordering, notice of dates to residence life for early arrivals for Campus Pal training, additional meetings of the Orientation Advisory Committee, notices to Orientation workshop participants, Fall Orientation workshop s and program development, involvement in the CAR pre-orientation program, and any other items pertinent to our Orientation program for new entrants, by not later than 3/14/02.

11. Refrain from making any disparaging remarks about by me, my character and/or my work ethics to students, other University personnel and clients outside of the University.

Your failure to follow, implement, execute and/or adhere, fully to the aforementioned items 1-11, will lead to your termination from the position of Acting Assistant Dean for Student Life and Activities.

I am available to discuss any and all items contained herein. If you need to do so, please make an appointment with the Administrative Secretary.

**Watkins, Belinda**

From:                    Barnes, Ann W.
  ~nt:                   Friday, February 15, 2002 4:19 PM
 ro:                     Watkins, Belinda
Subject:                 RE: DG rescind memo


Good to go.

> -----Original Message-----
> **From:** Watkins, Belinda
> **Sent:** Friday, February 15, 2002 4:05 PM
> **To:** Barnes, Ann W.
> **Subject:** FW: DG rescind memo

> Attached is the latest revised memo to Mr. Goodwin, as per our discussion.  I intend to give this to him today. <<
> File: dgoodwin term memo revised.doc >>

> -----Original Message-----
> **From:**    Watkins, Belinda
> **Sent:**    Friday, February 15, 2002 7:05 AM
> **To:**      Barnes, Ann W.
> **Subject:** FW: DG rescind memo

> Ann,
> This is the revised memo I gave to Mr. Goodwin on yesterday.

> -----Original Message-----
> **From:**    Belinda Lightfoot-Watkins [mailto:bwatkins@howard.edu]
> **Sent:**    Wednesday, February 13, 2002 9:47 AM
> **To:**      bwatkins@howard.edu
> **Subject:** DG rescind memo

> << File: dgoodwin term momo revised.doc >>

**Decl. Exh. B**

February 14, 2002

**Memorandum:**

TO:        Mr. Daniel Goodwin
           Acting Assistant Dean

FROM:      _____
           Ms. Belinda Lightfoot Watkins
           Acting Dean

SUBJ:      Meeting follow-up/performance evaluation

While a review of your performance evaluations for fiscal year 2001 and the mid year (done January 2002) supports the termination of you in the position of Acting Assistant Dean for Student Life and Activities, resultant our meeting on February 12th, regarding this matter, I am offering you an opportunity to improve your work performance for duties and responsibilities already assigned to that position. The period for improvement will begin **February 15th and end March 25th.** On March 25th we will meet to discuss your performance, as it relates to the specific items outlined herein. At that time, if these items have been completed in a satisfactory manner, you will be expected to maintain the same level of performance throughout the duration of your continued temporary appointment as Acting Assistant Dean for Student Life and Activities.

The following items represent specific responsibilities, tasks, and projects you will be expected to execute, implement, and/or adhere for the period aforementioned:

1. Update and execute upload information on Orientation web site for Spring 2002, by not later **2/19/02**. This task should have been done already, since Spring Orientation 02 began January 3, 2002.

2. Provide me with update draft for Orientation web site with information for Fall 2002, by not later than **3/11/02.**

3. Provide update draft for Orientation brochure for Fall 2002, by not later than **3/11/02.**

4.        A. Report to duty, on a **daily** basis, by not later than **9:00 AM.**
          B. Maintain daily office hours between **9AM and 5:30 PM..**
          C. Contact me, via my cell phone; if and when you are unable to report at the designated time, providing at projected arrival time.

5. Provide written notification to ineligible Campus Pals, with a copy to Ms. Cara Tyson, and me by not later than **2/15/02.**

6. Settle any and all open encumbrances, in your name, or that you caused to be encumbered, to include settlement reports, with the necessary receipts, receiving reports, and the like, to the General Accounting Office, of the University, by not later than **3/4/02.**

Page 1 of 2

7. Continue to serve as advisor to the Campus Pals Organization, which includes attending March executive board and general body meetings, as well

as overseeing officer elections, and reporting written results to me within 48 hours of the occurrence or process.

8. As per your annual performance objectives for FY02:

A. Convene meeting with the University wide Orientation Advisory Committee to critique Spring 2002 Orientation Program, particularly programs and materials sponsored by the Office of the Dean for Student Life and Activities, with a written report, to me, of the proceedings/minutes of that meeting including any feedback, from the membership, of suggested improvements to our program, by not later than **3/8/02.**

B. At that same meeting of the Advisory Committee, discuss, explore and note, to me, feedback for the Fall 2002 Orientation Program to include new deadlines for our receipt of pertinent information from the schools and colleges, as well as, information from other support services offices, for web site revisions, as well as the Fall Orientation Booklet.

C. Develop and implement at least one academic survival workshop, with freshman students as the focus participants, by not later than **3/4/02.**

9. Develop draft list and time line (deadline due dates) for all Orientation related activities to be reviewed, by me, which encompasses Orientation related duties of the Assistant Dean for Student Life and Activities from February 15th through May 1st; to include brochure mailings to domestic and international students, booklet printing, novelty/souvenir items and ordering, notice of dates to residence life for early arrivals for Campus Pal training, additional meetings of the Orientation Advisory Committee, notices to Orientation workshop participants, Fall Orientation workshop s and program development, involvement in the CAR pre-orientation program, and any other items pertinent to our Orientation program for new entrants, by not later than **3/20/02.**

Your failure or inability to perform the tasks outlined in items 1 through 10 of this memo, in a satisfactory manner and to maintain satisfactory performance of the duties and responsibilities of the position of Assistant Dean for Student Life and Activities may lead to your termination from that position prior to the expiration of your temporary appointment on June 30, 2002.

I am available to discuss this document with you. If you need to meet with me, please arrange an appointment with the administrative secretary.

C: Mr. Raymond W. Archer, III
   Interim Vice Provost for Student Affairs

# HOWARD UNIVERSITY

DIVISION OF STUDENT AFFAIRS
OFFICE OF THE DEAN
FOR STUDENT LIFE AND ACTIVITIES

**REVISED 2/15/02**
February 14, 2002

**Memorandum:**

TO:    Mr. Daniel Goodwin
       Acting Assistant Dean

FROM:  Ms. Belinda Lightfoot Watkins
       Acting Dean

SUBJ:  Meeting follow-up/performance evaluation

While a review of your performance evaluations for fiscal year 2001 and the mid year (done January 2002) supports the termination of you in the position of Acting Assistant Dean for Student Life and Activities, resultant our meeting on February 12th, regarding this matter, I am offering you an opportunity to improve your work performance for duties and responsibilities already assigned to that position. The period for improvement will begin **February 15th and end March 25th**. On March 25th we will meet to discuss your performance, as it relates to the specific items outlined herein. At that time, if these items have been completed in a satisfactory manner, you will be expected to maintain the same level of performance throughout the duration of your continued temporary appointment as Acting Assistant Dean for Student Life and Activities.

The following items represent specific responsibilities, tasks, and projects you will be expected to execute, implement, and/or adhere for the period aforementioned:

1. Update and execute upload information on Orientation web site for Spring 2002, by not later **2/19/02**. This task should have been done already, since Spring Orientation 02 began January 3, 2002.

2. Provide me with update draft for Orientation web site with information for Fall 2002, by not later than **3/11/02**.

3. Provide update draft for Orientation brochure for Fall 2002, by not later than **3/11/02**.

4.    A. Report to duty, on a **daily** basis, by not later than **12 NOON** _____ / _____
         Initial agreement to change     date

   B. Maintain daily office hours from **12:00 PM to 8:30 PM**. _____ / _____
         Initial agreement to change     date

   C. Contact me, via my cell phone; if and when you are unable to report at the designated time, providing at projected arrival time.
   **Revision Note: Items # 4A and #4B have been revised in this document.**



5. Provide written notification to ineligible Campus Pals, with a copy to Ms. Cara Tyson, and me by not later than **2/15/02**.

6. Settle any and all open encumbrances, in your name, or that you caused to be encumbered, to include settlement reports, with the necessary receipts, receiving reports, and the like, to the General Accounting Office, of the University, by not later than **3/4/02**.

7. Continue to serve as advisor to the Campus Pals Organization, which includes attending March executive board and general body meetings, as well as overseeing officer elections, and reporting written results to me within 48 hours of the occurrence or process.

8. As per your annual performance objectives for FY02:

   A. Convene meeting with the University wide Orientation Advisory Committee to critique Spring 2002 Orientation Program, particularly programs and materials sponsored by the Office of the Dean for Student Life and Activities, with a written report, to me, of the proceedings/minutes of that meeting including any feedback, from the membership, of suggested improvements to our program, by not later than **3/8/02**.

   B. At that same meeting of the Advisory Committee, discuss, explore and note, to me, feedback for the Fall 2002 Orientation Program to include new deadlines for our receipt of pertinent information from the schools and colleges, as well as, information from other support services offices, for web site revisions, as well as the Fall Orientation Booklet.

   C. Develop and implement at least one academic survival workshop, with freshman students as the focus participants, by not later than **3/4/02**.

9. Develop draft list and time line (deadline due dates) for all Orientation related activities to be reviewed, by me, which encompasses Orientation related duties of the Assistant Dean for Student Life and Activities from February 15th through May 1st; to include brochure mailings to domestic and international students, booklet printing, novelty/souvenir items and ordering, notice of dates to residence life for early arrivals for Campus Pal training, additional meetings of the Orientation Advisory Committee, notices to Orientation workshop participants, Fall Orientation workshops and program development, involvement in the CAR pre-orientation program, and any other items pertinent to our Orientation program for new entrants, by not later than **3/20/02**.

Your failure or inability to perform the tasks outlined in items 1 through 9 of this memo, in a satisfactory manner and to maintain satisfactory performance of the duties and responsibilities of the position of Assistant Dean for Student Life and Activities may lead to your termination from that position prior to the expiration of your temporary appointment on June 30, 2002.

I am available to discuss this document with you. If you need to meet with me, please arrange an appointment with the administrative secretary.

