IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

HOWARD UNIVERSITY,                        *

      Plaintiff,                         *

v.

                                   *

BELINDA LIGHTFOOT WATKINS,            Civil Action No.: 8:06-cv-02076-DKC

      Defendant.                         *

                                   *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN OPPOSITION TO
## <u>DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT</u>

      This case exists because Defendant Belinda Lightfoot Watkins ("Watkins") harassed and abused an HIV positive subordinate employee, ultimately using her experience, born of years of employment with Howard University, to manipulate the University's personnel system to terminate him to satisfy her unlawful biases. She then manipulated the administrative procedures of the District of Columbia Office of Human Rights in a vain attempt to forestall her day of reckoning and now attempts to manipulate the court system to paint herself as some sort of victim, rather than the perpetrator of abhorrent discrimination.

      The University did not bring this action in retaliation for any claim by Watkins. The University brought this action because Watkins caused the University over $200,000.00 of harm. The University's Complaint states a claim upon which relief can be granted and should not be dismissed. Further, there are extensive disputes of fact which preclude the grant of summary judgment for the Defendant. The Defendant's Motion to Dismiss Complaint for Failure to State a Claim or for Summary Judgment should be denied.

DMEAST #9650668 v1

## STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure may be granted only "if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edward v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *see also Jackson v. Birmingham Bd. of Educ*., 544 U.S. 167 (2005); *Albright v. Oliver*, 510 U.S. 266 (1994); *Scheuer v. Rhodes*, 416 U.S. 232 (1974). When viewing the pleadings in the light most favorable to the non-moving party and providing plaintiff with the benefit of all inferences, there is a powerful presumption against dismissing pleadings for failing to state a cognizable claim for relief. *See Maez v. Mountain States Tel. & Tel., Inc.,* 54 F.3d 1488 (10th Cir. 1995); *see also Strand v. Diversified Collection Serv., Inc*,. 380 F.3d 316 (8th Cir. 2004) (dismissal only when pleading shows, on its facts, "some insuperable bar to relief"); *Phonometrics, Inc. v. Hospitality Franchise Sys., Inc*., 203 F.3d 790 (Fed.Cir. 2000)(noting that the complaint "contains enough detail to allow the defendants to answer. Rule 12 (b)(6) requires no more."). A claim will only be dismissed under Rule 12 (b)(6) if it appears beyond a doubt that the pleader can prove no set of facts in support of the claim that would entitle the pleader to relief. *Connelly v. Gibson*, 355 U.S. 41 (1957). When considering a claim under Rule 12(b)(6), the court must accept all well-pleaded facts as true. *See Volvo Const. Equip. North America, Inc. v. CLM Equip. Co.*, 386 F. 3d 581 (4th Cir. 2004).

Similarly, summary judgment should be denied if, when viewing all evidence and drawing all reasonable inferences therefrom in the light most favorable to the non-moving party, there exists a genuine issue of material fact. *See Dept. of Commerce v. House of Representatives*,

525 U.S. 316 (1999); *Nebraska v. Wyoming*, 507 U.S. 584 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Where evidence presented by the moving party fails to demonstrate the absence of a genuine issue of fact, summary judgment will be denied. *See Celotex , supra.* The movant must make a prima facie showing that summary judgment is appropriate pursuant to Fed. R. Civ. P. 56. *Id.* Only after the movant has met this burden, does the burden shift to the non-moving party to show, by affidavit or otherwise, that genuine issues of material fact remain to be resolved the fact finder. *Id.* Under these circumstances, it is clear that the Watkins has failed to make a prima facie showing and that the University has demonstrated there exists genuine issues of material facts that remain for trial. *See Anderson v. Liberty Lobby, Inc*. 477 U.S. 242 (1986).

## FACTS

As of June 1998, when she was named Acting Dean for Student Life and Activities, Defendant Watkins had been employed by Howard University for thirty years in a variety of positions. *Complaint at ¶5.* As Acting Dean for Student Life and Activities, Defendant Watkins supervised, directly and indirectly, numerous employees at the University, including Daniel Goodwin ("Goodwin"). *Id.* at 6, 14.

Daniel Goodwin was hired in August 1998 as Acting Assistant Dean of Students on a one-year contract that was subject to annual renewal. Within sixty days of his initial hire, Goodwin suffered a stroke that resulted in a coma and hospitalization. *Id.* at 16. During his hospitalization, doctors discovered that Goodwin was infected with the Human Immunodeficiency Virus ("HIV") and Goodwin was housed in the infectious diseases ward. *Id.* While Goodwin was hospitalized, he was visited frequently by co-worker, Paulette Porter ("Porter"). *Id.* at 17. Porter was Watkins' administrative assistant and worked in the same office as Goodwin and Watkins. *Id.* at 14. While visiting Goodwin, Porter learned of Goodwin's HIV

infection.  *Id.* at 18.  At some time thereafter, Porter advised Watkins that Goodwin was HIV positive.  *Id.*

Upon Goodwin's return to work in February 1999, Watkins and Porter's treatment of Goodwin changed.  *Id.* at 19.  Porter would wipe the telephone down with cleaning antiseptic every time Goodwin used it.  *Id.* at 21.  She did not do so when others used the phone.  Porter told Goodwin "It's no secret what is going on with you.  We know what is wrong with you."  Porter also made statements to a student at the University, which made that student believe Goodwin had Acquired Immune Deficiency Syndrome.  *Id.* at 23.  Porter began to refuse to complete work assigned by Goodwin, embarrassing him in front of other students and staff members.  Porter made inappropriate, derogatory comments about Goodwin, including accusing Goodwin of having sexual relations with male students and comments about his medical condition.  Porter told a student that Goodwin had returned to "his old ways" and that "it wasn't wise to have any dealings with him."

Watkins was aware of Porter's inappropriate behavior, but, rather than disciplining Porter, Watkins joined in the harassment of Goodwin.  *Id.* at 24, 25.  Like Porter, Watkins began to harass Goodwin by questioning Goodwin's relationships with male students, frequently making comments to male students to discourage them from consulting with Goodwin and implying that Goodwin was having sexual relationships with students.  *Id.*  When Watkins learned that Goodwin was HIV positive, she apparently concluded that he was homosexual.  *Id.* at 26.  Within earshot of Goodwin, Watkins and Porter referred to Goodwin and male students by

crude and derogatory terms that implied they were homosexual and engaged in sexual relations. *Id.* at 20, 24. [1]

In addition to harassing Goodwin and creating a hostile work environment, Watkins refused Goodwin's request for reasonable accommodation for his HIV infection. *Id.* at 28. Soon after Goodwin returned to work in February 1999, he began to experience side effects from the drug regimen he was taking to treat his HIV infection. *Id.* at 29. As a result of those side effects, Goodwin frequently was unable to arrive at the office by the regularly scheduled start time. He compensated for lost time by staying past the office's regularly scheduled closing time. *Id.*