C: Mr. Raymond W. Archer, III
   Interim Vice Provost for Student Affairs

**Watkins, Belinda**

| | |
|---|---|
| **From:** | Cash Jr, Clyde G. |
| **Sent:** | Tuesday, June 25, 2002 3:47 PM |
| **To:** | Watkins, Belinda; Jenkins Jr., Leroy |
| **Subject:** | RE: Assistance |

Dean Watkins not to belabor the point ; I concur with the "domino effect " as stated in your e-mail.I would only add this very important point.Please review your PEP document on these individuals prior to your review with them.
thanks;
cgc

       -----Original Message-----
| | |
|---|---|
| **From:** | Watkins, Belinda |
| **Sent:** | Tuesday, June 25, 2002 11:31 AM |
| **To:** | Jenkins Jr., Leroy |
| **Cc:** | Cash Jr, Clyde G. |
| **Subject:** | RE: Assistance |

I wanted to speak with you regarding a matter we had discussed previously.  Ann Barnes had been my contact in Human Resources regarding the attempted early termination of the appointment for Dan Goodwin, Acting Assistant Dean for Student Life and Activities, whose appointment expires June 30th.  I just wanted to give you an update and to reconfirm my intentions not to continue the temporary appointment for him.  In addition, I intended to allow Mr. Samuels to return to that position; which means he would not be temporarily appointed to the position of Acting Director of Student Activities.
I talked to Mr. Cash about this matter, yesterday.  I was informed that you would be out of your office this week, entirely.
Ultimately, I wanted to be certain that I was proceeding correctly and, at the same time, safeguarding University liability, with these two personnel actions.

       -----Original Message-----
| | |
|---|---|
| **From:** | Jenkins Jr., Leroy |
| **Sent:** | Tuesday, June 25, 2002 5:46 AM |
| **To:** | Cash Jr, Clyde G. |
| **Cc:** | Watkins, Belinda |
| **Subject:** | Assistance |

Please give Dean Watkins a call at 6-5990 and provide her with some assistance on a human resource matter. Thank you.

**Decl. Exh. C**

# HOWARD UNIVERSITY
## PERSONNEL RECOMMENDATION FORM
### (SEE INSTRUCTIONS ON REVERSE SIDE)

CHECK IF PRESIDENTIAL
APPROVAL IS REQUIRED

## SHADED INFORMATION ENTRY AREAS FOR BUDGET OFFICE USE ONLY

| RECOMMENDATION | | ACTION | | TRANS-ACTION | PAY SCALE IND. | FILL IN APPLICABLE AREA | | | | | | | POSITION CODE (If known) | | SOCIAL SECURITY NO. | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE | NO. | 1st | 2nd | | | UNIV. BUDGET | | RESEARCH (R) or CONSTRUCTION (C) BUDGET | | | | | | | | | |
| | | | | | | DIV. | DEPT. | NUMBER | PART | YR. | | | | | | | |
| 6 7   10 | 11 | 12  14 | 15 | 16  18 | 20 | 16 | 20 | 21 | 23 | 24   28 | 29 | 30 | 38 | | | | |
| | 300 | | 4 | | | 240 | 303 | R | | | 131 | 006 | 247 | 53 | 8700 | | |

NAME (LAST, FIRST, M.I.) & TITLE
Goodwin, Joseph L.

POSITION TITLE
Acting Assistant Dean

☐ FACULTY
☐ NON FACULTY

ADDRESS (STREET, STATE & ZIP)
8247 ... Dallas Street, Laurel, Md. 20724

DATE OF BIRTH
04/07/1968

GRANT TITLE (IF APPLICABLE)

DIVISION TITLE
Student Affairs

DEPARTMENT TITLE
Student Life

## 1 APPOINTMENT

- A ☐ INITIAL
- B ☐ RE-APPT.
- C ☐ REINSTATEMENT
- D ☐ REPLACEMENT
- E ☐ TEMPORARY
- F ☐ OTHER*

## 2 POSITION CHANGE

- A ☐ CHANGE IN TIME
- B ☐ TRANSFER
- C ☑ PROMOTION
- D ☑ DEMOTION
- E ☐ INDEFINITE TENURE (FACULTY ONLY)*

### FILL IN APPROPRIATE BOXES BELOW FOR APPOINTMENT AND POSITION CHANGE

| BUDGET OFFICE ONLY | Provide New Pos. for Pos. Chg. Only | | | EFFECTIVE DATE | SALARY RATE | | | | PART TIME FRACTION | | GRADE OR RANK | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DIV. | DEPT. | POSITION | | | | | | NUM | DEN | SCALE | LEVEL | STEP |
| 39  41 | 39 | 41 | 43 44 | 49 50 | | ANNUAL AMOUNT ☐ A | | | 53 | 57 | 58  63 | 64 65 | 66 67 68 |
| | | | | | EXACT AMOUNT ☐ B | 55,000.00 | | | | | | | |
| | | | | | HOURLY AMOUNT ☐ C | | | | | | | | |

## TERMS OF APPOINTMENT

| CHECK ONE BOX (If applicable) | | IF REGULAR (CA) | | TERMINATION DATE | | Leave Accrued* (For Pos. Chg. Only) |
|---|---|---|---|---|---|---|
| INDEFINITE (FACULTY ONLY) | ☐ I | ENTER | | DATES MUST BE ENTERED IF NOT 'CA' or 'I' | | ANNUAL |
| REGULAR APP'T (STAFF) | ☐ C-A | PROBATION MONTHS | | | | SICK |
| | 74 75 | | 76 77 | 06  78  79 | | |

OLD POSITION - GRADE LEVEL
(For Position change only)

DEPT./SECTION

ANNUAL SALARY RATE
$

TERMINATION

* EXPLANATION REQUIRED

## 3 SEPARATION

- A ☐ RESIGNATION
- B ☐ TERMINATION
- C ☐ OTHER*

| | Last Working Day | | REASON | ANNUAL LEAVE/SICK LEAVE | ANNUAL SALARY |
|---|---|---|---|---|---|
| | 06 | 30 | 02 | 10 | $ 35,000.00 |
| | 42 | 45 | 46 47 | | GRADE OR RANK |
| | | | | | EFFECTIVE DATE 6/30/02 |

## 4 LEAVE OF ABSENCE

- A ☐ WITH PAY
- B ☐ WITHOUT PAY*
- C ☐ SABBATICAL

| | BEGINNING DATE | | ENDING DATE | | ANNUAL LEAVE/SICK LEAVE | ANNUAL SALARY $ |
|---|---|---|---|---|---|---|
| | 40 | 45 | 46 | 51 | GRADE OR RANK | LAST WORKING DAY |

| BUDGET OFFICE COMMITMENT | CONTRACT OR EMP. PERIOD IF LESS THAN 12 MONTHS | BUDGET ACTION CODES | | | |
|---|---|---|---|---|---|
| | | 1. MEMO ORIG. / MEMO CORR. | 3. APPTV'D MEMO / 4. APPTV'D MEMO | 5. DENIED / 6. CANCELLED | APPROVAL COLLECTION |

RECOMMENDED BY (NAME & TITLE) & DATE
Belinda Lightfoot-Watkins
Acting Dean Student Life  5/28/02

SUPPORTED BY (NAME & TITLE)

Authorized pending approval of the Board of Trustees or Executive Committee

V.P. RECOMMENDING APPROVAL        DATE
Raymond A. Archer, III
Interim V.P. for Student Affairs

V.P. FINAL AUTHORIZATION & DATE
A. Roy Cadwell-Colbert, Provost
(Needed When Presidential Signature is Not Required)

BUDGET DIRECTOR & DATE
Carole V. Bland
1/18/01

ENCUMBRANCE AMOUNT
$

President

CERTIFIED, HUMAN RESOURCE MANAGEMENT

DATE

JUN 26 2002
VICE PROVOST FOR STUDENT AFFAIRS

USE JUSTIFICATION SHEET FOR JUSTIFICATION

PERS. 10-R6 12M-6/87

**Decl. Exh. D**

OCTUPLICATE - RETAINED BY ORG. OFFICE

LAW OFFICES

# BALLARD SPAHR ANDREWS & INGERSOLL, LLP

300 EAST LOMBARD STREET, 18TH FLOOR
BALTIMORE, MARYLAND 21202-3268
410-528-5600
FAX: 410-528-5650
WWW.BALLARDSPAHR.COM

PHILADELPHIA, PA
DENVER, CO
SALT LAKE CITY, UT
VOORHEES, NJ
WASHINGTON, DC
WILMINGTON, DE

TIMOTHY F. McCORMACK
DIRECT DIAL: 410-528-5680
PERSONAL FAX: 410-361-8901
MCCORMACKT@BALLARDSPAHR.COM

April 5, 2006

Ms. Belinda Lightfoot-Watkins
6224 Cheverly Park Drive
Cheverly, MD  20785

Re:    Belinda Watkins v. Howard University
       Docket No. 05-326P(CN)
       EEOC No. 10CA500247

Dear Ms. Watkins:

As you know, we represent Howard University in connection with the above-referenced matters.

We have reviewed with the University the offer you made during mediation on January 10, 2006.  That offer is unacceptable to the University.  The University has, however, authorized us to offer to settle your claims in the above-referenced matters and the claims of Howard University against you arising from the matter *Daniel L. Goodwin v. Howard University, et al.*, Civil Action No. 1:03-CV-2447-RCL, upon the following terms:

1.    You will retire from the University's employ no later than ten (10) days after your acceptance of this offer of settlement.

2.    Upon retirement, your pension and retirement benefits shall be calculated in the same manner as are the pension and retirement benefits of every other similarly situated employee of the University, *i.e.*, the University will not include in the calculation of your pension or other retirement benefits any amounts that are not included in the pension or retirement benefits of other University employees, nor will the University artificially increase either your pension or other retirement benefits.

3.    Within ten (10) days following the execution of a written confidential settlement agreement, you will dismiss the above-referenced complaints pending before the District of Columbia Office of Human Rights and the U.S. Equal Employment Opportunity Commission.

Decl. Exh. E

Ms. Belinda Lightfoot-Watkins
April 5, 2006
Page 2

4.      Within twenty (20) days following execution of a written confidential settlement agreement, the University will pay to you a one-time lump sum payment of $3,667.00, in full settlement of any and all claims against the University.

5.      You and the University will each release the other from any and all claims that each holds against the other.

6.      The University will respond to any inquiries from your prospective employers with only a neutral reference, stating your years of employment with the University, the positions you held, and the fact that you retired from the University's employ.