On March 21, 2001, Watkins delivered a letter to Goodwin expressing concern about his late arrivals. *Id.* at 30. On March 22, 2001, Goodwin responded to Watkins' letter and, as an accommodation, requested that he be permitted to arrive at work after the office opened at 8:00 a.m. and work later into the evening. *Id.* Goodwin urged that the requested accommodation was reasonable because much of his work involved interaction with students whose schedules mirrored Goodwin's requested schedule accommodation. *Id.* Watkins told Goodwin she did not understand his request and refused his requested accommodation. *Id.* at 30. Goodwin urged Watkins to telephone Goodwin's doctor and told her that his doctor would answer her questions

---

[1]    Watkins has attached Goodwin's somewhat sanitized Amended Complaint to her Motion to Dismiss. The Amended Complaint states only that Watkins and Porter referred to Goodwin by derogatory names. *See* Amended Complaint, at ¶ 56. In the original Complaint, which Goodwin filed *pro se*, a copy of which is attached as **Exhibit A,** Goodwin makes clear the crude manner in which Watkins referred to Goodwin and male students at the University, calling Goodwin a "queer" and calling Goodwin and the male students who met with him and voted him Administrator of the Year "butt buddies." *See* Complaint, at ¶ 54.

about the requested accommodation. *Id.* Watkins refused. *Id.* Subsequently over the following months, Watkins refused Goodwin's repeated requests for an accommodation in his daily schedule. *Id.* at 32.

Watkins' superiors at the University were unaware of her harassment of Goodwin or her failure to provide Goodwin with the accommodation he requested. *Id.* at 33. In 2002, Watkins proposed to the University that Goodwin's annual contract as Acting Assistant Dean of Students not be renewed for what Watkins claimed was poor performance. *Id.* at 34. In connection with the review of Watkins' recommendation, representatives of both the University's Office of General Counsel and Office of Human Resources Management consulted with Watkins. *Id.* at 35. They expressly asked Watkins why she was recommending that the University not renew Goodwin's contract, whether Goodwin was a member of any class protected by federal or local anti-discrimination employment laws, and whether there was any reason why federal or local employment laws might be implicated in the decision to not renew Goodwin's contract. *Id.* at 36.

At the time that Watkins was interviewed by the representatives of the Office of the General Counsel and the Office of Human Resources Management, Watkins believed that Goodwin was homosexual, knew that Goodwin was HIV positive and had, on repeated occasions, denied Goodwin's request for an accommodation of his daily schedule. *Id.* at 39, 40. Watkins sought Goodwin's discharge because of his health condition and her belief as to his sexual orientation. *Id.* at 40. She knew that terminating an employee for those reasons violated federal law, the law of the District of Columbia and the policies of the University which prohibit discrimination. *Id.* at 7-11. Watkins, therefore, misled the University officials and administrators to accomplish her goal of terminating Goodwin. *Id.* at 40.

- 7 -

Watkins advised the representatives of the University that Goodwin exhibited "behavior problems," including excessive socializing and disrespectful behavior toward Watkins. *Id.* at 37. Watkins also claimed that Goodwin was improperly describing himself as a Dean, rather than Acting Assistant Dean of Students, and that Goodwin had told members of the University that Watkins had a drinking problem. *Id.* When discussing Goodwin with the representatives of the Office of General Counsel and the Office of Human Resources Management, Watkins disclosed that Goodwin had been ill in 1998, but described the illness only as a stroke and stated he had recovered and returned to work. *Id.* at 38. Watkins never disclosed that Goodwin was HIV positive and had, on several occasions requested and been denied, an accommodation as a result of his HIV positive status. *Id.* at 39. She also failed to disclose her or Porter's campaign of abuse directed at Goodwin, her belief that Goodwin was homosexual, or her true reasons for seeking to terminate Goodwin. *Id.*

Watkins' reason for recommending that the University not renew Goodwin's contract was that Goodwin was HIV positive, her belief that Goodwin was homosexual, or both. *Id.* at 40. Watkins knew that her recommendations, if based on Goodwin's health condition or sexual orientation, violated the University's policy against employment discrimination, its Code of Ethics and Conduct, federal law, and the law of the District of Columbia. *Id.* The University, believing of course that one of its administrators had the best interests of the University in mind, approved Watkins' recommendation and Goodwin's contract was not renewed when it expired on June 30, 2002. *Id.* at 41.

After his contract was not renewed, Goodwin filed a claim before the U.S. Equal Employment Opportunity Commission ("EEOC") and the D.C. Office of Human Rights. *Id.* at 42. On June 21, 2003, the EEOC issued a Determination which concluded, *inter alia*, that

DMEAST #9650668 v1

Watkins' decision to discharge Goodwin by not renewing his contract was in retaliation for his request for accommodation. *Id.* On or about November 26, 2003, Goodwin filed suit against both the University and Watkins in the United States District Court for the District of Columbia. *Id.* at 43. When Goodwin filed his complaint, the University re-interviewed Watkins. *Id.* at 44. It soon became clear to all who participated in investing Goodwin's allegations that Watkins had prior knowledge of the extent and nature of Goodwin's illness and that she and Porter had engaged in unlawful harassment of Goodwin. *Id.* It also became apparent that Watkins believed that Goodwin was homosexual and that her recommendation that Goodwin be terminated was for unlawful reasons. *Id.*

The University would never have approved the non-renewal of Goodwin's contract had it been aware of the facts. *Id.* at 45. When it became apparent to the University that Watkins had acted with an improper and unlawful animus toward Goodwin in recommending that his contract not be renewed, the University determined that it would be a conflict for its counsel to also defend Watkins and that Watkins' improper behavior had taken her outside the University's indemnification and defense policy. Watkins was directed to hire her own counsel.

Watkins devotes much of her memorandum and declaration to discussions of settlement negotiations in the Goodwin matter, the settlement and mediation and negotiations in the proceeding on her charge before the D.C. Office of Human Rights. She has, however, largely exaggerated or misstated events. Watkins is correct when she states in her motion that the United States District Court for the District of Columbia directed the parties to mediation before a United States Magistrate Judge. She overstates matters, however, when she suggests that she was excluded involuntarily from those settlement discussions. Defendant's Motion to Dismiss the Complaint for Failure to State a Claim or For Summary Judgment and Memorandum in

Support Thereof ("Defendant's Memorandum") at p. 12; Declaration of Belinda Lightfoot Watkins ("Declaration") at ¶9. In fact, the Magistrate Judge proposed that the parties proceed in a "round robin" fashion, with Howard University and Goodwin conferring first. At the conclusion of the first mediation session, Watkins' counsel complained so vociferously about having to be present at the mediation sessions, the Magistrate Judge excused her until such time as the parties' discussions to the point where Watkins' input would be required. Declaration at ¶9. The Magistrate Judge, however, directed that counsel for Howard University keep Watkins' counsel informed of the status of negotiations with Goodwin.

Watkins also misstates the facts and circumstances of the settlement of Goodwin's claim. She states repeatedly in her Motion to Dismiss that she was first asked to contribute to the settlement that was ultimately negotiated with Goodwin only after she brought her own age discrimination claim before the D.C. Office of Human Rights in mediation before that office. Declaration at ¶11. Watkins urges that the University's efforts to recoup from her the money that the University was forced to pay to Goodwin to settle his claim that resulted from Watkins' harassment of him is nothing more than retaliation from Watkins' discrimination claim. *Id.* Watkins misstates the chronology of events.