7.      The settlement is expressly conditioned upon you and the University entering into a written confidential settlement agreement, satisfactory to the University, which will incorporate and supercede the terms of this letter and provide, *inter alia*, that you expressly agree and acknowledge that the University's entry into the settlement is not an admission of any wrongdoing on the part of the University; that you will keep the terms of the settlement and the amount of any settlement payment confidential; and that you will agree not to disparage the University or any of its trustees, officers, administrators, employees, or agents.

This letter and its contents are subject to the privilege for offers of settlement compromise. They are not intended as and may not be construed as an admission of wrongdoing or statement of position on the part of the University in the event of future litigation. They are entirely without prejudice to any position that the University may elect to take in the event of future litigation.

You may accept this offer by dating and countersigning the enclosed copy of this letter in blue ink and returning that dated and signed copy to the undersigned at this address prior to 5:00 EDST on April 17, 2006. If not so accepted by that date and time, this offer of settlement shall be deemed automatically withdrawn without further notice or action by the University.

If you have any questions or wish to discuss this offer, please feel free to telephone me.

Very truly yours,

Timothy F. McCormack

TFM/rk

ACCEPTED this ___ day of April, 2006.

_____
Belinda Lightfoot-Watkins

DMEAST #9502109 v1



# HOWARD
## UNIVERSITY

Office of the Provost and
Chief Academic Officer

### CONFIDENTIAL MEMORANDUM

TO:          Ms. Belinda Lightfoot Watkins
                Director of Student Activities

FROM:      Richard A. English, Ph.D.
                Provost and Chief Academic Officer

DATE:       July 17, 2006

SUBJECT:   Equal Employment Opportunity Complaint Against Dr. Franklin D. Chambers,
                Vice Provost for Student Affairs

This is to inform you that I have completed my review of your complaints of discrimination and retaliation against Dr. Franklin D. Chambers, Vice Provost for Student Affairs, dated December 6, 2004, and amended on May 31, 2005, and February 7, 2006.

In the complaint of December 6, 2004, you charged Dr. Chambers with discrimination and retaliation for not having appointed you to the vacant position of Dean for Student Life and Activities for which you had applied and one that you had occupied on an interim basis for six years prior to July 1, 2004. You also charged Dr. Chambers with effectively demoting you on July 1, 2004, by not reappointing you as Interim Dean and by letting you revert to your permanent position as Director of Student Activities. You also allege retaliation by the University for your role in the termination of the former Acting Assistant Dean for Student Life.

On May 31, 2005, you submitted an amended complaint, adding an additional specification to the original charges of discrimination and retaliation, claiming that the person appointed as permanent dean was less qualified than you.

On February 7, 2006, you submitted another amendment to your original complaint, specifically adding the charge of age discrimination in the selection of the permanent dean. The amended complaint also added to the charge of retaliation a specification citing the University's investigation into a possible case of nepotism with respect to the employment of your daughter as a yearbook assistant.

I hereby inform you that I have determined that your allegations of sex and age discrimination and retaliation are not sustained by the facts.

cc:      Ms. Talaya Gilmore-Moye
          Director, Equal Employment Opportunity



**Decl. Exh. F**

2400 6th Street, NW, Suite 405
Washington, DC 20059

Telephone 202 806 2550
Facsimile 202 806 4971
www.howard.edu

# HOWARD
## UNIVERSITY

Division of Student Affairs
Office of the Vice Provost
for Student Affairs

July 20, 2006

**BY HAND DELIVERY**
Mrs. Belinda Lightfoot Watkins
6224 Cheverly Park Drive
Cheverly, MD 20785

Re:     Termination of Employment

Dear Mrs. Watkins:

Please be advised that Howard University is terminating your employment effective immediately as a result of your serious neglect in duty and conduct incompatible with the welfare of the University, including, but not necessarily limited to, the following: You violated the Howard University Policy and Procedure on Equal Opportunity and Employment in Education Programs and Activities in your supervision of Daniel Goodwin and, as a result, caused the University to incur a significant financial liability to Mr. Goodwin. You misrepresented to the Office of General Counsel and the Department of Human Resources the reasons for your decision not to renew Mr. Goodwin's contract with the University and concealed from the University your true reasons, again causing the University to incur a significant financial liability to Mr. Goodwin.

It is the position of the University that you serve in your current position at the will of the President of Howard University and are, therefore, an employee-at-will. Nevertheless, each of the foregoing represent independent grounds to immediately terminate you pursuant to the Howard University Employee Handbook (Non-Faculty).

Immediately upon receipt of this letter you are requested to surrender to me all University property in your possession or under your control. If you do not wish to gather your belongings at this time, or cannot carry all of them with you, please make an appointment with Tonya Guillory, Dean for Student Life and Activities, to return to the Office at a mutually convenient time in the near future to collect your possessions. You are not permitted back on campus for any other purpose without clearance from the Chief of Campus Police.

Any questions you may have with respect to your benefits or rights to continued health insurance under the Consolidated Omnibus Budget Reconciliation Act (Public Law 99-272, Title IX) should be addressed to the University Office of Total Compensation (202 806-1280).

Sincerely,

*Frankl. Chambers.*

Franklin D. Chambers, Ph.D.
Vice Provost for Student Affairs



**Decl. Exh. G**

2400 6th Street, NW, Suite 201
Washington, DC 20059

Telephone 202 806 2100
Facsimile 202 806 9302
www.howard.edu

Subj:     **RE: Request for Extension**
Date:     9/5/2006 3:36:43 P.M. Eastern Standard Time
From:     McCormackT@ballardspahr.com
To:       Blwatkins6@aol.com

Dear Ms. Watkins:

You were served with the Complaint and Summons on August 17, 2006.  Your response is due 20 days after that date, September 6, 2006.

We cannot accommodate your request for an extension to respond.  Your request is denied.  You must timely respond.

Timothy F. McCormack
Ballard Spahr Andrews & Ingersoll, LLP
18th Floor
300 East Lombard Street
Baltimore, Maryland  21202-3268
(410) 528-5680
(410) 361-8901 (fax)
mccormackt@ballardspahr.com

---

**From:** Blwatkins6@aol.com [mailto:Blwatkins6@aol.com]
**Sent:** Monday, September 04, 2006 4:26 PM
**To:** McCormack, Timothy F. (Balt)
**Subject:** Request for Extension

Mr. McCormack:
I am respectfully requesting a 45 day extension in the matter of a response in summons regarding Howard University vs Belinda Lightfoot Watkins: Civil Action No. DKC06CV2076, due which is due September 8, 2006. I am currently seeking legal counsel to assist me in answering the compliant.

Your kind consideration of this request would be greatly appreciated.  I await your response.

**Decl. Exh. H**

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| BELINDA LIGHTFOOT WATKINS<br>6224 Cheverly Park Drive<br>Cheverly, MD 20785 | )<br>)<br>)<br>) |
| Plaintiff, | ) Civil Action No.: |
| | ) |
| v. | ) |
| | ) |
| HOWARD UNIVERSITY<br>2400 Sixth St., NW<br>Washington, DC 20059 | )<br>)<br>) |
| | ) |
| H.PATRICK SWYGERT<br>President<br>Howard University<br>Sixth St., NW<br>Washington, DC 20059 | )<br>)<br>)<br>)<br>) |
| | ) |
| FRANKLIN D. CHAMBERS<br>Vice Provost for Student Affairs<br>Howard University<br>Sixth St., NW<br>Washington, DC 20059 | )<br>)<br>)<br>)<br>) |
| | ) |
| NORMA LEFTWICH<br>Office of General Counsel<br>Howard University<br>Sixth St., NW<br>Washington, DC 20059 | )<br>)<br>)<br>)<br>) |
| | ) |
| THOMAS TRIMBOLI<br>Deputy to the General Counsel<br>Howard University<br>Sixth St., NW<br>Washington, DC 20059 | )<br>)<br>)<br>)<br>) |
| | ) |
| LEROY JENKINS<br>Assistant General Counsel<br>Howard University<br>Sixth St., NW<br>Washington, DC 20059 | )<br>)<br>)<br>)<br>) |
| | ) |
| KEITH MILES | ) |

0007247-06

RECEIVED
Civil Clerk's Office

SEP 2 6 2006

Superior Court of the
District of Columbia
Washington, D.C.

**Decl. Exh. I**

Litigation Coordinator in the Office General Counsel )
Howard University                                    )
Sixth St., NW                                        )
Washington, DC 20059                                 )
                                                     )
ANN BARNES                                           )
Director of Employment                               )
Howard University                                    )
Sixth St., NW                                        )
Washington, DC 20059                                 )
                                                     )
CLYDE CASH                                           )
Associate Vice Provost for the Human Resources       )
Howard University                                    )
Sixth St., NW                                        )
Washington, DC 20059                                 )
                                                     )
PHILLIP LATTIMORE                                    )
Office Of General Counsel                            )
Howard University                                    )
Sixth St., NW                                        )
Washington, DC 20059                                 )
                                                     )
REPUNZELLE JOHNSON                                   )
Office Of General Counsel                            )
Howard University                                    )
Sixth St., NW                                        )
Washington, DC 20059                                 )
                                                     )
TIJUANNA WILLIAMS                                    )
Office Of General Counsel                            )
Howard University                                    )
Sixth St., NW                                        )
Washington, DC 20059                                 )
                                                     )
GWENDOLYN GOOD                                       )
Empoyee, Office Of General Counsel                   )
Howard University                                    )
Sixth St., NW                                        )
Washington, DC 20059                                 )
                                                     )
PAUL ABRAHAMS                                        )
Investigator, Howard University EEO Office           )
Howard University                                    )
Sixth St., NW                                        )

- 2 -

Washington, DC 20059                                    )
                                                        )
TALYA GILMORE-MOYE                                      )
Director of Howard University EEO Office                )
Howard University                                       )
Sixth St., NW                                           )
Washington, DC 20059                                    )
                                                        )
TOYA CALDWELL-COLBERT                                   )
Provost                                                 )
Howard University                                       )
Sixth St., NW                                           )
Washington, DC 20059                                    )
                                                        )
ELIZABETH STROUD                                        )
Associate Vice Provost for Human Resources             )
Howard University                                       )
Sixth St., NW                                           )
Washington, DC 20059                                    )
                                                        )
CAROLE BORGGREN                                         )
Budget Director                                         )
Howard University                                       )
Sixth St., NW                                           )
Washington, DC 20059                                    )
                                                        )
KIM WILSON                                              )
EEO Officer                                             )
Howard University                                       )
Sixth St., NW                                           )
Washington, DC 20059                                    )
                                                        )
TONYA GUILLORY                                          )
DEAN FOR STUDENT LIFE AND ACTIVITIES                    )
Howard University                                       )
Sixth St., NW                                           )
Washington, DC 20059                                    )
                                                        )
                                                        )
                                                        )
                      Defendants.                       )

## COMPLAINT

(Employment Discrimination and Retaliation)

1.      Howard University discriminated against Belinda Lightfoot Watkins on the basis of her age when it demoted her from her position as Acting Dean which she had held for more than four years, and then promoted a much younger and much less qualified person in her place. When Ms. Watkins complained about the fact that a young supervisor had recently passed over two senior employees in favor of much younger and less qualified candidates, Howard University retaliated against her in a variety of ways, including unlawfully terminating her in July, 2006. Not content with ending her thirty-year career, Howard University continued to retaliate against Ms. Watkins after her termination by, among other things, improperly filing a lawsuit against her for $250,000.  These and other acts described herein constitute discrimination and reprisal in violation of D.C. law.  All allegations are based on information and belief.