In fact, the University first advised Watkins that it believed she was culpable for any harm to Goodwin when it declined to provide her with a defense to the lawsuit. Defendant's Memorandum at p. 13, Declaration at ¶9. The University then raised the issue of Watkins' financial contribution to any settlement with Goodwin on October 25, 2004, in a telephone conversation between the University's attorney and Watkins' attorney, Timothy Romberger. See Declaration of Timothy F. McCormack, at ¶¶5 and 6, a copy of which is attached as Exhibit B. On December 3, 2004, the University repeated its demand that Watkins contribute to any

- 10 -

financial resolution of Goodwin's claim. In a conversation on that date, counsel for the University advised Mr. Romberger that Goodwin and the University were near settlement and that the ultimate payment to Goodwin would be in excess of $200,000.00. *Id.* at ¶7. The University's attorney told Mr. Romberger that the University viewed Watkins as responsible for the Goodwin claim because of her harassment of Goodwin and her misrepresentation of the facts to the Office of General Counsel and Office of Human Resources Management. *Id.* Mr. Romberger was told that the University would expect Watkins to, at the very least, contribute to the financial settlement with Goodwin and terminate her employment with the University. *Id.*

It was only after the University demanded on two occasions that Watkins contribute to a financial settlement with Goodwin, that Watkins complained to the University's Equal Employment Opportunity ("EEO") office on December 6, 2004. Defendant's Memorandum at p. 2, Declaration at ¶8. In fact, Watkins' initial complaint to the University's EEO Officer references (and misdescribes) the statement by counsel for the University that Watkins would be expected to separate from the University because of her actions in the Goodwin matter. Watkins' internal complaint was that she was somehow a victim of gender and age discrimination because she had not been made permanent Dean of Student Life and Activities by the University's Vice President for Student Affairs. At the time Watkins made her internal complaint, the position of Dean of Student Life and Activities was vacant and the University was undertaking a nationwide search for a new dean. No decision had been made. Watkins' application was considered by the University and she was interviewed by the University search committee in January 2005. Ultimately, the University selected another woman for the position. Declaration of Franklin Chambers, at ¶ 5, a copy of which is attached as Exhibit C. Watkins first filed a claim with the District of Columbia Office of Human Rights on August 9, 2005. The chronology was not as

Watkins would have this Court believe, that she was asked to contribute financially to the Goodwin settlement after she complained of age discrimination, but the reverse. Declaration at ¶7. Watkins brought a claim of age discrimination only after the University advised her that it considered her responsible for Goodwin's claims because of her harassment of Goodwin, her discriminatory behavior towards Goodwin and violations of University policy, federal and local laws. *Id.* at ¶7 but *see* ¶11; Declaration of Timothy F. McCormack at ¶¶ 6-7..

In her Declaration, Watkins correctly states that during the mediation of her administrative claim before the D.C. Office of Human Rights, there was a discussion of the University's claim against her for her actions in the Goodwin case. Declaration, at 11. She misstates the chronology when she suggests that the mediation before the D.C. Office of Human Rights is the first time the University made demand of her for indemnification. *Id.* She also fails to disclose the circumstances in which the discussion of Goodwin arose. The actual timing of these events, the University's demand for indemnification followed by Watkins' charge before the D.C. Office of Human Rights, raises the obvious implication that Watkins brought the frivolous DCHRA charge with the intention of either forestalling her termination or to invent a claim of retaliation. Surprisingly, during the mediation, Watkins candidly admitted that her motivation, when asked the basis for her DCHRA charge, was in response to the University's demand that she contribute to the Goodwin settlement and terminate her employment with the University. See Declaration of Franklin Chambers, at ¶7. Watkins' charge before the D.C. Office of Human Rights was ultimately withdrawn by her prior to any finding by the Office.

The University ultimately settled Goodwin's claims against both the University and Watkins for the sum of $253,000, of which amount the sum of $35,000 was paid to Goodwin's attorneys, the sum of $55,000 was allocated to back wages, and the sum of $163,000 was

- 12 -

allocated to Goodwin's claims for emotional distress.   *Id.* at ¶ 4. Watkins, or at least her attorneys, were aware of the payment to Goodwin and Goodwin's express release of his claims against Watkins.  Following the settlement payment, Goodwin, the University and Watkins all executed and filed with the Court a Stipulation of Dismissal.  On July 20, 2006, Watkins' employment with the University was terminated, not in retaliation as she claims, but because of her actions or inactions in the Goodwin matter, which included fostering and tolerating a hostile work environment and misrepresenting to the University's Office of the General Counsel of Howard University and the Office of Human Resources Management of the circumstances under which she recommended that Goodwin's appointment be terminated.

## **ARGUMENT**

**I.**     *Northwest Airlines, Inc. v. Transp. Workers Union of America* **Does Not Bar This Claim for Indemnification.**

Defendant Watkins reads too much into *Northwest Airlines, Inc. v. Transp. Workers Union of America*, 451 U.S. 77 (1981).  It does not bar these state law claims for indemnification, fraud and misrepresentation.  *Northwest* is largely inapposite because the Court was interpreting Title VII of the Civil Rights Act of 1964 and the Equal Pay Act when it concluded that Northwest could not bring a claim for contribution against two unions that allegedly bore at least partial responsibility for violations of the Equal Pay Act and Title VII.  *Id*. at 79.  The Court was applying federal statutory law and the limited federal common law.  It did not discuss indemnification at all, much less indemnification under state law and under the much broader DCHRA.

In fact, even to the issue of contribution, the Court left open the possibility that a claim for contribution from a supervisor might lie under a non-federal employment law.  The Court

- 13 -

specifically noted that "federal courts, unlike their state counterparts, are courts of limited jurisdiction and have not been vested with open-ended lawmaking powers." *Id*. at 95. However, the Court went on to conclude that "federal courts, including this Court, have recognized a right to contribution under state law in cases in which state law supply the appropriate rule of decision." *Id.* at 97.

Although the courts of the District of Columbia have often looked to cases construing Title VII to aid in construing the DCHRA, *Lively v. Flexible Packaging Assoc*., 830 A.2d 874 (D.C. 2003), they do not do so to limit the scope of the DCHRA. "[T]he DCHRA 'is a remedial civil rights statute that must be generously construed.'" *Id.* at 886, *quoting Executive Sandwich Shoppe v. Carr Realty Corp*., 749 A.2d 774, 731 (D.C. 2000). The DCHRA has long been praised for its broad scope. Its coverage is significantly wider than that of Title VII. It protects additional categories of persons beyond those protected by Title VII and, of particular importance here, allow claims against supervisors, which are not permitted under Title VII. *Id.* at 887.