## JURISDICTION

2.      This lawsuit is brought under the District of Columbia Human Rights Act (DCHRA), D.C. Code §§ 2-1401.01 et seq. to remedy defendants' actions in discriminating against and retaliating against plaintiff in her employment and afterwards because of her age and because she engaged in protected activity under the Act.  Jurisdiction of this Court is founded on D.C. Code, §§ 11-921.

## PARTIES

3.      Plaintiff, Belinda Lightfoot Watkins, was long-term employee of defendant Howard University.  Watkins' employment with Howard University commenced in 1976. Her

- 4 -

most senior position, until her demotion, was as Acting Dean for Student Life and Activities.

Plaintiff is over the age of 50. Waktins has engaged in protected activity under the DCHRA,

including both informal opposition to discrimination, written complaints to supervisors and to

the EEO office, and a formal complaint.

4.      Defendant Howard University is an educational institution conducting business in

the District of Columbia. It is an employer as defined by D.C. Code § 2-1401.02.

5.      Defendants H.Patrick Swygert, Franklin D. Chambers, Norma Leftwich, Thomas

Trimboli, Leroy Jenkins, Keith Miles, Ann Barnes, Clyde Cash, Phillip Lattimore, Repunzelle

Johnson, Tijuanna Williams, Gwendolyn Good, Paul Abrahams, Talya Gilmore-Moye, Toya

Caldwell-Colbert, Carole Borggren, Elizabeth Stroud, Tonya Guillory, and Kim Wilson

(hereafter "HU Defendants") were, at the relevant times, acting as employers, or in the interest of

Howard University as an employer either directly or indirectly, or individually aided and abetted

the actions complained of herein. Each of these individuals' position or title are listed in the

caption of this complaint, and are incorporated herein.

## FACTS

6.      Watkins was appointed Acting Dean for Student Life and Activities in or about

June 1998. Watkins performed well in this position.

7.      On or about July 1, 2003, Franklin Chambers was a appointed Vice-Provost for

Student Affairs. Chambers was under 40 years old. Chambers was selected over Raymond

Archer. At the time of Chamber's selection, Archer was over 50 years old. Archer had

substantially more experience for the position of Vice-Provost for Student Affairs than

Chambers. Archer was better qualified than Chambers for the position of Vice-Provost for

Student Affairs.

8.      At the time of Chambers' appointment to Vice-Provost for Student Affairs, Watkins has been serving as Acting Dean for Student Life and Activities for approximately four years. In or about December 2003, Watkins received a merit award based on her performance as Acting Dean for Student Life and Activities, and a raise in her salary.

9.      Shortly after Chambers' appointment to Vice-Provost for Student Affairs, Watkins spoke with Chambers about her prospects for becoming the Dean for Student Life and Activities. Chambers. No later than September 2003, Chambers was aware that Watkins wanted to be the Dean for Student Life and Activities.

10.     In or about December, 2003, Chambers appointed Charles Gibbs to be the Dean for Residence Life. Gibbs did not meet the listed qualifications for that position. Gibbs was under 40 years old when Chambers appointed him to be the Dean for Residence Life. Chambers appointed Carol Shelton, who was under 40 years old, to replace William Keene, an employee over 40 years old with extensive experience. At the time, Shelton lacked the requisite experience for the position as Executive Assistant. Chambers made or participated in other hiring decisions, choosing younger and less qualified people over older and better qualified candidates.

11.     Chambers told Watkins that if she wished to apply for the position of Dean for Student Life and Activities., he would not permit her to remain as Acting Dean for Student Life and Activities. Watkins told Chambers that she did want to be Dean for Student Life and Activities. Chambers decided to demote Watkins from Acting Dean for Student Life and Activities to Director of Student Life and Activities. Chambers' demotion of Watkins reduced her annual income by approximately Fifteen Thousand Dollars. Chambers demoted Watkins to punish and/or deter her from seeking or receiving the position of Dean for Student Life and Activities.

12.    Watkins applied for the position of Dean for Student Life and Activities. Watkins met the listed requirements for the position of Dean for Student Life and Activities. Watkins was not selected.

13.    Watkins made an age discrimination complaint to Howard University in December 2004. The position of Dean for Student Life and Activities was advertised in May 2004. Watkins had applied shortly after the advertisement. Watkins had not been contacted about interviewing for the position of Dean for Student Life and Activities at any time between her application and her written discrimination complaint in December 2004.

14.    Shortly after Watkins complained about discrimination, the minimum qualifications for the position of Dean for Student Life and Activities were changed. The change in minimum qualifications for the position of Dean for Student Life and Activities were posted in or about January 2005. This change was motivated wholly or partially because of Watkins' discrimination complaint.

15.    In or about May 2005, Chambers announced the appointment of Tonya Guillory as the new Dean for Student Life and Activities. Guillory was substantially less qualified for the position of Dean for Student Life and Activities than Watkins. At the time of her selection, Guillory did not meet minimum qualifications as originally listed in May 2004. Without the January 2005 change in the job posting, Guillory would not have met the minimal qualifications for the position of Dean for Student Life and Activities.

16.    In June 2005, Howard University said that Guillory was selected because her background and experience were a better match for the requirements of the position. This was a false statement.

17.    Howard University's EEO office did not respond to her original complaint.

- 7 -

Watkins had to send a letter to the office director to get a response.

18.    In or about June 2005, Watkins filed a complaint of discrimination and retaliation against Howard University with the D.C. Human Rights Commission.

19.    During and after the time that Watkins made her complaint of discrimination, Watkins was subjected to unwarranted criticism and harassment. HU Defendants Guillory and Chambers participated directly in t his, along with the knowledge, assistance and/or approval of most of the other HU Defendants.

20.    In April 2006, Howard University responded to Watkins' EEO complaint by asking that she retire immediately. Howard University repeated its request that Watkins leave her job at Howard University at least three times between April 5, 2006 and May 30, 2006.

21.    On or about July 17, 2006, Howard University's EEO office closes its EEO investigation regarding Watkins' complaint of discrimination.

22.    On or about July 20, 2006, Howard University fired Watkins. This ended her 30-year career at Howard University. This firing was unlawful because it was wholly or partially because of Watkins age and/or in retaliation for her protected activity, including, but not limited to, her complaints of discrimination.

23.    In or about August, 2006, Howard University filed a lawsuit in Maryland against Watkins seeking over $250,000. This lawsuit is not proper. This Maryland lawsuit was filed against Watkins for the improper purpose of discriminating and/or retaliating against Watkins.

24.    All former personnel actions at Howard University require the approval or concurrence of multiple officials. In addition, because of Watkins EEO complaint, various officials in Howard University's Office of General Counsel, Human Resources and EEO office participated or aided in the unlawful conduct. Typically various individually had to formally sign

paperwork or otherwise approving Watkins' termination in these circumstances, including, but not limited to, Chambers, Swygert, Borggren, Caldwell-Colbert, Jenkins, and Leftwich. Upon knowledge and belief, each of the named individual defendants participated, directly or indirectly, the acts complained of herein, and/or aided and abetted in the acts complained of herein.

## COUNT ONE

### (Discrimination)

25.    Defendants, and each of them, took the complained of actions wholly or partially because of plaintiff's age.

26.    Defendants unlawful conduct consisted of both the creation of a hostile environment and various discrete acts that may be actionable either separately or in aggregate.

27.    Defendants' actions were wanton, willful and malicious and taken in disregard of plaintiff's civil rights. The actions of the individuals have been tolerated, condoned and ratified by defendants.

## COUNT TWO

### (Retaliation)

28.    Plaintiff enjoyed an absolute right to protest actions she believed to be discriminatory and in violation of local and federal civil rights statutes, without being subjected to reprisals. Defendant's actions as described above constitute unlawful retaliation in violation of the DCHRA.

29.    Defendants unlawful conduct consisted of both the creation of a hostile environment and various discrete acts that may be actionable either separately or in aggregate.

30.    Defendants' actions were wanton, willful and malicious and taken in disregard of

plaintiff's civil rights.  The actions of the individuals have been tolerated, condoned and ratified by defendants.

WHEREFORE, plaintiff asks that this Court:

1) declare that defendant has violated the DCHRA by discriminating and/or retaliating against plaintiff because of her statutorily protected activity, and enjoin defendant from further unlawful acts;

2) award plaintiff compensatory damages in an amount to be proven at trial;

3) award her punitive damages in an amount to be proven at trial;

4) award plaintiff her costs, including reasonable attorneys' fees; and

5) award such other relief as the Court deems just.

### JURY DEMAND

Plaintiff requests trial by jury.