The District of Columbia recognizes a cause of action for common law indemnification. *D.C. v. Washington Hospital Center*, 722 A.2d 332 (D.C. 1998); *Hall v. George A. Fuller Co*., 621 A.2d 848 (D.C. 1993). It is beyond dispute that a claim for indemnification exists for Goodwin's common law intentional inflation of emotional distress. Further, there is no case decided under the DCHRA barring such indemnification claims. Significantly, other state courts, noting the distinction between federal and state common law, allow third-party indemnity claims by employers against supervisors. In *Degener v. Hall Contracting Corp*., 27 S.W.3d 775 (Ky. 2000), an employer clinic filed a third-party indemnification claim against a physician supervisor. The court held that the employer was entitled to complete indemnification for its employee's harassment claim. Distinguishing *Northwest*, the court noted that "the different

- 14 -

result [under state v. federal law] obtains because there is no common law right to either indemnity or contribution in the federal law, and the federal courts have held that those state law remedies cannot be applied to causes of actions created by federal statutes." *Id*. at 782. However, since the claim in *Degener*, like Goodwin's claim, arose under state law (or in this case, the law of the District of Columbia) the court concluded that a right to indemnification did exist. *See also Biggs v. Survey Broadcasting Co*., 811 P.2d 111 (Okla. 1991) (holding that an employer can pursue indemnification from a manager with respect to employee's settled harassment and discrimination suit). Therefore, *Northwest* does not prevent Howard University from bringing this claim for indemnification under state statutory and common law.

## II.    Howard University Has Stated a Claim for Indemnity Against Watkins.

Indemnity is a form of restitution. It involves the shifting of an entire loss from one who has paid to another who was unjustly enriched by the first party's discharge of the obligation. *Washington Hospital Center*, 72 A.2d at 339. "Although the right indemnity may arise by contract, [the courts] have recognized that the obligation to indemnify may be implied in fact (on an implied contract theory) or implied in law in order to achieve an equitable result." *Id*. at 340 (citations omitted). The situations in which courts have granted indemnity include those where the indemnitee was liable only vicariously for the conduct of the indemnitor and where the indemnitee was induced to act by misrepresentation on the part of the indemnitor upon which the indemnitee justifiably relied." *Id.* at 340 n.9 (*citing* Restatement (Second) of Torts § 886(B)(2)). Both situations exist here.

At all times relevant to this action, Watkins was the Acting Dean for Student Life and Activities. As a dean of the University, Watkins owed the University a fiduciary duty and held a

position high enough within the organization that the University was vicariously liable for her harassment and mistreatment of Goodwin.  Watkins makes much of the fact that Goodwin complained not only of the actions of Watkins but also of those of her administrative assistant, Paulette Porter, and the fact that the decision to not renew Goodwin's contract required the approval of additional administrators besides Watkins.  The argument is of no moment because Watkins ignores relative positions of those persons that she urges are equally liable with her for the mistreatment of Goodwin and the circumstances of her interactions with the superior administrators at the University.

The crux of the University's claim against Watkins is that Watkins tolerated and then fostered a hostile work environment, refusing Goodwin reasonable accommodations for his HIV infection, disclosing information about Goodwin's health condition to University students and staff, and directing crude, homophobic slurs at Goodwin, and (ii) through a series of misrepresentations and non-disclosures, Watkins orchestrated the termination of Goodwin's employment with the University.  Watkins is correct that Goodwin states numerous examples of abusive behavior by Paulette Porter.  The difficulty for Watkins is that Porter's misbehavior strengthens the case against Watkins rather than diminishes it.

Porter was a relatively low level employee and was Watkins' subordinate and administrative assistant.  Central to Goodwin's claim against the University and Watkins and to the University's claim against Watkins is the contention that Watkins was aware of Porter's activity which created a hostile work environment for Goodwin and, rather than put an end to the misbehavior as was her responsibility as an administrator of the University, Watkins sanctioned and ultimately joined in the harassment.

- 16 -

As to the other University administrators who approved Watkins' recommendation that Goodwin's contract not be renewed, Watkins must do more than list the administrators involved in approving her recommendation before she can shift any liability from herself. It is the University's position that Watkins obtained those approvals by misrepresenting to the University her true reasons for seeking to discharge Goodwin and hiding from those same senior administrators and the representatives of the Office of General Counsel and Office of Human Resources Management the abuse and harassment of Goodwin that she and Porter inflicted. When confronted with Goodwin's suit, the University faced substantial liability, not because the other administrators in the chain of command had acted improperly, but because the University had failed to catch Watkins' misbehavior and misrepresentations before the decision to discharge Goodwin was approved. Ultimately, the issue will be one for the finder of fact.

Watkins again misstates events related to the Goodwin litigation when she claims that she was not consulted or kept apprised of the settlement negotiations with Goodwin in that she had no reason to believe that Howard University was going to seek indemnity. Those contentions are demonstrably false. Watkins was kept apprised of settlement negotiations between the University and Goodwin by the conversations between the University's counsel and her counsel, Timothy Romberger. Declaration of McCormack, at ¶¶ 4-6. Watkins was repeatedly advised that the University deemed her responsible for Goodwin's claim. She was repeatedly offered an opportunity to participate in the settlement with the University and Goodwin. Her attorneys were told of the magnitude of the payment to Goodwin and of the express release of Watkins negotiated by the University. Watkins accepted the benefit of the release when she joined in the dismissal of Goodwin's lawsuit. She cannot now rely on her strategic decision not to participate in the settlement to claim she was somehow denied due process. Moreover, even if the

University had not repeatedly invited her to participate in the settlement or accept the University's overtures with Goodwin, that failure or the failure to tender the University's defense to Watkins would not vitiate an indemnity claim.  At most, it may affect the level of proof necessary to establish a claim.  *Atlantic Richfield Co. v. Interstate Oil Transp. Co.,* 784 F.2d 106, 113 (1986); *Howard University v. Good Food Services, Inc.*, 608 A.2d 116, at 125, n.5 (D.C. 1992)  The issue, then, is the level of proof that may be required of the University at trial, not whether the claim is viable.

### III.    Howard University Has Property Set Forth The Legal Elements of Constructive Fraud and Misrepresentation In the Complaint.

Circumstances that must be pled with particularity pursuant to the standard set forth in Rule 9(b) are "the time, place, and contents of the false representations as well as the identity of the person making the misrepresentation and what he obtained thereby."  5 Charles Allen Wright and Arthur R. Miller, Federal Practice & Procedure:  Civil §1297, at 590 (2d ed. 1990); citing *Harrison v. Westinghouse Savannah Riverco*, 176 F.3d 776 (4th Circuit 1999).  The University's counts for constructive fraud intentional and negligent misrepresentation unquestionably meet that standard.  Further, Fed. R. Civ. P. 9(b) states that "malice, intent, knowledge, and other condition of mind of a person may be averred generally."  *Harrison v. Westinghouse Savannah Riverco*, 176 F.3d 776, 784, n.6 (4th Cir. 1990) (*citing* Fed. R. Civ. P. 9(b)).  The University's complaint not only meets but exceeds these requirements.