Stephen Z. Chertkof (451713)
Tammany M. Kramer
HELLER, HURON, CHERTKOF
LERNER & SALZMAN
1730 M Street, N.W.
Suite 713
Washington, DC  20036
(202) 293-8090

Attorneys for Plaintiff

LEXSEE 1990 U.S. APP. LEXIS 21666

**BARBARA SCOTT; PHYLLIS A. STONEKING; MAGUERITE ANDERSON; IRIS R. ISAACS; BARBARA DICREASE; KAREN L. VAUGHAN; SHERRY L. COOPER, Plaintiffs - Appellees, v. PPG INDUSTRIES, INCORPORATED, Defendant - Appellant, v. INTERNATIONAL CHEMICAL WORKER'S UNION AND ITS LOCAL NO. 45, Third Party Defendant - Appellee**

**No. 89-2362**

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

*920 F.2d 927; 1990 U.S. App. LEXIS 21666*

**October 30, 1989, Argued
December 13, 1990, Decided**

**NOTICE: [*1]**

RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THE THIS CIRCUIT.

**SUBSEQUENT HISTORY:**

As Amended January 9, 1991.

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of West Virginia at Wheeling. William M. Kidd, Senior District Judge. No. CA-88-21-W-K.

**DISPOSITION:**

AFFIRMED

**COUNSEL:**

ARGUED: Charles David Morrison, STEPTOE & JOHNSON, Clarksburg, West Virginia, for Appellant.

Timothy F. Cogan, O'BRIEN, CASSIDY & GALLAGHER, L.C., Wheeling, West Virginia, for Appellees.

ON BRIEF: Robert J. Schiavoni, STEPTOE & JOHNSON, Clarksburg, West Virginia, for Appellant.

Patrick S. Cassidy, O'BRIEN, CASSIDY & GALLAGHER, L.C., Wheeling, West Virginia; G.

Charles Hughes, Moundsville, West Virginia, for Appellees.

**JUDGES:**

Russell, Circuit Judge, Butzner, Senior Circuit Judge, and Ward, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.

**OPINION BY:**

PER CURIAM

**OPINION:**

Eight female employees ("plaintiffs") filed this action against their employer PPG Industries, Inc. ("PPG" or "defendant") for relief initially only under Title VII n1 but by amendment under the Equal Pay Act also. n2 The claim of the plaintiffs was [*2] that PPG had established a discriminatory employment job classification structure under which female employees were paid less in some classifications than male employees in another classification, though the requirements of skill, qualifications, responsibilities and efforts were comparable in both classifications. It was the plaintiffs' contention that such discrimination violated both Title VII and the Equal Pay Act. By way of remedy, the plaintiffs sought in their amended complaint injunctive relief n3 and "back pay" under their Title VII count and "liquidated damages under the Equal Pay Act" count. This appeal concerns procedural motions by PPG. PPG sought by motion to add the International Chemical Workers' Union and Local No. 45 of the Union (collectively, "the Unions") as parties defendant and for leave to file a third-party com-

plaint against the Unions, seeking contribution from them for any award against it in this Title VII and Equal Pay Act suit. The district judge granted the motion to add the Unions as parties defendant but only "for the limited purpose of fashioning any necessary equitable relief related to the collective bargaining agreement." The district court dismissed **[*3]** the motion for leave to file the third-party complaint on the ground that there was "neither an implied right to contribution nor a federal common-law right to contribution" in either Title VII or Equal Pay actions; nor could such a suit for contribution be maintained under the collective bargaining agreement between the Union representing PPG employees and PPG. PPG petitioned for an interlocutory appeal under *28 U.S.C. § 1292*(b) to review these rulings. The Unions joined in the motion. The interlocutory appeal was granted. We affirm the rulings of the district court.

n1 *42 U.S.C. § 2000*(e).

n2 *29 U.S.C. § 206*(d).

n3 The plaintiffs later abandoned any claim for injunctive relief. The district court permitted such claim only for the purpose, if necessary, to full relief if plaintiffs prevailed.

I.

Eight female employees filed this suit for relief under Title VII and the Equal Pay Act. Their claim was that PPG had established a discriminatory employment assignment structure that assigned female employees to **[*4]** a classification requiring equal skill, qualifications, work effort and responsibilities but providing a lower scale of pay than is provided to male employees in other like or similar classifications. PPG undertook by motions to bring the Unions in as parties defendant and to be permitted to file a third-party complaint under *Rule 14(a) of the Federal Rules of Civil Procedure* against the Unions in order to secure contribution from the Unions in the event of any award against it in the Title VII and Equal Pay action. The basis for such third-party complaint for contribution was the provision of the collective bargaining agreement requiring observance by the parties of "the principles of equal pay for women as for men when doing the same quantity and quality of work or the same job. . . ." n4 Based on what it describes as this "joint" obligation of the Unions and itself under the collective bargaining agreement to refrain from discriminatory practices, PPG alleged in its proposed cross-complaint that the Unions were "legally required to con-

tribute their proportionate share of liability should the plaintiffs recover against defendant and third-party plaintiff PPG *in this action*." **[*5]** (Emphasis added.) It concluded its cross-complaint with the prayer that it be granted "judgment against third-party defendants ICWU and its Local No. 45 in such proportionate amount, if any, to what the plaintiffs may recover from defendant and third-party plaintiff PPG in this action, together with interest, costs and reasonable attorneys fees."

n4 Article XIX, No 14. PPG cites, in addition, two other provisions of the collective bargaining agreement. These provide:

There shall be no discrimination as to rates of pay between employees of the same classification.

Article XIX, No. 13.

The parties hereto agree to apply the provisions of this Agreement to all employees without discrimination because of race, color, sex, religious creed, age, or national origin.

Article II.

These additional provisions merely supplement the language quoted above.

II.

Both the plaintiffs in the primary action and the Unions moved to dismiss both PPG's motion to add the Unions as parties defendant and its petition to file the proposed **[*6]** cross-complaint. The district court granted with qualifications the motion to add the Unions as parties defendant and dismissed PPG's proposed cross-complaint.

III.

In granting with qualifications the motion of PPG to add the Unions as parties defendant, the district court said:

The Court agrees that, depending on the evidence adduced during discovery or at trial, equitable relief may be required in order to achieve a final determination of the issues raised by the complaint. Accordingly, the motion of the defendant, PPG, to add the Union as a defendant is GRANTED for the limited purpose of fashioning any necessary equitable relief related to the collective bargaining agreement.

It will be noted that the order did not grant the motion to add defendants for the purpose of filing a cross-complaint for contribution. In effect, the district court dismissed the motion to add the Unions as parties defendant.

Addressing the petition of PPG to file a cross-complaint for contribution, the district court found that PPG's proposed cross-complaint was contrary to *Northwest Airlines, Inc. v. Transport* **[*7]** *Workers Union, 451 U.S. 77 (1981),* which had held that a defendant in either a Title VII or an Equal Pay Act suit had no right of contribution. The district court put its ruling in these words:

This Court cannot distinguish the Supreme Court's ruling in *Northeast [sic] Airlines* simply because the parties included a provision in their contract agreeing to do what the law required them to do -- refrain from discriminating against union members on the basis of race, color, creed, sex, and national origin. Accordingly, the Court follows the holding in *Northeast [sic] Airlines* and hereby GRANTS the motion to dismiss the third-party complaint filed by the Union.

It is the dismissal of the cross-complaint on which this appeal actually focuses.

IV.

The starting point for any review of the decision of the district court herein must be the opinion of the Supreme Court in *Northwest Airlines*. The facts in that case are singularly similar to those in this case. Both were brought by female plaintiffs alleging that the defendant in each case had established a wage classification structure under the collective bargaining agreement between the employer-defendant and the representative **[*8]** Unions which gave female employees lower pay than male employees doing similar work requiring like skills and qualifications. The female employees-plaintiffs filed their suits in both cases under Title VII and the Equal Pay Act against only the employer. In this case, the employer-defendant seeks to file a cross-complaint against the Unions as third-party defendants to establish a right of contribution against the Unions; in *Northwest Airlines*, the employer, after a rebuff of its attempt to file a cross-complaint seeking contribution, filed a separate suit for contribution after judgment in the main suit establishing its liability. Except for that procedural difference, the two cases are similar. The Supreme Court held that a defendant-employer in either a Title VII or Equal Pay Act suit could not secure contribution from a third party. That ruling was found by the district court to be applicable here and it dismissed PPG's efforts to establish in this case a right to contribution from the Unions.

But the defendant would find a distinction between the two situations. That distinction is the inclusion of Section 301 of the Labor Management Relations Act ("LMRA"), now codified as **[*9]** *29 U.S.C. § 185,* as the source of its claim for contribution in its cross-complaint. It alleges that under the collective bargaining agreement both the employer and the Unions "promised that the principles of equal pay for women as for men when doing the same quantity and quality of work on the same job will be observed" and that the employer and the Unions were "jointly liable for any alleged breach of said promises." It accordingly asserts that the Unions "are legally required to contribute their proportionate share of liability should the plaintiffs recover against defendant and third-party plaintiff PPG in this action."

PPG recognizes that the suit filed against it by the plaintiff-employees is premised entirely on Title VII and the Equal Pay Act, and, citing *Northwest Airlines*, it concedes that normally in such a case there is no right to contribution in its favor should it lose the case. But it asserts that it has surmounted this difficulty by filing its cross-complaint stating a separate and distinct claim under the non-discrimination language of the collective bargaining agreement, jurisdiction for which it would find in Section 301 of the LMRA. It argues that it is a **[*10]** "beneficiary" under the discriminatory provisions of that collective bargaining agreement and that as such "beneficiary" it has a right to bring in the Unions as third-party defendants in an implied action for contribution under Section 301 and to recover in that implied action against the third-party defendants a judgment of contribution. Thus, the argument concludes, the employer in this case has successfully evaded the denial of a right of contribution in this Title VII and Equal Pay suit under *Northwest Airlines*. There are, however, a number of serious flaws in this carefully crafted theory.