The University identified, with particularity, all facts and circumstances regarding the false representations made by Watkins to the Office of the General Counsel of Howard University and the Office of Human Resources of Howard University.  The Complaint specifically states that on several occasions Watkins claimed that Goodwin displayed "behavior

problems" and that he should not be reappointed to his position as Acting Assistant Dean of Students.  In fact, as the Complaint makes clear, Goodwin's only behavior problem was his inability to begin work at the time specified by Watkins because of his drug regimen, his adverse reaction to that regimen and the fact that he consistently requested an accommodation to meet his needs, which Watkins repeatedly denied.  Further, the University has not only generally averred Watkins' malicious intentions, as required by Rule 9(b), but has specifically alleged them.  There is no doubt that Watkins not only intended to make Goodwin's working environment miserable simply because she believed him to be homosexual and HIV positive but concealed her biases and engineered Goodwin's termination from the University.

### IV.    This District Is The Proper Venue For This Civil Action.

Jurisdiction in this action is founded on diversity of citizenship.  Watkins is the sole defendant and is a citizen of Maryland.  The first venue for diversity actions identified by Section 1391 of Title 28 of the United States Code is the judicial district where the defendant resides.  28 U.S.C. § 1391(a).  The Plaintiff's choice of forum should rarely be disturbed.  *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947).  Although the court has authority to transfer cases according to an "individualized, case-by-case consideration of convenience and fairness," *Stewart Organization, Inc. v. Ricoh, Corp.*, 497 U.S. 22, 29 (1988) (*quoting Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)), "[the burden is on the movant to show that "the balance of convenience in the interest of justice [is] strongly in favor of the moving party." *Lanier v Dus. Prod. v. Graymar Co.*, 355 F. Supp 524, 527-28 (D. Md. 1973).

> In order to carry this burden, the movant should submit, for example, affidavits from witnesses and parties explaining the hardships it would suffer if the case were heard in the plaintiff's chosen forum. *Helsel v. Tishman Realty & Constr., Co.,* 198 F. Supp 2d., 710, 712 (D. Md. 2002).    Mere assertions of

- 19 -

> inconvenience or hardships are inadequate support for a motion to
> dismiss or transfer pursuant to 28 U.S.C. § 1404 (a).  *Id.*

*Dow v. Jones*, 232 F. Supp. 2d 491, 499 (D. Md. 2002) (motion to dismiss or transfer denied

where movants did not submit any affidavits from parties witnesses stating that they would suffer

hardship or inconvenience by having to travel from Washington, D.C. to Baltimore).

Watkins has simply failed to meet this significant burden.  She has offered no evidence

whatsoever of any hardship in defending this action in the judicial district in which she resides.

The fact that the events which gave rise to the University's indemnification claim occurred a

handful of miles from the federal courthouse in which this case will be tried is not the type of

inconvenience or hardship which would support the transfer of the matter to the District of

Columbia.  Every witness working or residing in Maryland, the District of Columbia or northern

Virginia is subject to the subpoena power of this Court.  There is simply no hardship involved in

Watkins defending this action in this jurisdiction and, therefore, transfer of venue would be

inappropriate.

## CONCLUSION

For the foregoing reasons, the Defendant's motion to Dismiss Complaint for Failure to

State a Claim or for Summary Judgment should be denied.

Respectfully submitted,

_____/s/_____
Timothy F. McCormack (Bar No.: 03565)
Jennifer E. Keyser
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
300 East Lombard Street, 18th Floor
Baltimore, Maryland  21202
Telephone: (410) 528-5600
Facsimile: (410) 528-5650

- 20 -

E-mail:  mccormackt@ballardspahr.com
             keyserj@ballardspahr.com

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 26th day of October, 2006, a true and accurate

copy of the foregoing was delivered via electronic notification to:


      Stephen C. Chertkof, Esquire
      Tammany M. Kramer, Esquire
      Heller, Huron, Chertkof, Lerner, Simon & Salzman
      1730 M Street N.W., Suite 412
      Washington, D.C.  20036


                                   /s/
                        Timothy F. McCormack

DMEAST #9650668 v1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DANIEL GOODWIN )
P.O. Box 75693 )
~~Laurel, Maryland~~ 20013 )
*WDC* (202)-276-8874 )
"*Homeless*" )
Plaintiff, )

    CASE NUMBER 1:03CV02447

v.

    JUDGE: Royce C. Lamberth

HOWARD UNIVERSITY )
2400 6ᵗʰ Street, N.W. )
Washington, D.C. 20059 )

    DECK TYPE: Employment Discrimination

    DATE STAMP: 11/26/2003

    &amp; )

BELINDA L. WATKINS )
6224 Cheverly Park Drive )
Cheverly, Maryland  20785 )

    Defendants. )

**JURY ACTION**

**FILED**

**NOV 2 6 2003**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## COMPLAINT FOR DECLARATORY JUDGMENT, PERMANENT INJUNCTIVE RELIEF, AND DAMAGES

### NATURE OF ACTION

1.    Plaintiff Daniel Goodwin brings this action for retaliation, denial of reasonable accommodation, discrimination and intentional infliction of emotional distress against his former employer, Defendant Howard University ("the University"), under the Americans with Disabilities Act of 1991 ("ADA"), 42 U.S.C. § 12111 *et al* the D.C. Human Rights Act ("DCHRA"), D.C. CODE § 2-1401.01 *et al*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and the Health and Human Services Regulations thereto, 45 C.F.R. Part 84 and District of Columbia common law. Plaintiff further brings this action for intentional infliction of emotional distress against his former supervisor,

EXHIBIT
A

Belinda L. Watkins. Watkins and the University subjected Plaintiff to unwarranted

denial of requests for reasonable accommodation, differential treatment on the basis of

his actual or perceived disability, retaliation for his complaint of discriminatory denial of

reasonable accommodation, and discriminatory and retaliatory termination. These

behaviors not only altered the privileges and conditions of his work environment, but also

lead to severe and long-lasting emotion distress.

## PARTIES

2.      Plaintiff Daniel Goodwin is a citizen of the United States. At all times

relevant to the matters described in this Complaint, Plaintiff was a resident of Laurel,

Maryland. Plaintiff is currently without residence. Plaintiff was continuously employed

by Defendant from 1998 until June 2002.

3.      Defendant Howard University is a private university doing business in

Washington, D.C. At all relevant times, Defendant has continuously done business in the

District of Columbia. Defendant is subject to the Americans with Disabilities Act, as

well as the D.C. Human Rights Act. Defendant also is a recipient of federal financial

assistance and therefore is subject to Section 504 of the Rehabilitation Act.

4.      Defendant Belinda L. Watkins, Plaintiff's supervisor, is a citizen of the

United States. Watkins is a resident of Cheverly, Maryland.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over Plaintiff's ADA claims pursuant to 28

U.S.C. §§ 1331 and 1343.

6.      This Court has jurisdiction over Plaintiff's Rehabilitation Act claims

pursuant to 28 U.S.C. §§ 1331 and 1343.

2

7.   This Court has jurisdiction over Plaintiff's DCHRA claims pursuant to supplemental jurisdiction, 28 U.S.C. § 1367(a).

8.   This Court has jurisdiction over Plaintiff's common law claims pursuant to supplemental jurisdiction, 28 U.S.C. § 1367(a).

9.   Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391 (b) (1) and (2) because Defendant resides in the District of Columbia and because most of the events giving rise to this claim occurred in the District of Columbia.