Basic to the defendant-employer's right to file its third-party claim for contribution is the impleading of the Unions as third-party defendants. Obviously, there can be no maintainable third-party complaint if the proposed third party cannot be impleaded as a party in the action. Impleader is controlled by *Rule 14(a) of the Federal Rules of Civil Procedure*, which authorizes a defendant to bring a third-party suit against "a person not a party to the action *who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against him.*" (Emphasis added.) n5 **[*11]** It is manifest from the language of the rule that the third-party claim must be dependent on or related to the initial plaintiff's claim against the defendant, that is, in this case, the Title VII and Equal Pay counts of the plaintiffs' complaint. As the Supreme Court has said in *Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365, 368 n.3 (1978),* "under Rule 14(a), a third-party defendant may not be impleaded

merely because he may be liable to the *plaintiff*." (Emphasis in original.) We repeat that the third-party claim must be "derivative" of the plaintiff's claim for "derivative liability is central to the operation of Rule 14," *Watergate Landmark Condominium Unit Owners' Association v. Wiss, Janey, Elstner Associates, Inc., 117 F.R.D. 576, 578 (E.D. Va. 1987).* This same point was made in *United States v. One 1977 Mercedes Benz, 708 F.2d 444, 452 (9th Cir. 1983), cert. denied, 464 U.S. 1071 (1984),* where the Court said that "a third-party claim may be asserted only when the third party's liability is in some way dependant on the outcome of the main claim and the third party's liability is secondary or derivative. It is not sufficient that the third-party [*12] claim is a related claim; the claim must be derivatively based on the original plaintiff's claim." (Citations omitted.) *See also Sears v. Atchison, Topeka & Santa Fe Railway Co., 749 F.2d 1451, 1454 (10th Cir. 1984), cert. denied, 471 U.S. 1099 (1985); Collini v. Wean United, Inc., 101 F.R.D. 408, 410-11 (W.D. Pa. 1983).* It cannot be said that a claim of liability under an assumed implication of a federal common law right of contribution by virtue of Section 301 of the LMRA is derivative of, dependent on and secondary to the employees-plaintiffs' Title VII and Equal Pay action. Yet that precisely is what the employer contends here and it is a contention which in our opinion is without merit. Since the defendant has not, therefore, met the threshold requirement for an allowance of its cross-complaint, the district court properly refused to sustain the proposed cross-complaint of the employer here.

n5 *See EEOC v. Ferris State College, 493 F. Supp. 707, 717-18 (W.D. Mich. 1980)* (citations omitted):

The authority under federal law to initiate a third-party complaint arises out of *Rule 14 of the Federal Rules of Civil Procedure . . . .*

Rule 14 does not, however, have the effect of enlarging substantive rights under federal law . . . .

An employer's right to seek contribution for damages incurred as a result of its liability under the Equal Pay Act rests solely upon the rights Congress created in enacting the Equal Pay Act. If the Act itself confers no right of contribution favoring employers, then no such right exists under federal common tort law which would authorize a third-party action pursuant to Rule 14. Because I conclude that the Equal Pay Act precludes contribution actions, I likewise conclude that this court lacks jurisdiction to hear, under Rule 14, a similar suit based on common tort law.

[*13]

There is another reason that makes a right of contribution unavailable to the employer in this case. PPG admits that Section 301 grants no express right of contribution, and neither does the collective bargaining agreement between the employer and the Unions. Section 301 actually confers no substantive rights; it is a procedural or jurisdictional statute authorizing a federal forum for suits under a collective bargaining agreement. *Local 205, United Electrical, Radio, & Machine Workers v. General Electric Co., 233 F.2d 85, 96 (1st Cir. 1956), aff'd, 353 U.S. 547 (1957).* The employer here recognized that Section 301 does not expressly authorize a claim for contribution in suits involving claims under the collective bargaining agreement or in any other context. The right of contribution by way of a suit for breach of the collective bargaining agreement under the jurisdictional authorization in Section 301 can therefore exist, if at all, only by implication. In assessing the maintainability of a party's claim for such an implied right, the claimant must first establish its standing to maintain that claim. In order to meet this requirement, the claimant must show that it was intended [*14] to be a beneficiary under the statute or under the terms of the collective bargaining agreement. Clearly, the employer here was not intended to be a beneficiary under Section 301 or under the non-discrimination provisions of the collective bargaining agreement between the employer and the Unions, the proposed third-party defendants. The non-discrimination provisions of the collective bargaining agreement were intended to benefit and protect the employees, not the employer. Any right of action under the non-discrimination provisions of the collective bargaining agreement could be implied, if at all, only in favor of the victim or victims of such violation and certainly not in favor of one who was one of the perpetrators of the discriminatory conduct alleged by the employer itself in its proposed cross-complaint. Under the employer's hypothetical scenario, the employer would be a joint tortfeasor. There is absolutely nothing in Section 301 or in the collective bargaining agreement to support the argument that a claim for contribution in favor of a joint tortfeasor was to be implied under the facts of this case.

The shortcoming in this argument of the employer was emphasized in *Northwest* [*15] *Airlines*. To paraphrase somewhat the Supreme Court's language in that case, the Court said that the non-discrimination provisions in the collective bargaining agreement in that case, which were substantially as those here, were not intended for the "especial benefit" of the employer; they were clearly "directed at the employees," and were intended to "regulate the conduct [of the employer] for the benefit of employees" such as the employee-plaintiffs. The Supreme Court conceded that an action might be brought

920 F.2d 927; 1990 U.S. App. LEXIS 21666, *

for a breach of the collective bargaining agreement which might have harmed the employer, but that was, as the Supreme Court said, "entirely different from a right to compel the union to share the responsibility for a joint violation of a third party's rights. Clearly, the language of neither statute [*i.e.*, Title VII and the Equal Pay Act] supports implication of a right to contribution in favor of employers against unions." *Northwest Airlines, 451 U.S. at 93.* This language of the Supreme Court is, in its reasoning, equally applicable to this effort of the employer

to claim the status of a "beneficiary" entitled to an implied right of contribution under Section 301 **[*16]** in this case and warrants the dismissal of the employer's proposed cross-complaint.

The rulings of the district court herein are accordingly

*AFFIRMED.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DANIEL GOODWIN, | : | |
| | : | |
| Plaintiff, | : | Civil No. 1:03-cv-02447 (RCL) |
| vs. | : | |
| | : | |
| HOWARD UNIVERSITY, AND | : | |
| BELINDA L. WATKINS, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MOTION TO DISMISS SECOND AMENDED COMPLAINT
## BY THE INDIVIDUAL DEFENDANT– BELINDA WATKINS

Defendant, Belinda L. Watkins, (hereinafter "Ms. Watkins"), by and through her undersigned counsel, hereby move this Court, pursuant to Rules 12(b)(6), 12(b)(1), 12(h) and/or 12(e) of the Federal Rules of Civil Procedure, to dismiss her as party defendant in this matter. For the reasons set forth in the attached Memorandum of Points and Authorities, Plaintiff's allegations against Ms. Watkins in the Second Amended Complaint fail to state a claim upon which relief can be granted, or are barred by the applicable statute of limitations.

Respectfully submitted,

**KHAN ROMBERGER PLLC**

BY:_____/s/_____
    Karen A. Khan, Esquire
    D.C. Bar No. 455297
    1025 Connecticut Avenue, N.W.
    Suite 1000
    Washington, D.C.  20036
    Attorneys for Belinda L. Watkins
    (202) 828-1243

Date:__April 14, 2004___

## COUNSEL CONFERENCE

As the present motion is dispositive as to the challenged claims, the parties are not required to meet and confer.  As moving Defendant seeks a complete dismissal of all claims, the instant motion is presumed to be contested.

Respectfully submitted,

**KHAN ROMBERGER PLLC**

BY: _____/s/_____
Karen A. Khan, Esquire
D.C. Bar No. 455297
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C.  20036
Attorneys for Belinda L. Watkins
(202) 828-1243

Date:  April 14, 2004

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|                          |     |                              |
|--------------------------|-----|------------------------------|
| DANIEL GOODWIN,          | :   |                              |
|                          | :   |                              |
| Plaintiff,               | :   | Civil No. 1:03-cv-02447 (RCL)|
| vs.                      | :   |                              |
|                          | :   |                              |
| HOWARD UNIVERSITY, AND   | :   |                              |
| BELINDA L. WATKINS,      | :   |                              |
|                          | :   |                              |
| Defendants.              | :   |                              |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF HER MOTION TO DISMISS**

**INTRODUCTION**

Plaintiff, a former Acting Assistant Dean of Students for Howard University, instituted this action *pro se*, by filing a Complaint on or around November of 2003, alleging various employment discrimination and related claims stemming from his employment and ultimate termination thereof, which was announced on June 20, 2002. Plaintiff was thereafter appointed counsel, who filed a First Amended Complaint on his behalf on or about January 28, 2004. The individual Defendant – Belinda Watkins – thereafter moved to dismiss all claims against her in the First Amended Complaint on February 17, 2004.

In response to the Motion to Dismiss, Plaintiff, through his counsel, filed an Opposition agreeing to drop several claims against Ms. Watkins, and additionally sought leave of Court to file a Second Amended Complaint reflecting these changes. By Minute Order dated April 6, 2004, this

3

Court granted the Motion for Leave to file the Second Amended Complaint, a true and correct copy of which is attached hereto as Exhibit "1."

Plaintiff's Second Amended Complaint attempts to raise multiple claims against his former employer, Howard University, and Ms. Watkins, who formerly served as his supervisor. More specifically, Plaintiff is attempting to raise three independent claims against Ms. Watkins, those being: (1) discrimination under the District of Columbia Human Rights Act, D.C. Code Ann. §2-1401.01, *et seq*. ("DCHRA"); (2) violations of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*. ("FMLA"); and (3) a common law claim for intentional infliction of emotional distress ("IIED").[1]

The moving Defendant herein – Ms. Belinda Waktins, is currently employed by Howard University. Despite this, Howard University has refused to provide representation for Ms. Watkins, even though there is complete commonality of interests in the defense. This has resulted, unfortunately, in Ms. Watkins being forced at her own expense to retain her own separate counsel.

Ms. Watkins now respectfully moves this Court for a dismissal of the remaining claims alleged against her as set forth in the Second Amended Complaint. As more thoroughly set forth herein, these claims must fail for several reasons, including that:

---

[1] Plaintiff had previously sought to prosecute claims against Ms. Watkins for violations of the Americans with Disabilities Act, 42 U.S.C. §12111 *et seq*., ("ADA"); the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"); and the District of Columbia Family and Medical Leave Act, D.C. Code Ann. §32-501, *et seq*. ("DC FMLA"). Plaintiff agreed to dismiss these claims as to Ms. Watkins in response to the initial motion to dismiss.