10.   Plaintiff's claims of retaliation, failure of reasonable accommodation, and discriminatory termination are timely filed under the ADA and the DCHRA.

11.   Plaintiff's claims of retaliation, failure of reasonable accommodation, and discriminatory termination are timely filed under the Rehabilitation Act, pursuant to D.C. CODE § 12-301 (2003).

12.   Plaintiff's claim of intentional infliction of emotional distress is timely filed pursuant to D.C. CODE § 12-301 (2003).

## FACTS

13.   Plaintiff Goodwin, at all times discussed herein, was a qualified individual with a disability.  Specifically, he is and was at all relevant times infected with the Human Immunodeficiency Virus ("HIV").  He is limited in the major life activities of bowel continence, sitting, procreating, and working.

14.   Goodwin was hired by Defendant in early August 1998 as Acting Assistant Dean of Students.

15. From 1998 until 2001, Plaintiff Goodwin received performance reviews of "meets expectations" or greater from his supervisor, Belinda Watkins, Acting Dean of Students.

16. On September 29, 1998, Goodwin suffered a stroke that resulted in a coma and hospitalization. During his hospitalization at Howard University Hospital, Goodwin learned that he was infected with HIV.

17. During his stay at the hospital, Goodwin was housed in the Infectious Diseases ward.

18. During his hospitalization, Paulette Porter, an administrative assistant in the office in which Goodwin worked, stopped by frequently to check on Goodwin. Upon information and belief, Porter, during one of her visits, learned of Goodwin's disability.

19. Goodwin returned to work in February 1999.

20. Immediately upon his return, Porter and Watkins' treatment of him changed. For instance, after his use of office phones, Porter would wipe the phone down with a cleaning antiseptic. She would not do so when others used the phones.

21. In March 1999, Porter stated to Goodwin, "It's no secret what's going on with you. We know what is wrong with you." Upon information and belief, in the spring of 2000, Porter also made statements that led a student to believe that Goodwin had AIDS.

22. The relationship between Goodwin and Porter, once congenial, progressively worsened until, ultimately, Porter began to refuse to complete work assigned by Goodwin, thus publicly embarrassing him in front of students and other staff members. Porter also made inappropriate personal comments to students about Goodwin,

4

including accusing Goodwin of having sexual relations with male students and comments about his medical condition. Porter also called male students Goodwin's butt buddies, implying that they were engaged in homosexual relations.

23. For instance, in the spring of 2000, Porter told a student that Goodwin had returned to "his old ways" and that "it wasn't wise to have any dealings with him," implying to the student that Goodwin was acting improperly.

24. In the meantime, soon after his return to work in February 1999, Goodwin began to experience side effects from the drugs he was taking in order to treat his HIV.

25. Due to the side effect of these drugs, which caused irritable bowel symptoms including uncontrollable diarrhea, Goodwin frequently was unable to make it into the office at the regularly scheduled time.

26. Goodwin compensated for the lost time by staying past the regularly scheduled office closing time.

27. Goodwin's late arrivals seemed not to constitute a problem until early 2001. Goodwin received a letter from his supervisor, Belinda Watkins, on March 21, 2001 that expressed concerns about his late arrivals.

28. Goodwin therefore submitted a response letter and an attached doctor's note on March 22, 2001 to Watkins, requesting an adjustment of his work schedule. Specifically, the note stated, "This is to certify that Mr. Goodwin has a chronic medical condition that requires accommodations to facilitate his employment. If there is any question and if specific details are required, please notify me." His physician also sent the same signed letter to Watkins on March 23, 2001.

29.    Goodwin also met with Watkins to discuss this matter, explained the need for the accommodation based on her new requests that he arrive at 8:30 a.m. and suggested she contact his physician if she wanted further information to supplement the request.

30.    Furthermore, the scheduling accommodation that Goodwin sought was beneficial to his position.  In the previous months, Goodwin had stayed late each night in order to compensate for any time lost in the morning.  Students found this schedule very helpful, as it mirrored their own schedules better.  Goodwin, therefore, was better able to perform his job with the modified schedule.

31.    Nevertheless, upon information and belief, after receiving this note and based upon her discussions with Porter, Watkins suspicions about Goodwin's disability were confirmed and she knew, with certainty, that Goodwin had HIV and therefore concluded he was disabled.  Thereafter, her poor treatment of Goodwin worsened.

32.    Upon information and belief, Goodwin alleges that based upon this realization, Watkins believed that he was a homosexual.  Goodwin was aware of Watkins feelings of distaste for persons who are homosexual.  Specifically, in 1994 or 1995, Watkins, who was at that time friendly with Goodwin, called Goodwin to tell him that a former classmate of his had died of AIDS and that the death was because of his "risqué lifestyle."  Furthermore, in the spring of 1999 and other times throughout his employment, Watkins referred to gay students as having "sugar" in their "tank," meaning they were gay.

33.    Watkins, like Porter, began to question Goodwin's relationships with male students and, upon information and belief, frequently made comments to male students

6

discouraging them from visiting Goodwin and implying that Goodwin's relationship with male students was sexual in nature.

34.    Furthermore, upon information and belief, in April 2001, Porter, in a conversation with a student, accused Goodwin of having sexual relations with male students. When this student complained of this statement in writing to Goodwin, he brought the matter to HR and to the EEO office. Upon information and belief, no action was ever taken against Porter for this statement.

35.    In response to his March 2001 request for accommodation, Watkins expressed displeasure at the note, claimed she did not "understand" the note but refused to contact the doctor and refused the accommodation. Goodwin attempted to explain the request to her, but she waved him away as if she did not have time to speak with him.

36.    Subsequently, Goodwin frequently requested the accommodation, each time referencing his doctor's note. Each time Watkins brushed his request aside, stating she did not "understand" it.

37.    Specifically, in a June 21, 2001 email, Watkins again reprimanded Goodwin for arriving late. Goodwin went to her office and again discussed his need for an accommodation. He explained that she could contact his doctor. Watkins replice that she "did not understand" what the letter meant and that she had given him enough time to "get himself together" before returning to work in February 1999. Goodwin, again, asked her to contact his doctor. She refused to answer.

38.    In the meantime, upon information and belief, Watkins made comments during this time to students and staff members accusing Goodwin of having inappropriate

7

relations with male students and questioning male students who would come to visit Goodwin.

39. Watkins continued to send Goodwin reprimanding emails based on his late arrivals in October and November of 2001.

40. Goodwin attempted to arrive at work on time, in spite of the effects of his drug regimen. These attempts were usually unsuccessful. His incontinence often resulted in Goodwin needing to shower at Howard before beginning work. As a result, Goodwin was still late for work.

41. Determined to satisfy demands that he be at work at the regularly scheduled time, but unable to do so because of the effects of his morning drug regimen, Goodwin began to sleep overnight in his office.

42. Around this same time, Watkins began a campaign of harassment against Goodwin, including questioning students about their interactions with him, falsely accusing him of "title fraud" when students referred to him as "dean" and refusing him leave for the 2001 Christmas holidays.