1.      The DCHRA claims against Ms. Watkins are barred by the one year statute of limitations;

2.      The IIED claim is barred by the applicable statute of limitations, and further fails to state a claim upon which relief can be granted as a matter of law;

3.      The FMLA claims fail to state a claim against Ms. Watkins *individually* upon which relief can be granted as a matter of law.

## STANDARD

In determining a motion to dismiss for failure to state a claim upon which relief can be granted, the Court must view the factual allegations in the Plaintiff's Amended Complaint as true. Hishon v. King & Spalding, 467 U.S. 69, 104 S.Ct. 229, 81 L.Ed.2d 59 (1984); Higashi v. Shifflet, 195 F.2d 784 (D.C. Cir. 1952). A motion to dismiss under Fed.R.Civ.P. 12(b)(6) should be granted where it appears beyond doubt that the Plaintiff can prove no set of facts which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a Rule 12(b)(6) motion, a court should accept all allegations in the complaint and construe all reasonable inferences in the light most favorable to the non-movant. EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621 (D.C. Cir. 1997).

On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. Shulman v. Yoyou, LLC., – F.Supp.2d –, 2004 WL 180932 (D.D.C. 2004). The court may dismiss a complaint for lack of subject-matter jurisdiction only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (citations omitted).

6

## ARGUMENT

I.    **THE DCHRA CLAIMS ARE BARRED BY THE APPLICABLE ONE YEAR STATUTE OF LIMITATIONS**

Plaintiff's claim for violations of the District of Columbia Human Rights Act is barred by the Acts' one (1) year statute of limitation. *See* D.C. Code Ann. § 2-1403.16(a)(claims under the DCHRA must be brought "within one year of the unlawful discriminatory act, or the discovery thereof...).

In his Second Amended Complaint, Plaintiff alleges that he was hired by Howard University in August of 1998 as Acting Assistant Dean of Students. (*See* Ex. 1, Second Amended Complaint, ¶ 13). Plaintiff alleges that in September of 1998, he suffered a stoke which resulted in hospitalization. During this hospital stay, Plaintiff discovered that he was infected with HIV. (¶ 15). While hospitalized, Plaintiff believes that an employee named Paulette Porter learned that he had HIV, and began treating him differently upon his return to work in February of 1999. (¶¶ 16-18). Plaintiff's Second Amended Complaint alleges varying instances of differing treatment, denial of accommodation, and alleged adverse employment actions from February of 1999 through June 20, 2002, when he was informed that his employment contract for the following year would not be renewed because of performance problems. (¶ 59).

Put simply, Plaintiff's claims are time-barred, as all of the underlying facts giving rise to his claims of disability discrimination and retaliation under the DCHRA necessarily occurred between February of 1999, and June 20, 2002. However, Plaintiff did not file the instant lawsuit until

7

November of 2003, well beyond the one year limitations period for these claims.[2]

In the event Plaintiff asserts that the running of the DCHRA claim should be tolled because he previously filed an administrative charge with the EEOC which was cross-filed with the District of Columbia Office of Human Rights (¶ 11), this would not affect the outcome.  Ms. Watkins was never named as a respondent in any agency action.  In fact, a simple review of the EEOC charge referenced in Plaintiff's Second Amended Complaint shows that the only named respondent at the administrative level was Howard University. (*See* Ex. 2).

While Title VII actions cannot be brought against individual supervisors, the DCHRA does contemplate claims against individuals.  Hence, if Plaintiff wanted to bring an action against Ms. Watkins individually, he had one of two choices: (1) file an administrative complaint against Ms. Watkins with the D.C. Office of Human Rights, or (2) initiate a lawsuit against Ms. Watkins within one year of the alleged discrimination.  It is well settled that the DCHRA is a statute which provides for an "election of remedies," meaning that a complainant has a *choice* of either proceeding directly to court to assert a private right of action, or pursuing an administrative

---

[2]      Notably, the First Amended Complaint does not allege in any form that Plaintiff was subjected to a continuing violation of discrimination.  Even if a continuing violation doctrine were raised, it would surely fail in light of the Supreme Court's recent decision in National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 S.Ct. 2061 (2002), which severely limits the scope and application of the continuing violation doctrine as it applies to claims of employment discrimination. It is questionable that Plaintiff ever had a good faith basis for bring untimely claims in the first instance.  Even if Plaintiff, as a *pro se* litigant, was unaware of the limitations period for these claims, his newly appointed counsel should have been.

8

remedy with the District of Columbia Office of Human Rights ("OHR").  East v. Graphic Arts Industry Joint Pension Trust, 718 A.2d 153, 155 (D.C. 1998).  In this case, Plaintiff did not pursue an administrative remedy against Ms. Watkins, and failed to initiate a timely private cause of action against her.[3]  This is fatal.  Counts I and II of the Second Amended Complaint must be dismissed against Ms. Watkins.

---

[3]

       Even if Plaintiff had initiated an administrative complaint against Ms. Watkins (he did not), his DCHRA claims would be foreclosed by the election of remedies bar.  Under the clear and unambiguous language of the statute, a party who first initiates an administrative action with the OHR may only preserve their right to a private cause of action in two very limited circumstances: (1) where the OHR has dismissed the complaint on the grounds of administrative convenience, or (2) where the complainant has withdrawn a complaint prior to the completion of the Office's investigation and findings. East v. Graphic Arts Industry Joint Pension Trust, 718 A.2d 153, 155 (D.C. 1998). Neither circumstance has been suggested in this case.  To the contrary, the agency closed its' investigation and issued a notice of right to sue on August 5, 2003. (¶ 11). As such, Plaintiff has availed himself of his administrative remedy under the DCHRA and cannot now pursue a private claim under the Act.

III.   **PLAINTIFF'S IIED CLAIM FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AS A MATTER OF LAW**

   A.   Plaintiff's Claim is Time-Barred

At the outset, Plaintiff's claim for intentional infliction of emotional distress (Count IV) is time barred given the fact that it is based on the very same allegations which serve as the operative facts for Plaintiff's discrimination and retaliation claims.

In the District of Columbia, because there is no specific statute affixing a limitations period for IIED claims, it has been held to be subject to the three year catch-all limitations period as set forth in D.C. Code Ann. § 12-301(8).  Saunders v. Nemati, 580 A.2d 660 (1990).  Notwithstanding this, it is well settled that where an IIED claim is "intertwined" with any other causes of action in the complaint, then the IIED claims are subject to those limitations periods. *See* Rendall-Speranza v. Nassim, 107 F.3d 913, 920 (D.C. Cir. 1997)(finding that IIED claims were intertwined with allegations of battery, the IIED claims would be subject to the one year limitations period for a battery action); Thompson v. Jasas Corp., 212 F.Supp.2d 21 (D.D.C. 2002)(finding IIED claim intertwined with underlying hostile environment claim).  Courts in this jurisdiction have referred to this as the doctrine of shared statute of limitations. Vitikacs v. The American Legion, 2003 WL 22004935 (D.C. Super.Ct.  2003)(slip copy attached).

In determining whether claims are intertwined, courts look to determine whether the IIED claims are premised on allegations that are *independent*, that is, allegations which are different from those which serve as the underlying basis for the other claims. Hunter v. District of Columbia, 943

10

F.2d 69, 72 (D.C. Cir. 1991).  In this case, there can be no meaningful dispute that the allegations which serve as the basis for Plaintiff's IIED claim are the very same allegations which form the basis for his discrimination and retaliation claims under the DCHRA and DC FMLA.[4]   For example, Plaintiff's Second Amended Complaint alleges that Defendants engaged in behavior which was harassing, abusive and intimidating, and that Defendants' actions influenced his continued employment, livelihood, and ability to remain a part of the Howard University campus. (¶¶ 75-76).

In all, Plaintiff's IIED claims are clearly intertwined with the discrimination and retaliation claims which are at the center of this controversy, and must be subjected to the appropriate one year statute of limitations for these statutes.[5]  Accordingly, for the reasons set forth in Point I, *supra*, Plaintiff's IIED claim is time-barred.

---

[4]    Count IV of Plaintiff's Second Amended Complaint, in fact, specifically "realleges and incorporates by reference Paragraphs 1 through 69, as if set forth fully herein." (¶ 74).  This, by itself, demonstrates the interrelatedness of the claims.

[5]    Notably, the statute of limitations for the ADA and Rehabilitation Act are even shorter.  The ADA requires an aggrieved party to bring forth a claim within 180 days of the date of alleged discrimination, or up to 300 days if the party filed with a local fair employment agency. Simpkins v. WMATA, 132 F.3d 1482 (D.C. Cir. 1997).  Since the Rehabilitation Act usually involves claims against the federal government, aggrieved employees are required to seek an EEO counsel within a mere 45 days of alleged discrimination.  Armstrong v. Reno, 172 F.Supp.2d 11 (D.D.C. 2001).  Either way, these limitations periods are shorter than the one year period proscribed by the DCHRA.

B. Watkins' alleged Conduct was not "Extreme and Outrageous"

Even if Plaintiff's IIED claim were timely (it is not), it still fails to state a claim upon which relief can be granted as a matter of law.   In order to maintain an action for intentional infliction of emotional distress, Plaintiff must show (1) "extreme or outrageous conduct" which (2) "intentionally or recklessly" causes (3) "severe emotional distress to another." Drejza v. Vaccaro, 650 A.2d 1308, 1312 (D.C. 1994); Bernstein v. Fernandez, 649 A.2d 1064, 1075 (D.C. 1991)(internal quotations marks omitted).

The conduct asserted by Plaintiff regarding Ms. Watkins[6] as the basis for this IIED claim is so woefully lacking in merit in light of other District of Columbia court decisions that it borders on frivolous.   It is well settled that courts in the District do not favor actions for intentional infliction of emotional distress.  In the employment context, courts have traditionally been demanding in the proof required to support such a claim. Kerrigan v. Britches of Georgetown, 705 A.2d 624, 628 (D.C. 1997).  In fact, no less an authority than the District of Columbia Court of Appeals had held that *employer-employee conflicts generally do not rise to the level of outrageous conduct*.  Duncan v. Children's National Medical Center, 702 A.2d 207, 212 (D.C. 1997)(emphasis added).

---

[6]     For purposes of this motion, Defendant distinguishes between the alleged conduct of Ms. Watkins, an individual Defendant, and that of other employees, such as Paulette Porter, who is alleged throughout the Second Amended Complaint to have acted in a wanton and egregious manner, but who is not named individually in this suit. (¶¶ 18, 19, 20, 38, 51).