43. On January 25, 2002, Goodwin received an unprecedented "interim evaluation" from Watkins. This evaluation focused on Goodwin's frequent late arrivals and alleged performance problems. Watkins, however, never explained what the alleged performance problems were.

44. In his meeting with Watkins, Goodwin specifically responded that he had problems with the fact that Watkins continued to write him up for being late and that she had ignored his request for a reasonable accommodation.

8

45.     Watkins responded, again, that she did not "understand" the doctor's note and brushed his request aside.  Again, Goodwin responded and asked her to contact his doctor to get the necessary information.  Watkins refused to do so.

46.     In February 2002, Watkins sent Goodwin an email and memo reiterating their discussion in the meeting.

47.     In February 2002, Goodwin complained to the Human Resources Department of the University about the denial of reasonable accommodation and the negative performance review.

48.     The Human Resources Department referred the matter to the General Counsel's Office and an EEO investigator was assigned.

49.     Watkins was instructed to rescind the threat of termination and to give a modified work schedule to accommodate his health situation, almost one year after Goodwin first requested the accommodation.

50.     Watkins, in response, sent Goodwin nine "objectives" to complete by March 25, at which time she promised to meet with Goodwin to discuss his progress. These objectives only covered tasks that Goodwin needed to complete, tasks that were part of his normal job responsibilities.  The memo only offered Goodwin a thirty-minute accommodation.  Upon a second directive from the General Counsel's office, Goodwin was finally offered a sufficiently modified work schedule.

51.     Immediately after his complaint, however, Watkins bad treatment of Goodwin worsened dramatically.  She began to strip Goodwin of even the most minor authority, including his ability to send mail out of the office.  Watkins also began to deny

Goodwin access to staff meetings. Furthermore, she refused to meet with him in person. All exchanges between them took place over e-mail.

52.    Watkins also began removing job responsibilities from Goodwin. For example, even though his duties included student orientation, on May 16, 2002, Watkins sent an email to others in the office, without informing Goodwin, telling them to no longer discuss orientation issues with him and to direct all inquiries to her instead.

53.    Watkins also, without giving proper notice to Goodwin, transferred Goodwin's voluminous hours of annual leave to his sick leave, which still held a deficit due to his lengthy illness at the beginning of his tenure. Upon contacting Human Resources about this, Goodwin was told that such removal was improper and that he should have been allowed Family Medical Leave Act time for his illness. Goodwin filled out the proper paperwork for any further leave that may become necessary due to his illness. He identified his disability as HIV in this paperwork.

54.    Later that spring, Howard University students voted Goodwin "Administrator of the Year." On the night he received the award, Goodwin overheard Watkins and Porter discussing his receipt of the award. In this conversation, they referred to him, among other things, as a "queer" and a "motherfucker." The statement was made that his "butt buddies" had "gotten together and decided to do this" and that they "were going to fix him."

55.    Regardless of these obstacles, Goodwin completed the nine objectives in the time assigned and reported his completion of assignments periodically to Watkins.

56.    Watkins, however, never offered to meet with Goodwin.

10

57.    On May 16, 2002, Goodwin received what he perceived to be a harassing email from Paulette Porter, his subordinate, which told him to "get a life." He reported this comment three separate times to Watkins between May 16 and May 20, 2002.

58.    In a May 17, 2002 email about this matter, Goodwin wrote, "An immediate response to this rather uncomfortable message would be most appreciated in light of the *hostile work environment* that I am currently experiencing under your leadership." (emphasis added)

59.    In response, in a May 17, 2002 email, Watkins accused Goodwin of being unprofessional.

60.    On May 22, 2002, Goodwin sent an email to Watkins in which he described the "degradation" he had had to suffer, and still suffered, from Watkins' management and treatment.

61.    On June 20, 2002, Watkins informed him that his contract for the following year's employment would not be renewed for alleged performance problems. When he inquired what the alleged problems were, since he had completed all the objectives assigned to him, Watkins refused to respond.

62.    However, regardless of the fact that Goodwin's employment ended on June 30, 2002, Watkins' reign of harassment did not end there. On May 6, 2003, she continued her inappropriate behavior, questioning a campus services employee about his relationship with Goodwin in a manner that surprised and created discomfort for the employee. Upon information and belief, Watkins seemed to be implying that this male employee's relationship with Goodwin was a sexual one.

11

63.    Furthermore, recently Goodwin, who is currently homeless and facing bankruptcy as a result of the University's actions, received a bill for over $500 for *student fees* he allegedly incurred while a student at Howard University from 1986 to 1990. Upon information and belief, Goodwin alleges that Watkins may have caused this bill to be sent to him.

## COUNT I

### (DCHRA , Rehabilitation Act & ADA—Retaliatory Termination)

64.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 63, as if set forth fully herein.

65.    Plaintiff alleges that when Watkins refused to renew his contract, she was retaliating against him for his requests for a reasonable accommodation. .

66.    This retaliation is a violation of ADA, 42 U.S.C. § 12112, the Rehabilitation Act, 29 U.S.C. § 794 and the Health and Human Services Regulations thereto, at 45 CFR Part 84 and the DCHRA, D.C. CODE §§ 2-1402.01 and 2-1402.61.

## COUNT II

67.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 66, as if set forth fully herein.

68.    Plaintiff alleges that when Watkins refused to renew his contract, she was retaliating against him for his requests for his subsequent EEO complaint.

69.    This retaliation is a violation of ADA, 42 U.S.C. § 12112, the Rehabilitation Act, 29 U.S.C. § 794 and the Health and Human Services Regulations thereto, at 45 CFR Part 84 and the DCHRA, D.C. CODE §§ 2-1402.01 and 2-1402.61.

## COUNT III

### (DCHRA, Rehabilitation Act & ADA—Failure to Accommodate)

70.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 69, as if set forth fully herein.

71.    Plaintiff alleges that when Watkins refused to renew his contract, she did so on the basis of his request for reasonable accommodation in the form of a later arrival time.

72.    This refusal to renew his contract, therefore, was a refusal to accommodate Plaintiff's disability and need for a modified work schedule.

73.    This refusal is a violation of the ADA, 42 U.S.C. § 12112 and the DCHRA, D.C. CODE §§ 2-1402.01 and 2-1402.61.

## COUNT III

### (DCHRA, Rehabilitation Act & ADA—Termination)

74.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 73, as if set forth fully herein.

75.    Plaintiff alleges that when Watkins refused to renew his contract, she did so on the basis of his disability or perceived disability.

76.    This failure to renew his contract on the basis of his disability or perceived disability is a violation of the ADA, 42 U.S.C. § 12112 and the DCHRA, D.C. CODE §§ 2-1402.01 and 2-1402.11.

## COUNT IV

### (Intentional Infliction of Emotional Distress)

77.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 76, as if set forth fully herein.

78.    Defendant Howard University, by and through its employees Watkins and Porter, and Defendant Belinda Watkins, individually, sought to inflict, and did inflict, severe emotional distress upon Plaintiff. To that end, Defendants engaged in a behavior that was severely harassing, abusive and intimidating. They deliberately sought to demoralize, harass, torment and ostracize Plaintiff, and to publicly and privately humiliate him.