In this case, Plaintiff has failed to allege acts on the part of Ms. Watkins which even approach the demanding threshold for "extreme and outrageous" conduct. Whether conduct may reasonably be regarded as extreme and outrageous is, in the first instance, a question for the Court. Homan v. Goyal, 711 A.2d 812, 818 (D.C. 1998)(citations omitted). A careful review of Plaintiff's Second Amended Complaint reveals that the conduct at issue in this case, even if true, is clearly not actionable. Much of Plaintiff's complaints as it pertains to Ms. Watkins focuses on performance issues. For example, Plaintiff complains that beginning in March of 2001, he was unfairly "criticized" for his late arrivals to work. (¶ 25). Plaintiff claims that he requested an accommodation to excuse his late arrivals, but that Ms. Watkins "brushed his request aside," and further refused to contact his doctor. (¶¶ 29-30). Plaintiff asserts that he was given continued reprimands for late arrivals in October and November of 2001, and was eventually given a interim evaluation in January of 2002 focusing on his late arrivals and other performance issues. (¶¶ 31, 40). Near the end of his employment, Plaintiff alleges that he was given nine performance objectives, stripped of all but minor authority, and was accused by Ms. Watkins of being "unprofessional." (¶¶ 47, 48, 53). Ultimately, Ms. Watkins informed Plaintiff in June of 2002 that his contract would not be renewed because of performance problems. (¶ 59).

Viewing the complaint in the light most favorable to Plaintiff, he apparently takes the position that he was singled out for performance deficiencies because he had been diagnosed with HIV. However, Plaintiff does not even claim that Ms. Watkins was aware that he had HIV until the

13

fall of 2001, well after being disciplined for late arrivals. (¶¶ 33, 35). Plaintiff also indicates that he had a conversation with Ms. Watkins wherein she indicates that a former classmate had died of AIDS because of a risque lifestyle. (¶ 36). However, this conversation took place in 1994 or 1995, years before Plaintiff was even diagnosed with the illness. (¶ 34). Plaintiff also alleges that Ms. Watkins questioned a male campus employee about his relationship with the Plaintiff, which he felt "seemed to be implying" that the relationship was sexual. (¶ 50).

Even if taken as true, the actions and allegations raised against Ms. Watkins do not come close to meeting the strict standards for a claim of intentional infliction of emotional distress. To meet the minimum threshold of 'extreme and outrageous' under District of Columbia law, the conduct complained of must be so outrageous in character, and so extreme in degree, as to be beyond all possible bounds of decency, and regarded as atrocious, and utterly intolerable in a civilized community. Homan v. Goyal, 711 A.2d 812, 818 (D.C. 1998)(citations omitted). Plaintiff's claims must fail as a matter of law.

Additionally, Plaintiff's allegations that Ms. Watkins ignored his request for a reasonable accommodation and continued to discipline him for performance problems are clearly insufficient. The alleged failure of a supervisor to address requests or complaints by employees in the workplace do not sustain this type of claim, even when they involve more serious allegations of wrongdoing. In fact, the Court of Appeals has even held that a supervisors failure to respond to a complaint of sexual harassment is not extreme and outrageous. See King v. Kidd, 640 A.2d 656, 670-674 (D.C.

14

1993). Further, whether or not Ms. Watkins was justified in counseling Plaintiff for alleged performance concerns is also insufficient to support a claim. Even management action that is adverse, willful, and seemingly unjust will not do. *See, e.g,* Kerrigan v. Britches of Georgetown, 705 A.2d 624, 628 (D.C. 1997)(not extreme or outrageous behavior to target employee for sexual harassment investigation, manufacture evidence against him, leak information to other employees, and unjustifiably demote him); Duncan v. Children's National Medical Center, 702 A.2d 207, 212 (D.C. 1997)(not outrageous conduct for employer to force a pregnant employee to work in area where her fetus would be exposed to radiation or be fired).

Plaintiff's allegations that Ms. Watkins encouraged students from visiting him and further stripped of him of authority and denied him access to staff meetings must also fail. (¶¶ 37, 48). *See* Howard University v. Best, 484 A.2d 958, 986 (D.C. 1984)(interference with professional responsibilities does not constitute intentional infliction); Waldon v. Covington, 415 A.2d 1070, 1077-78 (D.C. 1980)(no extreme or outrageous conduct where employer refused to notify employee of meetings, make assignments outside his specialty, threatened actions to test competency with aim to terminate). Not even termination of employment has been found to constitute extreme and outrageous conduct. *See* Elliott v. Healthcare Corp., 629 A.2d 6, 9 (D.C. 1993)(discharge of an employee is not conduct which goes beyond all possible bounds of decency); District of Columbia v. Thompson, 570 A.2d 277, 290 (D.C. 1990)(pattern of criticism coupled with alleged assault and subsequent termination does not constitute outrageous conduct).

Plaintiff further alleges that Ms. Watkins accused him of "title fraud" when she overheard several students refer to the Plaintiff as "Dean," when in fact he was Acting Assistant Dean of Students (¶¶ 39, 13), and lastly, that he overheard Ms. Watkins referring to him in a derogatory fashion after being given an award by his students. (¶ 56). Without limitation, these allegations must fail as a basis for an emotional distress claim.  It is well settled that liability will not be imposed for "insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Homan v. Goyal, 711 A.2d 812 (D.C. 1998)(citations omitted). *See also* Kerrigan v. Britches of Georgetown, 705 A.2d 624 (D.C. 1997)(rejecting as a matter of law claim for emotional distress based in part on alleged defamatory statements by management concerning sexual harassment and resulting ridicule by co-workers).

Plaintiff's IIED claim must be dismissed for failure to state a claim upon which relief can be granted as a matter of law.

16

### III. PLAINTIFF'S CLAIM UNDER THE FAMILY AND MEDICAL LEAVE ACT OF 1993 FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AS A MATTER OF LAW

Plaintiff's individual claim against Ms. Watkins for violation of the Family and Medical Leave Act of 1993 must fail for the simple fact that he has failed to plead any facts which would suggest that Ms. Watkins could be liable under the Act, that he was ever denied leave, or that he suffered any monetary or related damages under the Act.

Although not clearly pled, it would appear that Plaintiff is attempting to suggest that Ms. Watkins interfered with his right to FMLA leave. Giving Plaintiff the benefit of the doubt, the Second Amended Complaint suggests that beginning in March of 2001, he made several requests to Ms. Watkins for a reasonable accommodation of his schedule which would allow him to arrive later at work due to "uncontrollable diarrhea" caused by his medication. (¶¶ 23, 27, 29, 30). Although Plaintiff claims that Ms. Watkins "brushed his request[s] aside" claiming that she did not "understand" it (¶ 29), there is no suggestion in the complaint that Plaintiff was seeking any type of FMLA leave, yet alone that Ms. Watkins was the appropriate person at Howard University to request and make determinations as to the appropriateness of FMLA qualifying leave. Notably, when Plaintiff did approach the "Human Resources Department" about a reasonable accommodation, he was offered a modified work schedule. (¶¶ 44, 47). Similarly, although Plaintiff complains that Watkins inappropriately used his accrued annual leave to cover his sick leave deficit, he finally contacted human resources whom "offered paperwork to apply for Family and Medical Leave." (¶

55).

_____In all, given these allegations, there is no basis upon which to hold Ms. Watkins individually and personally liable for alleged violations of the Family and Medical Leave Act, notwithstanding the conclusory allegations raised in the Second Amended Complaint. This is not to say that Plaintiff cannot attempt to bring a claim for an FMLA violation against Howard University and those individuals responsible for making leave determinations. *See* Smith v. University of Chicago Hospitals, 2003 WL 22757754 (N.D. Ill. 2003)(suggesting that FMLA violations can only be maintained against those who are "in whole or in part responsible."). In this case, while Plaintiff complains that his supervisor was largely indifferent to his requests for a modified schedule, once he properly brought this to the attention of Human Resources, he was given forms to apply for family and medical leave which he admittedly completed. (¶ 55). Plaintiff does not assert that he was subsequently denied such leave, and there are absolutely no pled facts upon which to find that Plaintiff was ever denied leave or suffered actual monetary harm, which is the essence of such a claim.[7] At least one Court in this jurisdiction recently granted a dismissal of an FMLA claim finding that the Plaintiff has suffered no "actual monetary losses" from the alleged violation and dismissed the suit. *See* Coleman v. Potomac Electric Power Co., 281 F.Supp.2d 250, 254 (D.D.C.

---

[7]       It is notable that Plaintiff was apparently given more than four months of leave from work between September of 1998 through February of 1999 when he suffered a stroke and was hospitalized. (¶¶ 13, 15). Plaintiff did not allege whether this time away from work was approved family and medical leave.

18

2003)(recovery under the FMLA is "unambiguously limited to actual monetary losses.").[8]

For the foregoing reasons, Ms. Watkins respectfully requests that the Court dismiss the instant claim for failure to state a claim upon which relief can be granted.  In the alternative, in accordance with Federal Rule of Civil Procedure 12(e), Ms. Watkins would request a more definite statement setting forth the complete nature and details of the dates and circumstances surrounding the application or denial of leave, the details regarding the alleged FMLA violation, the factual basis for any alleged damages under this act, and why Ms. Watkins should be individually responsible for any such violation.

---

[8]    To the extent Plaintiff is attempting to raise a retaliation claim under the FMLA, his Second Amended Complaint fails to set forth any facts which could support such a claim.  Even his pled Count III for violation of the Family and Medical Leave Act makes no reference of the word "retaliation." (*See* ¶¶ 72-73).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff has failed to state a claim upon which relief may be granted, and this Court similarly lacks jurisdiction over his time barred claims.  Ms. Watkins therefore respectfully requests that this Court dismiss the each claim against her individually (Counts I - IV), with prejudice.

Respectfully submitted,

**KHAN ROMBERGER PLLC**

BY:_____/s/_____
          Karen A. Khan, Esquire
          D.C. Bar No. 455297
          1025 Connecticut Avenue, N.W.
          Suite 1000
          Washington, D.C.  20036
          Attorneys for Belinda L. Watkins
          (202) 828-1243

Date:__April 14, 2004___