79.    Defendants' conduct was extreme and outrageous. Defendants had extreme power, authority and leverage over Plaintiff by virtue of its control and influence over (a) Plaintiff's continued employment and livelihood and (2) his ability to remain an active part of the Howard University campus, which is very important to him as an alumnus. This behavior was further exacerbated by virtue of Plaintiff's emotional vulnerability due to his disability and resultant impending demise and his extreme financial dependency on his employment with the University.

80.    As a direct result of Defendants' conduct Plaintiff has suffered, and continues to suffer, severe emotional distress. Plaintiff's emotional distress has been severe, debilitating, long lasting and intensive. Plaintiff has lost his job, his home, and faces bankruptcy, all as a result of the extreme and outrageous acts committed by Defendants.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant relief as follows:

A.  Enter a declaratory judgment finding that the actions of Defendant Howard University alleged in this Complaint violated the ADA and the DCHRA;

B.  Award Plaintiff all of the back pay, front pay and the value of all of the benefits and other privileges of his employment that he lost as a result of Defendant's unlawful conduct;

C.  Award compensatory damages in an amount that would fully compensate Plaintiff for the economic loss, humiliation, embarrassment, emotional distress, and mental anguish caused by Defendants' violation of the federally and locally protected rights alleged in this Complaint;

D.  Award punitive damages in an amount that would punish Defendants for the willful, wanton, and reckless misconduct alleged in this Complaint and that would effectively deter Defendant from future discriminatory and retaliatory behavior;

E.  Award Plaintiff his reasonable attorneys' fees and costs; and

F.  Order all other relief deemed just and equitable by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

This, the ___ day of November, 2003.

Respectfully submitted,

Daniel Goodwin
Pro Se Plaintiff

P.O. Box 75693
WASHINGTON D.C. 20013

15

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| HOWARD UNIVERSITY | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No.: 8:06-cv-02076-DKC |
| BELINDA LIGHTFOOT WATKINS, | * | |
| Defendant. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## DECLARATION OF TIMOTHY F. MCCORMACK

I, TIMOTHY F. MCCORMACK, state:

1.     I am over 18 years of age, competent to testify, and have personal knowledge of the facts stated herein, all of which are true.

2.     I am an attorney admitted to practice before the Court of Appeals of Maryland and the District of Columbia Court of Appeals.

3.     From April 30, 2004, through the dismissal of the case on October 19, 2005, I represented Howard University in the matter *Daniel Goodwin v. Howard University, et al.,* Civil Action No 1:03CV-2447-RCL, United States District Court for the District of Columbia.

4.     During the mediation of the claims of Daniel Goodwin against Howard University and Belinda Lightfoot Watkins, United States Magistrate Judge Deborah A. Robinson directed me to periodically advise the attorneys for Watkins of the status of the negotiations with Goodwin.

5.     I did so periodically, including on October 25 and December 3, 2004.

6.     On October 25, 2004, I spoke by telephone with Timothy Romberger.  I advised him as to the then-current status of negotiations with Goodwin and told him that Howard

EXHIBIT

B

University believed that his client, Watkins, was responsible for Goodwin's claim against the University and, therefore, would expect Watkins to contribute to any financial settlement with Goodwin.

7.      On December 3, 2004, I again spoke by telephone with Romberger and again advised him as to the status of negotiations with Goodwin.  I told Mr. Romberger that the University and Goodwin were close to a settlement and that the University anticipated it would ultimately be required to pay Goodwin in excess of $200,000.00 to settle his claims against the University and Watkins.  I advised Mr. Romberger that the University was conditioning any settlement with Goodwin upon a release of the University and all of its officers, administrators and employees, including Watkins expressly.  I repeated to Mr. Romberger that the University believed that Watkins was responsible for Goodwin's claim against the University and that the University expected Watkins to contribute to any settlement with Goodwin and to terminate her employment with the University.  I proposed to Mr. Romberger that the University and Watkins enter into negotiations concerning the timing and circumstances of the termination of Watkins' employment with the University.

I DECLARE under the penalty of perjury that the foregoing is true and correct.

Executed on October 26, 2006.

Timothy P. McCormack

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | |
|---|---|
| HOWARD UNIVERSITY | * |
| Plaintiff, | * |
| v. | *   Civil Action No.: 8:06-cv-02076-DKC |
| BELINDA LIGHTFOOT WATKINS, | * |
| Defendant. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DECLARATION OF FRANKLIN CHAMBERS

I, FRANKLIN CHAMBERS, state:

1.    I am over 18 years of age, competent to testify, and have personal knowledge of the facts stated herein, all of which are true.

2.    I am the Vice Provost for Student Affairs of Howard University.

3.    I am familiar with the claims of Daniel Goodwin against Howard University and Belinda Lightfoot Watkins and the terms of the settlement of those claims.

4.    Howard University paid to or on behalf of Daniel Goodwin the aggregate sum of $253,000.00 in exchange for an express release of Goodwin's claims against both Howard University and Belinda Lightfoot Watkins.  Of the settlement payment, the sum of $35,000.00 was paid to Goodwin's attorneys, the sum of $55,000.00 was allocated to Goodwin's claim for back wages, and the sum of $163,000.00 was allocated to Goodwin's claim for intentional infliction of emotional distress.

5.    On January 10, 2006, I attended mediation on the charge brought by Watkins against Howard University before the District of Columbia Office of Human Rights.  Watkins was asked the basis for her charge against Howard University.  Watkins admitted that she had



EXHIBIT
C

brought her internal complaint at the University and her charges of discrimination before the DC

Office of Human Rights only after the University made demand upon her for contribution to the

Goodwin settlement. Watkins stated when she was told of the University's demand that she

contribute to the settlement of Goodwin's claims and terminate her employment with the

University because of her actions with regard to Goodwin, she thought the University's position

was unfair and after consulting with her attorney, she brought the unrelated claim to the

University's EEO Officer.

6.    Watkins' claim in her internal complaint on December 6, 2004, was that she was

the victim of age and gender discrimination because I had not appointed her permanent Dean of

Student Life and Activities. At the time Watkins made her internal complaint, the position of

Dean of Student Life and Activities was vacant and the University was undertaking a nationwide

search for a new dean. No decision had been made. Watkins' application was considered by the

University and she was interviewed by the University search committee in January 2005.

Ultimately, the University selected another woman for the position.

7.    Watkins' employment with the University was terminated on July 20, 2006,

because of her actions in the Goodwin matter, including fostering and tolerating a hostile work

environment and misrepresenting to the University's Office of the General Counsel of Howard

University and the Office of Human Resources Management the reasons for and circumstances

of her recommendation that Goodwin's appointment be terminated. The termination of Watkins'

employment with the University was not in any way in retaliation for her charge of

discrimination against the University.

I DECLARE under penalty of perjury that the foregoing is true and correct.

Executed on October 26, 2006

_____
Franklin Chambers

I DECLARE under penalty of perjury that the foregoing is true and correct.

Franklin D. Chambers, Ph.D.

Executed on October 26, 2006